Exhibit 1



1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------------x

KEITH TURNER,

                Plaintiff,                Index No.

             vs.                      06 CV 1910

NYU HOSPITALS CENTER, NYU MEDICAL

CENTER, NYU SCHOOL OF MEDICINE, and

NYU HEALTH SYSTEM,

                Defendants.

------------------------------------------x

                November 15, 2006

                10:07 a.m.

        Deposition of KEITH ALLAN TURNER, held

at the offices of Jones Hirsch Connors &

Bull P.C., One Battery Park Plaza, New York,

New York, pursuant to Notice, before Maureen

McCormick, a Notary Public of the State of

New York.

---

**Computer Reporting Incorporated** 

501 Fifth Avenue  New York, NY 10017
(212) 986-1344  Fax (212) 983-9149  www.crinyc.com

*K. Turner*

1

2 Q. Are you married?

3 A. Yes.

4 Q. What is your wife's name?

5 A. Dene Motoike.

6 Q. Does she live with you?

7 A. Yes.

8 Q. Do you have any children living with

9 you?

10 A. Yes.

11 Q. Tell me their names and ages.

12 A. One child, James.  13 years old.

13  MR. GOLDBERG:  Peter, I'm giving you a

14 copy of Mr. Turner's current resume that is

15 on the monster.com.  I think you are marking

16 it as Exhibit A.  Feel free to question Mr.

17 Mr. Turner about it.

18  (Defendant's Exhibit A, Resume, marked

19 for identification.)

20 Q. Take a look at what's been marked as

21 Exhibit A and tell me if that's the resume that

22 you posted at monster.com.

23 A. Yes.

24 Q. I wanted to ask you some questions

25 about your employment before you worked for NYU

*K. Turner*

1
2     recall.
3              In charge of the managers and the
4     staff.
5         Q.    Approximately how many people were
6     under your supervision in that job?
7         A.    Over 50, maybe.
8         Q.    Why did you leave that job?
9         A.    Relocation.
10        Q.    By relocation, was that a return to
11    the United States?
12        A.    Yes.
13        Q.    At the time that you were hired at NYU
14    Hospital, were you working at the Ardsley Acres
15    Hotel or were you unemployed?
16        A.    I was working at Ardsley Acres Hotel.
17        Q.    How did you hear about the possibility
18    that there would be a job at NYU Hospital?
19        A.    Through Joey.  The building service
20    director, Joey Morelos.
21        Q.    Did you know Mr. Morelos previously?
22        A.    Yes.
23        Q.    How did you know him?
24        A.    He had worked as an executive
25    housekeeper at the Intercontinental Hotel in New

1                          *K. Turner*

2    York.

3            Q.     Is that some place you had worked as

4    well?

5            A.     No.  No, it was not.

6            Q.     How did you know him in connection

7    with that hotel?

8            A.     My wife worked there.

9            Q.     So would it be fair to say he was a

10   social friend of yours at that time?

11           A.     Well, he was an associate.  He worked

12   for my wife.  Actually, he worked in her -- under

13   her supervision, so I knew him as a subordinate

14   and -- of my wife's, and through that connection,

15   and we did socialize on occasion.

16                  Is that accurate?

17           MR. GOLDBERG:  It's your testimony.

18           THE WITNESS:  I mean --

19           MR. GOLDBERG:  Just answer the

20           question.

21           THE WITNESS:  Yes.

22           Q.     When did he, if you know, stop working

23   at the Intercontinental and join NYU?

24           A.     I'm not sure.  My -- because we had

25   relocated to Westchester, so he was at the

K. *Turner*

1

2   Intercontinental when we left.  He was still

3   there, so from my understanding.  I wouldn't

4   guess, so --

5        Q.   As your attorney said, I don't want

6   you to guess.

7        A.   Right.

8        Q.   Did Mr. Morelos contact you to tell

9   you about the opportunity at NYU or did you

10  contact him or something else?

11       A.   I'm not certain how the

12  conversation -- it came up in conversation, but

13  who initiated the conversation, I'm not certain.

14       Q.   Do you recall what if anything he told

15  you about what job was available at NYU?

16       A.   In the conversation, I do remember

17  something about the fact was I looking -- still

18  looking for work or seeking employment.  There was

19  something available.  He had something available

20  that he thought I was suitable for, knowing my

21  background, my experience.

22       Q.   Did he tell you what the job consisted

23  of?

24       A.   Managing a staff in the building

25  service department that he was the director of,

1                          K. Turner

2      and that it was in the housekeeping division, and

3      that it was a large staff, and that he thought I

4      would -- even though I had a food and bench

5      background, I had an extensive managerial

6      background worldwide.  Managerial background, and

7      I would fit in well.

8            Q.    Did he tell you whether that

9      managerial position was vacant at the time or were

10     you replacing an existing manager?

11           A.    I don't recall.  I don't recall.

12           Q.    Did you have any interviews with

13     anybody other than Mr. Morelos before being hired

14     at NYU?

15           A.    You mean at NYU?

16           Q.    Yes.

17                 Other than speaking to Mr. Morelos, as

18     I just related, did you come in and have

19     interviews with anybody else that worked at NYU?

20           A.    I had not before the conversation with

21     Mr. Morelos.  After that.

22           Q.    After that, tell me who you

23     interviewed with at NYU.

24           A.    Mr. DeGazon and Ms. Pineda.

25           Q.    What was Mr. DeGazon's position at

K. *Turner*

1

2    that time?  Do you know?

3       A.    Assistant director of building

4    services.

5       Q.    And Ms. Pineda?

6       A.    Operations manager, building services.

7       Q.    Tell me what you can recall about

8    those interviews.

9       A.    They went over my record, my

10    background, asked me questions about my resume,

11    where I worked, and what they were looking for,

12    what type of individual, what they needed, what

13    they were trying to accomplish in the housekeeping

14    division, building services, and what kind of

15    assistance Ms. Pineda was looking for, what kind

16    of assistant, what kind of manager she was looking

17    for, that type...

18       Q.    Do you recall what she told you about

19    the type of manager she was looking for?

20       A.    Just not -- well, basic skills that I

21    had.  You know, someone with confidence and

22    ability to manage a large staff and to mete out

23    disciplinary -- you know, adhere to disciplinary

24    guidelines and things of that nature, make sure

25    that the procedures and policies of the department

*K. Turner*

1

2  would be followed and adhered to.

3      Q.    Did Mr. Morelos before you were hired

4  tell you anything about his opinions or relations

5  with Mr. DeGazon or Ms. Pineda?

6      **MR. GOLDBERG:**  Before Keith was hired?

7      **MR. SHAPIRO:**  Yes.

8      A.    I can't recall.  Opinions of them, of

9  the --

10      Q.    Yes.

11      **MR. GOLDBERG:**  Before you were hired.

12      A.    Not -- I can't recall anything in

13  general terms, no.

14      Q.    Do you recall what month and year this

15  interview process was taking place in?

16      A.    It was 2002 I was hired, so it was --

17  must have been in August or -- I was hired in

18  September, so it had to be August or September.

19      Q.    Did someone contact you and tell you

20  you were hired?

21      A.    Yes.  How I was contacted, I don't

22  recall.

23      Q.    You accepted the job?

24      A.    Yes.

25      Q.    Do you recall what your starting

1                          *K. Turner*

2      salary was?

3            A.    58,000 something.

4            Q.    When you started work, who, if anyone,

5      were you reporting to directly?

6            A.    Hilda Pineda and DeGazon.

7            Q.    Were you reporting to Mr. DeGazon

8      directly or through Ms. Pineda?

9            A.    First Pineda, and Ms. Pineda and Mr.

10     DeGazon.  Their offices were next to each other,

11     and I -- I was in communication with both.  Most

12     direct with Ms. Pineda.

13           Q.    What was your title?

14           A.    Day manager building services.

15           Q.    At that time, were there any other

16     employees who held the title of manager in

17     building services?

18           A.    Yes.

19           Q.    Who were those people?

20           A.    Bozena Sutowski.

21           Q.    Anybody else?

22           A.    There was manager Frank -- he was

23     manager building services, Frank Trujillo.  He

24     was -- he worked in the evenings.

25           Q.    What were your hours?

1                       *K. Turner*

2        A.    Day manager, basically eight to four.

3        Q.    At the time you started, were your

4    duties and Mr. Sutowski's divided in any

5    particular way?

6        A.    No.

7        Q.    You shared the same duties; is that

8    correct?

9        A.    Yes.

10       Q.    Tell me generally what those duties

11   were.

12       A.    A daily check -- checking in of the

13   staff, housekeeping staff for Tisch Hospital,

14   floors 6 through 17 -- or I'm sorry -- floors 2

15   through 17.  I'm sorry.  Can I check that?  Floors

16   lobby through 17.  It's been a few years.

17            Those were the daily check-ins of all

18   the staff from lobby through 17 in Tisch Hospital.

19       Q.    Were there any other locations that

20   the building services department was responsible

21   for?

22       A.    Yes, the Rusk Institute, and it also

23   had another name, which -- they had different

24   names, but I can't recall at this time what it was

25   called, but it was the Rusk building, and building

1                              *K. Turner*

2    called HCC.

3         Q.    Were you and Ms. Sutowski also

4    responsible for the housekeeping staff at those

5    locations?

6         A.    Yes.

7         Q.    Did you have an office?

8         A.    Yes.

9         Q.    Where was your office?

10        A.    We had two offices.  My office was

11   located in HCC building, and we had a main office

12   in Tisch building in the basement.

13        Q.    Did you work out of that location at

14   times?

15        A.    Every morning.

16        Q.    Where was Ms. Sutowski's office?

17        A.    She had an office adjacent to the --

18   our main gathering office, check-in office, in the

19   basement of Tisch.

20        Q.    Where were the offices of Mr. DeGazon

21   and Ms. Pineda that you described earlier?

22        A.    Across the street, and the building

23   I -- it escapes me at the moment.

24        Q.    Separate building?

25        A.    A separate building across the street

*K. Turner*

1

2    A.    In addition to the daily check-ins,

3    there were advising -- making sure the policies

4    and procedures were being followed by all staff,

5    inspections of all the floors, coordinating the

6    daily activities with the nurses' stations, and

7    coordinating all building service activities with

8    the different departments throughout the hospital,

9    attending -- making sure that all training was

10   being followed by new staff, and the evaluations

11   of all staff was updated and current, all human

12   resource policies regarding training, disciplinary

13   guidelines, were being followed, all reports were

14   being -- daily reports were filled out and given

15   to my superiors, issues, such as -- well,

16   training, again, staff development, infection

17   control issues, fair and safety issues.

18         All those types of procedures that

19   needed to be done and updated.  The equipment --

20   equipment -- how do you say?  Condition of

21   equipment was -- everything was in working order.

22   Supplies, adequate supplies being provided for the

23   employees.

24         All of these types of things on a

25   daily basis and answering calls throughout the day

1                            *K. Turner*

2      through the various departments for a million

3      square feet in every department throughout the

4      various buildings.

5                    Those were some of the things that I

6      recall.

7           Q.     When you first started at NYU, was any

8      kind of training for these various duties

9      provided?

10          A.     I had some management -- I would say

11     not practical meetings, but management theory, I

12     would say, through Mr. DeGazon.  Maybe three

13     meetings of things that I found that were -- there

14     was an HR program as well that was attended, an

15     introduction, a beginnings -- I think it was

16     called new beginnings.  It was an HR program as an

17     orientation program provided by human resources at

18     NYU.

19                    In addition, Mr. DeGazon gave, I

20     think, three meetings of his own that were

21     management theory based, not practical use to me.

22          Q.     In the various meetings that you just

23     described, were those all within the first month

24     or two after you started?

25          A.     The human resource orientation

1                          *K. Turner*

2          A.     I'm sorry?   Once I became employed

3     there or --

4          Q.     Yes, if you had encountered any

5     problems in interpersonal relations with any of

6     the other employees.

7                 MR. GOLDBERG:   Are you saying did he

8          have issues with other employees?

9                 MR. SHAPIRO:   Yes.

10                MR. GOLDBERG:   Any particular time

11         frame?   The whole 18 months?

12         Q.     Starting at any point from when you

13    started forward, did you begin to experience any

14    problems in your mind?   And if so, tell me about

15    the first such problems you encountered.

16         A.     There were -- when there were issues

17    with people occasionally who weren't following the

18    policies and procedures of the department, then

19    normally I would sit and maybe counsel people,

20    employees, of either some type of infraction.

21                There were times I was instructed

22    through DeGazon or Pineda to -- that -- encouraged

23    to be more heavy handed and demanded that I create

24    more of an example, let's say, or use more

25    disciplinary force.

K. *Turner*

1
2      It was expected of me, so there
3 were -- there were union hearings and so forth on
4 certain individuals from time to time.
5      Q.    Were those union hearings as a result
6 of your having to impose more discipline pursuant
7 to your superiors' directives?
8      A.    I would say at -- there were some --
9 there were a few cases like that, yes.  I don't
10 know how many or -- how many people just weren't
11 following -- I can't say how many, but yes, there
12 were incidents like that.
13      Q.    Do you know when the first time was
14 that Ms. Pineda or Mr. DeGazon told you that you
15 needed to be more of a disciplinarian, if that's
16 an accurate characterization of your testimony?
17      MR. GOLDBERG:  And I'll just make my
18           little objection that you don't have to --
19           if he characterized your testimony in a way
20           that's not quite the way you meant it, you
21           should clarify that when you answer his
22           question.
23      A.    Okay.  I will clarify in this way:  As
24 part of my job, when people weren't following
25 disciplinary guidelines, it was my job to issue

K. *Turner*

1
2  warnings or issue the disciplinary action.

3         Was it my job to, you know, force, you

4  know, continue the issue to resolve it in such a

5  manner where it created a work environment like

6  that where it led to union hearings?  I don't know

7  if we needed to go down that path all the time is

8  what I'm saying.

9         At the insistence of Pineda and

10  DeGazon, and certain instances, that did happen,

11  so I thought either perhaps myself or the other

12  managers were being disciplinarian enough, and in

13  their view it wasn't at times.  They thought it

14  needed to be more.

15      Q.   My question is:  When, if you can

16  recall, was the first time that either of them

17  made clear that they thought in any instance --

18  wait until I finish the question -- that more

19  discipline was appropriate?

20         Is that something you would be able to

21  say happened within the first two months, six

22  months?

23      A.   I couldn't say.  We'd have to go

24  through the records.  There's union records I'm

25  sure of the disciplinary action.

1                          *K. Turner*

2   RQ           **MR. GOLDBERG:**  We would request the

3            plaintiff's side that to the extent this is

4            an issue that you believe is relevant to the

5            case, Peter, we would ask that you produce

6            the union files for the employees that you

7            are talking about, who you haven't named, so

8            that my client could then read the records,

9            refresh his recollection and testify about

10           union employees that were put through any

11           type of discipline, because I don't think he

12           can really testify without seeing those

13           files.

14                **MR. SHAPIRO:**  I'm not aware of who

15           they are, so...

16                **MR. GOLDBERG:**  Okay.

17           Q.    How was your working relationship with

18   Ms. Sutowski?

19           A.    Ms. Sutowski and I didn't -- we worked

20   very hard.  It's working in a large hospital like

21   that, there's a lot of requirements, pretty --

22   very hectic days.  Didn't always agree on -- see

23   eye to eye on certain ways of going about getting

24   things done, let's say, or resolving certain

25   situations, but -- so occasionally something would

*K. Turner*

1

2    come up.

3             Again, I would point out that didn't

4    go unnoticed or untreated, I would say, by my

5    superiors.

6             Q.    What did you your superiors do?

7             A.    In my opinion?

8             Q.    You said it didn't go unnoticed, and

9    I'm asking if they noticed and then did something,

10   and if so, what did they do.

11            A.    They mentioned the fact that they knew

12   there was some friction there or something.  I

13   think they mentioned it in a form -- I think they

14   created it intentionally.  I mean, not -- they

15   didn't create the friction.

16            I think they kept the divide and

17   conquer.  Instead of bringing us together, they

18   intentionally worked on any -- any kind of

19   conflict, or let's say they were -- I think that

20   suited them that there was a conflict.

21            Q.    When referring to they, tell me

22   specifically who you are talking about.

23            A.    Ms. Pineda and Mr. DeGazon.

24            Q.    What was your opinion as to why that

25   suited them?

K. Turner

1
2      A.      It suited them because eventually they
3   were hoping that one of us would leave.   They were
4   hoping we didn't work out any differences, that we
5   didn't come together, we didn't resolve any
6   issues, and that one of us would leave.
7      Q.      Did anybody ever tell you that that
8   was their hope or intention?
9      A.      Did anybody tell me they wanted to --
10  they wanted us to leave?
11     Q.      Prior to the time, obviously, that you
12  both left, was there any comment by anybody that
13  they wanted you to leave or they wanted her to
14  leave?
15     A.      Well, I know Mr. DeGazon never wanted
16  me hired.
17     Q.      How do you know that?
18     A.      Mr. Morelos at one point during my
19  employment told me that.   They told me that -- he
20  told me -- Mr. Morelos told me at one point -- I
21  don't know where it was.   I believe during rounds
22  or at one point when I mentioned things --
23  something wasn't right or why I was being targeted
24  or selected for certain type of treatment, which I
25  didn't bring to Mr. Morelos's -- I didn't want

1                                    *K. Turner*

2     to -- I respected him too much to keep complaining

3     to him, but I did mention something to him, and he

4     mentioned to me that Mr. DeGazon and Ms. Pineda

5     did not want to put me forward for hire.  They

6     wanted to hire Mr. Robert Stephen prior to my

7     coming aboard.

8              Q.    Do you have any ability to approximate

9     when this conversation with Mr. Morelos took

10    place?

11             A.    I was trying to recall, and I knew --

12    I know -- I knew -- I know it took place.  Where

13    in the hospital I was trying to -- and I was

14    trying to recall what prompted the conversation.

15    It was something I was mentioning about some type

16    of -- something I was concerned about, some

17    treatment I was receiving, and then it made sense

18    to me because I couldn't understand why I was

19    being treated a certain way, and then it made

20    sense to me that I wasn't really -- that I was

21    never wanted there by Mr. DeGazon.

22             Q.    Do you remember what the specific

23    issue was at that time that caused you to speak to

24    Mr. Morelos about that?

25             A.    No.  Mr. DeGazon used to -- would come

*K. Turner*

1
2  to the daily check-in every day, and why he would
3  come to the daily check-in every day, I can
4  only -- I know why.  It -- that was part of the
5  problem.
6          Q.    How was his coming to the daily
7  check-in part of the problem?
8          A.    Well, it was -- to create a hostile
9  environment.  His office was across the street.
10         Q.    What did he do when he came to those
11 daily check-ins that created a hostile
12 environment?
13         A.    He would stand in the corner with Mr.
14 Stephen while Boz Sutowski and myself would do the
15 daily check-in and show his support or his
16 preferential treatment for Mr. Stephen in view of
17 -- full view of the staff as they checked in
18 daily, either in the office or out in the hallway,
19 just in case they didn't see him in the office.
20         Q.    What was the preferential treatment
21 that he exhibited during those check-ins?
22         A.    Conversing with him, standing there
23 with him, cavorting with him, having coffee with
24 him.
25                Nothing to do with our business of

*K. Turner*

1
2   checking in.   Pointing out some minor points of
3   content or whatever, just making small points of
4   something that -- petty -- not infractions, just
5   petty preferences, let's say, that he had about
6   some way the check-in should be done or a person
7   or why something wasn't being done basically on a
8   daily basis.
9        Q.   When he did that, did that have to do
10  with criticism that he made of you or Ms.
11  Sutowski's work or issues that had arisen?
12             Is that what you were referring to
13  when you were talking about him pointing out minor
14  points?  Was that in effect his commenting on
15  issues that were arising in the building services
16  department in front of employees as part of this
17  check-in?
18        A.   No, I think it was an illustration to
19  Mr. Stephen that -- maybe preparing him for this
20  position.  I don't know, that when they're down --
21  this is how you do it.  I'm not sure why.  It was
22  a harassment.  To me, it was harassment.  It was
23  unnecessary and harassment.
24        Q.   So am I correct what you're saying
25  while he was conversing with Mr. Stephen, part of

1                        *K. Turner*

2      the content of the conversations was commenting on

3      the work that you and Ms. Sutowski were doing?

4          A.      Not so much work.  It might be an

5      employee or something.  It could have been

6      anything.  I can't say.  Sometimes it wasn't a

7      comment.  Sometimes it was a -- could be a stare,

8      a stern look, a look of disapproval.  Could be

9      anything.

10              Wasn't necessarily a comment.  Didn't

11     have to be a comment.  Just the fact that he was

12     there and where he -- and where he was.

13         Q.      In terms of the times that there were

14     statements, I'm trying to understand exactly what

15     you are saying.

16         A.      What I'm trying to say is he was

17     undermining our position, our ability, our

18     authority to do the job properly.

19              He was -- it's more than micromanage.

20     Micromanage you can handle.  That was more than

21     micromanage.  That was the display of -- I don't

22     know.  That was harassment.  That was creating a

23     hostile work environment.  We were working under

24     duress.

25              I would like to make an analogy, but I

*K. Turner*

1

2 can't at this point, but it was uncomfortable, and

3 it was unnecessary, and it was harassment.

4     Q.    Let me again try to clarify just the

5 comments part of it.

6         What I'm asking is if you heard Mr.

7 DeGazon making comments to Mr. Stephen that you

8 found harassing or objectionable, and if so, if

9 you can recall the content of any of those

10 comments.

11         **MR. GOLDBERG:**  I think just to make

12         sure I understand, too, I think what Keith

13         was saying -- and I'm not trying to take the

14         dep away from you, but what I think Keith

15         was saying is DeGazon was almost coaching or

16         preparing Stephen as to how he would like

17         things done and saying things in the way --

18         **THE WITNESS:**  No, that's to Stephen --

19         **MR. GOLDBERG:**  Undermining Keith and

20         Bozena.  I think that's what Keith said, but

21         if I'm wrong, you should clarify.

22         **THE WITNESS:**  I couldn't always hear.

23         You know, I didn't hear all the comments,

24         but I'm -- all I'm saying is -- what I'm

25         saying is it was quite obvious that his --

K. *Turner*

1

2      by his positioning in the -- his office is

3      across the street.

4            We are two managers trying to do our

5      job.  He comes in and positions himself with

6      our subordinate and to -- to do what?  To

7      show -- is he supporting us?  Is he going

8      over anything to manage our building

9      services?

10           No.  His only purpose there was to

11     harass us and to undermine our authority.

12     That is what I'm saying.

13     Q.    Did this happen every day?

14     A.    Just about, yes.  Very rarely was

15     there a day he wasn't there.

16     Q.    On those occasions when you could hear

17     what he was saying to Mr. Stephen, do you have any

18     recollection today of anything specific that he

19     said?

20     A.    No.

21     Q.    When you spoke to Mr. Morelos and he

22     told you that Mr. DeGazon hadn't wanted to hire

23     you, did he tell you anything about whether Mr.

24     Stephen had been proposed or considered for the

25     managerial position?

1                          *K. Turner*

2    daily check-ins?

3           A.     I told Mr. Reginald Odom.

4           Q.     Who was Mr. Odom?

5           A.     He -- I don't know his title.  He

6    worked in human resources.

7           Q.     How did you get in touch with him?

8           A.     I phoned him.  I spoke to him, set up

9    a meeting.

10          Q.     Do you know how you got his name?

11          A.     Through Ms. Sutowski.

12          Q.     Do you know how Ms. Sutowski knew his

13   name?

14          A.     She knew more about the people, and

15   she worked there before I did.  She had more

16   contact, contact with people.

17          Q.     Did Ms. Sutowski tell you whether she

18   had been having any communications with anyone

19   from human resources about any issues that she was

20   concerned about?

21          A.     Yes.

22          Q.     What did she tell you?

23          A.     Just that she had a meeting at -- in

24   HR.

25          Q.     Did she say that was with Mr. Odom?

1                              *K. Turner*

2          word I said, I don't believe.

3          Q.    Tell me what you told him.   Tell me

4     any questions he asked, any responses he had,

5     basically what you can recall.

6                I understand you are not going to

7     recall every, single thing, but whatever you do

8     recall.

9          A.    I recall voicing concerns about the

10    department.  Well, what I've said previous, that

11    the undermining of the department by Mr. DeGazon's

12    actions, which I considered to be harassment,

13    being undermined on a daily basis by the check--in,

14    basically the supervisors knowing that they didn't

15    have to abide by anything, our authority, both

16    Sutowski's and mine, as the managers of the

17    department, because Mr. DeGazon and Ms. Pineda,

18    who hired the supervisors, were there every day to

19    make sure and protect them, that we couldn't do

20    our job properly, and the reason for that is I

21    believe, for instance, was my race and Ms.

22    Sutowski's race.

23         Q.    Is that something you said to Mr.

24    Odom?

25         A.    I said favoritism.  I believe I said

K. Turner

the favoritism.  I didn't -- I don't think I used
the word racist.  I may have.  I don't recall.  I
know I used the word -- you have to understand Mr.
Odom is black, and I know Mr. DeGazon had been
there 35 years.  I don't know how long Mr. Odom
had been there.

I knew Mr. DeGazon had a very good
relationship with human resources.  I was trying
to bring up a complaint.  I was trying to tread
lightly.  I didn't know -- I didn't want
retaliation, and so I used the word favoritism.  I
didn't want to call -- I was trying to be careful,
I suppose, so I don't know if I -- I wanted to say
certain things, but I was trying to be careful at
the same -- in the same way, because I was looking
at a black man trying to complain about another
black man, who had a long connection and history
together, so I used words like favoritism being --
I said being from St. Lucia, describing that Mr.
Stephen was of the same race and of the same
national origin.

I don't know if I used the -- I said
same -- you know, same race and using favoritism,
and...

K. *Turner*

1

2     Q.    Sir, did you say both race and

3    national origin or just one?

4     A.    Maybe race.  I am not -- I can't

5    recall totally, but I -- the point was quite clear

6    that I was being treated unfavorably and I was --

7    because of -- it was made it quite clear to Mr.

8    Odom there was -- shouldn't have been any doubt in

9    Mr. Odom -- whatever words he wanted to put into

10    it, when I walked out of that room, Mr. Odom knew

11    how I felt, and he knew how Boz Sutowski felt.

12     Q.    Ms. Sutowski wasn't at the meeting

13    with you, I take it, though?

14     A.    No, but we were both Caucasian, and we

15    were both complaining about the same unfair

16    treatment.

17     Q.    You believe he knew how Ms. Sutowski

18    felt because she had her own meetings with him; is

19    that correct?

20     A.    I believe so.  I believe it was

21    basically -- I mean, I don't know the details, but

22    basically the whole harassment, undermining the

23    department, undermining our authority to run a

24    department.

25     Q.    Try to listen to my question.  I'm not

K. Turner

2    from Mr. Stephen?

3        A.    Not as much as Mr. Stephen.   Mr.

4    Stephen -- I would say they were -- if -- you want

5    my opinion?

6        Q.    Yes.

7        A.    I would say they showed favorable

8    treatment over, say, someone like Sutowski and Mr.

9    Turner.   They showed more favorable -- they were

10   nicer to the other supervisors than they were to

11   the management in that department.

12       Q.    Were there any particular individuals

13   among the supervisors that they were particularly

14   favorable towards, other than --

15       A.    Ms. Pineda was favorable to Ms.

16   Rodriguez because they spoke Spanish.

17       Q.    What is the basis for that conclusion

18   by you?

19       A.    In the main office in the daily

20   check-ins, Ms. Pineda would speak Spanish to Ms.

21   Rodriguez on a daily basis, and in fact told me I

22   should learn to speak Spanish.

23       Q.    Tell me about the rest of the

24   conversation, if there was one, in which she made

25   that comment.

1                        *K. Turner*

2          A.     Excuse me?  I was present in the

3    office.  They were having a conversation in

4    Spanish.  She looked at me.  I don't speak

5    Spanish, and Ms. Pineda told me that I should

6    learn to speak Spanish, and I don't believe I

7    replied.  I don't know.

8          Q.     Do you know whether they were speaking

9    about work or about something else?

10         A.     I don't speak Spanish.  I don't know.

11         Q.     When she said that to you, was she

12   serious, laughing, smiling?

13               How would you describe her?

14         A.     I would describe her as wanting me to

15   learn to speak Spanish.

16         Q.     Was she smiling?

17         A.     I don't recall.

18         Q.     Do you know when this conversation

19   took place?

20         A.     In the morning in the main office

21   after -- after Ms. Rodriguez was hired.  I don't

22   know how long after.

23         Q.     Do you know what year that was?

24         A.     No.

25         Q.     Other than speaking Spanish with Ms.

1                              *K. Turner*

2                   (Defendant's Exhibit C, Documents

3              Bearing Bates Nos. N 0709 through 0730,

4              marked for identification.)

5         Q.    I ask you to take a look at the

6    documents that have been marked and take the time

7    you need to review them and let me know when you

8    are done, and I'll ask you some questions about

9    them.

10                 (Recess taken.)

11             **THE WITNESS:**  Okay.

12        Q.    I've just asked you to review and you

13   have reviewed a series of memos and some

14   attachments to some of the memos.

15                 Are there any of the memos in this

16   packet that you specifically recall seeing?

17        A.    I probably have seen them -- these

18   date back to 2002, upon my arrival, so yes, I've

19   seen them.  I don't remember seeing the -- this

20   attendance one.

21        Q.    By Bates number, we refer to the

22   number in the lower right-hand corner.

23             **MR. GOLDBERG:**  N 0727.  It's not

24             addressed to Keith.

25        Q.    Is that the document you were

K. Turner

1

2     referring to?

3          A.     I'm sorry?

4          MR. GOLDBERG:   N 0727 is not addressed

5     to Keith.

6          Q.     Why don't you look at that one and

7     tell me if you have seen that one before.

8          A.     Yes, that's right.  That's correct.

9     That's addressed to --

10         Q.     Have you ever seen that before?

11         A.     No.

12         Q.     Other than what you might have seen in

13    connection with discovery in this case, did you

14    ever see it back in 2003?

15         A.     I don't believe so.

16         Q.     You made reference to another document

17    that you didn't recall having seen.  Can you tell

18    me what the Bates number is of that?  Is that 729?

19         A.     No, I think that was it.  No, I think

20    I've seen -- that was the one.

21         Q.     Looking at the document marked N 710,

22    dated October 2, 2002, do you have any

23    recollection of having spoken to Mr. DeGazon or

24    Ms. Pineda about the subject matter of this memo

25    at or about that time?

1                          *K. Turner*

2                  MR. GOLDBERG:  Your question is did he

3         discuss what's in the memo with DeGazon or

4         Pineda?

5                  MR. SHAPIRO:  At or about that time.

6                  MR. GOLDBERG:  Around about October 2,

7         2002?

8                  MR. SHAPIRO:  Yes.

9         A.    No, I don't, because --

10                 MR. GOLDBERG:  It's just yes or no.

11                 THE WITNESS:  No.

12        Q.    The next document, 711, dated October

13        14, 2002, is a memo that you are CCed on.

14                 Do you have any recollection of

15        speaking to Mr. DeGazon or Ms. Pineda about the

16        subject matter of this memo at or about that time?

17        A.    No.

18        Q.    712 is a March 6, 2003, memo to you

19        from Ms. Pineda.

20                 Do you have any recollection of having

21        a discussion with Ms. Pineda or Mr. DeGazon or Mr.

22        Morelos about the subject matter of this memo at

23        or about that time?

24        A.    No.  Can I say something?

25                 MR. GOLDBERG:  He's asking you a very

1                              *K. Turner*

2          simple question.  Did you discuss what's in

3          this memo at this time with these people?

4                  THE WITNESS:  No.  I remember getting

5          these memos or seeing these memos, but I

6          don't remember discussing these memos.

7              Q.    Not discussing the memos, but the

8     subject matter of the memos.

9              A.    At that time, no.

10             Q.    Let me ask you -- for the previous

11    ones we have just been discussing, I referred to

12    them as memos.

13                 Do you recall whether at the time you

14    received 711, 712, and 713 that was by e-mail?

15             A.    Can you go over that again?  711 is --

16             Q.    711, 712, and 713, were those e-mails

17    that you received?  Do you know?

18             A.    Either e-mails or put in my mail box.

19             Q.    714 is an August 19, 2003, memo from

20    Ms. Pineda to you.  Do you recall discussing that

21    with her at or about that time?

22             A.    713?

23             Q.    714.

24                  MR. GOLDBERG:  It's addressed to

25          Bozena Sutowski, but it's a highlighter

K. Turner

1

2          copy.

3                    MR. SHAPIRO:   Yes.

4          A.     Yes.

5          Q.     Was there a discussion about the

6     subject matter of this at that time?

7          A.     Yes.

8          Q.     What was the discussion and who was it

9     with?

10         A.     There was a discussion regarding the

11    answering of the pagers.

12         Q.     Did you have a response to the

13    concerns that Ms. Pineda voices in this memo?

14         A.     Yes, I -- I did respond to it.   I --

15    actually, I believe I did.   I think it's here.   I

16    wrote a memo to -- apology to -- they were making

17    an issue, they meaning Hilda Pineda was making an

18    issue about my beeper response time.

19               I thought it was not just -- it wasn't

20    just me not answering.   I was being inundated with

21    calls, faulty equipment.   If you go there now,

22    you'll find that the communications department had

23    a couple of drawers full of -- after using the

24    same product, faulty beepers, so there were a few

25    issues, and I did acknowledge that, and I vowed to

1                          *K. Turner*

2          Q.     The next document appears to be a

3     two-page document, N 718 to 719.

4                 Did you see this document at any time

5     in or about 2003?

6          A.     I believe so.

7          Q.     Do you recall in what connection you

8     saw it?

9          A.     I think it's part of a competency

10    assessment form, part of the orientation

11    or in-service training.

12         Q.     Did you have any discussion with Ms.

13    Pineda about this form or the subject matter of

14    any competency assessment that she was analyzing?

15         A.     Did I have any conversation?

16         Q.     With her at or about this time?

17         A.     I don't recall.

18         Q.     We will move to document N 722, a memo

19    to you from Ms. Pineda dated March 13, 2003.

20                Do you have any recollection of

21    discussing the subject matter of this memo with

22    Ms. Pineda at or about that time?

23         A.     I don't recall conversation.

24         Q.     The next memo is a two-page memo N 723

25    to 724 from Ms. Pineda to you and Ms. Sutowski

1                              *K. Turner*

2    concerning a meeting that was held on April 9,

3    2003.  Do you recall that meeting?

4           A.    Yes.

5           Q.    Can you tell me how that meeting came

6    to be held?

7           A.    There was a -- a meeting regarding how

8    things should be divided, separated out, and who

9    should be more responsible for what areas, just a

10   report of what -- to be more effective of getting

11   the policies and procedures followed, and in

12   communication there was some concern that was

13   reported by supervisors to Ms. Pineda that Ms.

14   Sutowski and I weren't communicating to their

15   satisfaction, apparently, and so she had a meeting

16   based on that false assumption.

17          Q.    Did you feel that at or about this

18   time your level of communication with Ms. Sutowski

19   was satisfactory?

20          A.    We were doing the job.  We were

21   getting the job done.  I felt at all times Ms.

22   Sutowski and I worked very hard and very

23   effectively, and we got the job done.

24                We did it, worked hard and got the job

25   done satisfactorily, yes.

K. Turner

1

2      Q.     Do you know who among the supervisory

3  staff made any comments to Ms. Pineda or anyone

4  else at a level above you that expressed concerns

5  about communications between you and Ms. Sutowski?

6      A.     It's common knowledge between Boz and

7  myself who the people were.  We didn't have

8  specific -- something would happen in the

9  department and then Ms. Pineda would have

10  knowledge of it instantaneously, and so it was

11  quite obvious to us who was reporting that to Ms.

12  Pineda at a certain time.

13              What exactly that would be right at

14  the point, right now, I couldn't recall what would

15  happen, but we knew who and what.

16      Q.     Who were the people that you

17  understood were communicating directly with Ms.

18  Pineda?

19      A.     Mr. Lewis, Mr. Stephen, Ms. Barr, Mr.

20  Oliveros, Ms. Rodriguez, maybe Mr. Majeed, as far

21  as supervisors that --

22      Q.     Was that substantially all the

23  supervisors, all or most of whom you identified

24  earlier?

25              Are there any that you would exclude

K. Turner

2      from that list of people who had a direct

3      communication?

4            A.      There was -- that I exclude?

5            Q.      Yes.

6            A.      Exclude from the list, Jesse, which

7      I -- I don't have Jesse's last name.   I'm drawing

8      a blank.   Magda Aybar I would exclude from that

9      list.

10           Q.      At this meeting, was anyone present

11     other than Ms. Pineda, Ms. Sutowski, and you?

12           A.      I don't recall.

13           Q.      During the meeting, did you make any

14     statements objecting to any of the conclusions

15     that Ms. Pineda was reaching as set forth in this

16     memo?

17           A.      I don't recall if I made any comments.

18           Q.      Do you recall whether Ms. Sutowski

19     made any comments during the meeting?

20           A.      No, I don't.

21           Q.      After the meeting, did you make any

22     complaints about the comments by Ms. Pineda to Mr.

23     Morelos or anybody else?

24           A.      I don't recall.

25           Q.      From April 10, 2003, forward, was the

1                           K. Turner

2      division of responsibilities that's set forth in

3      this memo something that was adhered to?

4          A.     No, not really.   It was -- these areas

5      were divided.   These were our main

6      responsibilities, meaning if something happened on

7      a 10th Floor when I -- when we were both at work,

8      it was my main responsibility, not Boz's, if

9      something happened on the 17th Floor when we were

10     both at work, it was her -- mostly her

11     responsibility, not mine, but we answered calls --

12     if she were at lunch on a break, we answered calls

13     for each other's areas on a daily basis, and on

14     weekends when we worked, obviously we covered each

15     other's areas, holidays, so we received so many

16     calls that it was hard.

17                You didn't not answer a call because

18     it wasn't your area, so it was interchangeable.

19     We -- but for a major -- well, not major, but for

20     some -- I can't even say for inspection purposes,

21     because just up until June when I -- two days

22     before I left, I did major inspections on the 17th

23     Floor with notes given to Ms. Rodriguez, detailed

24     inspections of each room on the 17th Floor and on

25     other floors that were not necessarily my area.

1                              *K. Turner*

2                    Those are Boz Sutowski's areas, so

3       even up to the day I left, I was working in her

4       areas and she on mine, so no.

5              Q.    Was there any change in terms of what

6       the division was at or about this time?

7                    In other words, you referred to the

8       10th Floor and the 17th Floor.  Was that something

9       that had been a division prior to this memo and

10      continued to be thereafter, or was that something

11      that changed at around that time?

12             MR. GOLDBERG:  I'm sorry.  I'm

13             confused.  If you don't mind, you are asking

14             him if this memo assigns some specific

15             responsibilities that were not previously

16             divvied up?

17             MR. SHAPIRO:  Right.

18             MR. GOLDBERG:  I thought he said yes

19             to that before, but I just -- the question

20             confused me.

21             A.    I'm sorry?

22             Q.    I think we are all or at least the

23      attorneys are a little bit uncertain about what

24      the impact was of the memo.

25                   You testified about the concept that

1                          K. Turner

2      you had certain responsibilities and Ms. Sutowski

3      had certain responsibilities, such as 10th Floor

4      versus 17th Floor.

5           A.   Well, no.  I said in the memo it says

6      that we had -- you will be responsible for the

7      10th Floor, me.  It says Boz would be responsible

8      for a certain area.

9                You asked me did that -- was that

10     adhered to, and I said no.

11          Q.   Was that something that had ever -- a

12     division like that, had that ever been in place

13     before this memo?

14          A.   No.

15          Q.   After the memo, is it your testimony

16     that that division existed in theory, but in

17     practice you continued to share the same manner as

18     you had shared previously?

19          A.   We continued to share.  We continued

20     to cover each other's areas and work as necessary.

21          Q.   I'm going to ask you about the next

22     memo.  N 725 is April 26, 2004, memo from Ms.

23     Pineda to three managers.

24               Do you recall any discussion with Ms.

25     Pineda about the subject matter of this memo at or

1                          *K. Turner*

2          MR. SHAPIRO:  I'd like to mark as

3      Exhibit E a document that on the first page

4      says, "Employee Performance Review and

5      Planning Form," and it goes from Bates

6      numbers N 694 through 708.

7              (Defendant's Exhibit E, Employee

8      Performance Review and Planning Form, marked

9      for identification.)

10         Q.    I ask you to take a look at what's

11     just been marked as Exhibit E and let me know when

12     you are done reading it.

13         MR. GOLDBERG:  I'll note for the

14     record while Keith looks at the document

15     that it's not clear to me that this document

16     as a single stapled document was actually

17     prepared as a single stand-alone document.

18     Are you saying that?

19         MR. SHAPIRO:  I think you're right.

20         MR. GOLDBERG:  I don't mind if you

21     make it one exhibit, but there are pages on

22     here from different time periods, so you can

23     keep it as a single exhibit, and Keith can

24     answer your questions --

25         MR. SHAPIRO:  I'll clarify that.

*K. Turner*

1

2        MR. GOLDBERG:  -- with that in mind.

3        THE WITNESS:  Okay.

4        Q.    Let me ask you first about the page of

5    the document that are 694 to 701.

6              Looking at those pages, can you tell

7    me whether those constitute something that you

8    were shown in or about September of 2003?

9        MR. GOLDBERG:  I think 703 is part of

10           that.  It's the page that says, "Meets

11           performance standards."

12           MR. SHAPIRO:  Sorry, okay.

13           MR. GOLDBERG:  Page 702, that I think

14           may be out of sequence.

15           MR. SHAPIRO:  Let me strike that

16           question.

17       Q.    Let's look at Page 702.  Do you recall

18   seeing that particular page before?

19       A.    No.

20       Q.    If we ignore that page and discuss 694

21   through 703 --

22           MR. GOLDBERG:  Put this aside and look

23           at that.

24           THE WITNESS:  Yes.

25       Q.    Do you recall whether that constitutes

1                        *K. Turner*

2      a document that you received in or about September

3      of 2003?

4            A.    Yes.

5            Q.    Can you tell me the circumstances

6      under which you were given or shown that document?

7            A.    Ms. Pineda gave this to me at my

8      yearly -- my annual evaluation.

9            Q.    Was that the first annual evaluation

10     you had at NYU Hospital?

11           A.    Yes.

12           Q.    Did you have a meeting with her to

13     discuss the contents of this document?

14           A.    Yes.  Can I go on record as -- I

15     signed this document.

16           Q.    Okay.

17           A.    And I see that the follow-up date was

18     December 28.  I signed it.  I don't recall it

19     being almost a year -- I mean approximately a

20     year.  I thought it was sometime after, but -- but

21     maybe my recollection is not --

22                 MR. GOLDBERG:  It's your signature on

23           701?

24                 THE WITNESS:  I signed it 9/29, so...

25           Q.    What are you referring to when you

*K. Turner*

1

2  meetings, meetings with supervisors and managers.

3        There was a meeting -- may have been a

4  meeting with Ms. Pineda.  There could have been a

5  few department meetings with Ms. Pineda and Mr.

6  DeGazon.

7        Q.    Were those meetings held that were

8  held on a regular basis or just something

9  occasional?

10        A.    No, there was one in -- I remember

11  meeting with Mr. DeGazon and Ms. Pineda in May

12  after we had gone to human resources.

13        Q.    May 2004?

14        A.    Mid May 2004, and I was told to decide

15  whether or not I wanted to work there anymore.  So

16  was Ms. Sutowski.

17        Q.    Tell me, how did the meeting you just

18  described come about?  Were you told to go meet

19  with anyone?

20        A.    I was told to meet with Mr. DeGazon,

21  and Ms. Pineda called a meeting with Boz Sutowski

22  and myself sometime in mid May.

23        Q.    Tell me what you recall about

24  statements by anybody at that meeting.

25        A.    Mr. DeGazon explained to us, declared

*K. Turner*

1

2  that he knew that Boz and myself had gone to human

3  resources and complained about him, and he knew

4  from human resources what was said by whom

5  verbatim, and that we had the -- we had the

6  weekend to think about it and decide whether or

7  not we wanted to work there anymore, which I took

8  as a threat to my position, my employment.

9        Q.    Did you make any response during that

10  meeting?

11        A.    I don't recall.  I don't think I did.

12        Q.    How about Ms. Sutowski?  Did she make

13  any response?

14        A.    I don't recall.  I don't know if she

15  did.

16        Q.    Did Ms. Pineda say anything at the

17  meeting?

18        A.    I don't believe she did.  I don't

19  recall.

20        Q.    How long was this meeting?

21        A.    Again, I would -- less than a half an

22  hour.

23        Q.    Other than the issue of your having

24  gone to human resources, was there anything else

25  that Mr. DeGazon discussed at that meeting

1                          K. Turner

2      bring it up to her?  It's not the person to bring

3      it to.

4              Q.    Did you bring up that same concern

5      ever in a face-to-face meeting with Mr. DeGazon?

6              A.    No, because he was the orchestrator of

7      all of that.

8              Q.    Did Mr. DeGazon ever say anything in

9      your presence that reflected that he had any bias

10     against Caucasians?

11             A.    Any racial slurs?

12             Q.    Yes, anything along those lines.

13             A.    Caucasians?

14             MR. GOLDBERG:  You mean offensive

15     comments?

16             MR. SHAPIRO:  Yes.

17             MR. GOLDBERG:  Anything offensive that

18     he said?

19             MR. SHAPIRO:  Yes, anything offensive

20     about Caucasians.

21             Q.    Not necessarily you as a Caucasian,

22     but Caucasians generally.

23             A.    He called Mr. Harney a faggot.  He's

24     Caucasian and the president of the hospital.

25             Q.    That appears to be a comment about

1                          K. Turner

2    sexuality.

3                I'm asking specifically about if there

4    were any comments that made reference to the fact

5    that someone was a Caucasian or was white as

6    opposed to any other characteristics that that

7    person may have.

8        A.    I'm sorry.   What he said about a --

9    about a Caucasian, I get your point.

10               I didn't hear him say a racial slur.

11   I didn't hear him call him somebody whitey or

12   honky or anything.

13       Q.    Tell me the connection in which he

14   called Mr. Harney a faggot.

15       A.    We were walking down the hallway

16   together, and I don't know why we were under

17   discussion of Mr. Harney.   I don't know what

18   brought it up or what prompted it, but the fact

19   that Mr. Harney is perhaps sissified or effeminate

20   behavior maybe.   He called him a faggot, that

21   faggot.

22       Q.    Did you make any response?

23       A.    No, I was too mortified and too upset.

24   I have many gay associates and friends worldwide.

25               No, I did not.   I was too offended and

1                              *K. Turner*

2    too intimidated to utter a word.

3          Q.    Did you ever hear Ms. Pineda make any

4    racial slurs or derogatory comments about

5    Caucasians or whites?

6          A.    That I would have to think about it.

7    I can't recall at this time.

8          Q.    Did you ever hear Mr. DeGazon make any

9    slurs against people who were of United States

10   origin on the basis of that characteristic?

11         **MR. GOLDBERG:**   You mean national

12         origin slurs?

13         **MR. SHAPIRO:**   Yes.  I don't like

14         Americans, anything.

15         A.    No, I didn't hear him say you rotten

16   American person, no.  I was being facetious there.

17   I didn't hear any national, American slurs.

18         Q.    Did you hear any such slurs or

19   comments from Ms. Pineda?

20         A.    Not that I -- I can't recall any

21   specific points in time at this time.

22         Q.    Did you hear anyone else who was

23   employed at NYU at a supervisor level up make any

24   derogatory comments about whites or people of

25   United States origin, aside from those two

1                           K. Turner

2    office every day in the main check-ins.

3         Q.    Do you recall anything specific about

4    any communications you had with her during that

5    time period?

6         A.    No.  Oh, yes, I do.

7         Q.    Tell me what you recall.

8         A.    I do recall an incident.  There was an

9    incident regarding Mr. Oliveros, and it was

10   something -- I don't recall exactly what it was.

11   It may have been something with a communication,

12   either him not returning a phone call to the

13   office, and Mr. Oliveros had 20 plus years of

14   service there, and Ms. Pineda was critical of me

15   for not disciplining Mr. Oliveros or further doing

16   something along is the disciplinary track to Mr.

17   Oliveros for not responding in a timely fashion,

18   according to her, and I made a comment of

19   basically Mr. Oliveros has been here for 20 years,

20   give the guy a break, basically was my -- like

21   relax a little bit.  It's not that big a deal.

22             It was my take on it, my gist of the

23   conversation, and he -- Mr. DeGazon was present,

24   and they both kind of went ballistic over this of

25   how dare I even make mention after I was given a

1                              *K. Turner*

2        that there might be any reductions in force at the

3        hospital?

4              A.    No, I don't recall.

5                    MR. GOLDBERG:   If you don't, that's

6              fine.

7              Q.    Tell me how you were informed that you

8        were being terminated.

9              A.    I was brought into Mr. DeGazon's

10       office in the presence of Ms. Pineda.

11             Q.    Anybody else there?

12             A.    No.

13             Q.    Who spoke to you?

14             A.    Mr. DeGazon.

15             Q.    What did he say?

16             A.    He said my job was being eliminated

17       for budgetary -- they had no money, couldn't

18       afford to pay me anymore.

19             Q.    Did you make any response?

20             A.    No, I believe I didn't have a response

21       to Mr. DeGazon.  I asked him when he got done

22       speaking if he were through and if I could go to

23       my office and collect my -- what else I was

24       supposed to do, and he told me to report to human

25       resources at a certain time.

1                          *K. Turner*

2          Q.     Approximately how long did this

3    meeting take place?

4          A.     Five minutes.

5          Q.     How long did this meeting take?

6          A.     Five minutes.

7          Q.     Any other words that anybody else said

8    that you can recall, other than what you just told

9    me?

10         A.     No.   You mean any other person speak?

11   Mr. -- Ms. Pineda, no.

12         Q.     Anything else that Mr. DeGazon said or

13   that you said beyond what he told you?

14         A.     No, I can't recall.   What I recall is

15   what I said.

16         Q.     Did they give you any documents at

17   that time?

18         A.     No.

19         Q.     Did you then go to human resources?

20         A.     I went to my office.

21         Q.     Sometime after that, that day, did you

22   go to human resources?

23         A.     Yes.

24         Q.     Did you meet with anybody there?

25         A.     Yes.

*K. Turner*

1

2    Q.    Who did you meet with?

3    A.    Mark Parauda.

4    Q.    Tell me what the conversation was

5  between you and Mr. Parauda.

6    A.    I don't recall much of the

7  conversation.  I recall him giving me documents,

8  layoff documents or separation documents,

9  basically saying about the budget or whatever.

10           **MR. GOLDBERG:**  The documents speak for

11           themselves.  He wants to know if you spoke

12           to him.

13    A.    That's all, and that's what I recall,

14  getting the documents and going on my way.

15    Q.    Did you make any complaints to him

16  about your termination or about anything else

17  regarding your employment that day?

18    A.    No, I did not.

19    Q.    Is he the only person from human

20  resources that you spoke to that day?

21    A.    Yes.

22    Q.    Were you told what the effective date

23  of your termination was going to be?

24    A.    Well, it was effective -- well, there

25  is a -- the payment plan or whatever, so it was

*K. Turner*

1

2          jobs and send out, and monster.com are

3          listed, and employers can contact you.

4              Q.    You have placed a listing with

5     monster.com?

6              A.    Waiting to be contacted, hoping to be

7     contacted.

8              Q.    As you understand the process, if

9     there is an interest by an employer in response to

10    your resume, you will receive some kind of contact

11    through monster.com; is that correct?

12             A.    Yes.

13             Q.    Have you listed with any other of the

14    competitors of monster.com?

15             A.    I believe I was previously.  I don't

16    know if it's on there now.  I received help

17    through a few people I know have helped me with my

18    search.

19             Q.    Did you utilize any out placement

20    services from NYU Hospital?

21             A.    No, I did not.  Actually I thought --

22    no, I did not.

23             **MR. SHAPIRO:**  Let's mark as Exhibit G

24         a two-page document P 116 to 117.

25             (Defendant's Exhibit G, Documents

K. *Turner*

2   Bearing Bates Nos. P 116 to 117, marked for

3   identification.)

4   Q.   Can you take a look at that, and when

5   you are done tell me what it is, if you know.

6   A.   This was a meeting in -- on June 8

7   with my name, addressed to me at a supervisor's

8   meeting in Mr. DeGazon's handwriting.

9   Q.   Was this the same as the meeting you

10   described earlier, in which he expressed his

11   unhappiness about your having gone to human

12   resources?

13   A.   No, this was a different meeting.

14   Q.   Tell me what you can recall about this

15   meeting, where was it held, who was present and

16   what was said.

17   A.   This was in June.  The other meeting

18   that we were referring to was back in May.  This

19   was in June.  There was a -- in the main building,

20   near his office, and there were supervisors and

21   managers, and the end of -- I believe there were

22   some other supervisors present.

23   Ms. Sutowski was there, and I was

24   there, and to me this was a response to Ms.

25   Sutowski and I going to human resources, another

1                           *K. Turner*

2    form of harassment, cop-outs, hold-outs, all this

3    about cop-outs, commitment, are you a coward.

4              I don't understand the type of

5    meeting.  To me, the only point to this meeting

6    was again to further harass and to create a

7    hostile work environment for Ms. Sutowski and

8    myself.

9         Q.    Was this memo also given to Ms.

10   Sutowski, do you know?

11        A.    I don't know.  This one has my name.

12   I don't know.

13        Q.    Do you know whether it was given to

14   anybody else who was present at the meeting?

15        A.    I don't know.  I can't say.

16        Q.    What do you recall, if anything, Mr.

17   DeGazon saying during this meeting?

18        A.    I don't recall the particulars, but

19   it's outlined in here.  Obviously the subject

20   matter is commitment.

21        **MR. GOLDBERG:**  Don't guess what he

22        said.

23        Q.    That's what the document says.

24        A.    I was given the document, but I think

25   I answered the question.  I thought it was

K. *Turner*

1

2  harassment to give me a document on June 8 after I

3  had gone to human resources and discussed

4  commitment.

5        Q.    You are not listening to my question.

6  All I'm asking you is what did he say, not what

7  the document says, not what you thought the

8  document says, just what he said.

9        A.    I don't recall.

10        Q.    Do you recall anything anybody else

11  said at that meeting?

12        A.    I don't recall.  I don't believe it

13  was for anybody else to say anything.  It was his

14  meeting.

15        Q.    Do you know approximately how long

16  this meeting lasted?

17        A.    No, I do not.

18        Q.    Was Ms. Pineda present?

19        A.    I don't recall.  Most likely.

20        Q.    Do you have any recollection whether

21  he used the word coward when he was speaking that

22  day?

23        A.    Possible.  I don't -- I can't -- I'd

24  have to think about it.

25        Q.    Did you ever discuss the contents of

1                           K. Turner

2    this memo with any of your colleagues at NYU prior

3    to the time that you were terminated?

4         A.    I don't recall if I had a conversation

5    with Ms. Sutowski or not.

6         Q.    Anybody else?

7         A.    I don't recall.

8         Q.    Do you have any recollection of Ms.

9    Pineda making any comments about your overall job

10   performance after the date of your September '03

11   performance review?

12        A.    No, no, I don't.  To my knowledge, I

13   was performing to the standards of the department.

14        Q.    Have you ever been convicted of a

15   crime?

16        A.    No.

17        Q.    Did you review any documents in

18   preparation for this deposition, other than the

19   documents that you produced during discovery or

20   that NYU produced during discovery?

21        A.    No.

22        Q.    Did you talk to anybody to prepare for

23   your deposition, other than your attorney?

24        A.    No.

25        Q.    Have you spoken to anybody to ask them