Exhibit 5

Page 1

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X

KEITH TURNER,

        Plaintiff,

    - against -          INDEX NO.:
                   06 CV 1910

NYU HOSPITALS CENTER, NYU MEDICAL
CENTER, NYU SCHOOL OF MEDICINE, AND
NYU HEALTH SYSTEM,

        Defendants.

------------------------------------X

              60 East 42nd Street
              New York, New York
              November 28, 2006
              10:05 A.M.

          EXAMINATION BEFORE TRIAL OF HILDA

PINEDA-LOPEZ, a witness on behalf of the

Defendants, taken by the attorney for the

Plaintiff, pursuant to Notice, and held before

Deborah Thier, a Notary Public of the State of New

York at the above-stated time and place.

             *   *   *   *

## Page 6

```
1            H. Pineda-Lopez       6
2      A   That's correct.
3      Q   You were hired in 1982?
4      A   That's correct.
5      Q   You are Hispanic?
6      A   Yes, I am.
7      Q   Your maiden name is Pineda,
8  P-I-N-E-D-A?
9      A   That's correct.
10     Q   And your married name is Lopez,
11 L-O-P-E-Z?
12     A   That's correct.
13     Q   I've seen many documents that say
14 Pineda, I've seen some that say Lopez.  Either one
15 refers to you?
16     A   That's correct.
17     Q   You are Hispanic?
18     A   Yes, I am.
19     Q   You speak fluent Spanish?
20     A   Yes, I do.
21     Q   Where were you born?
22     A   Year?
23     Q   Were you born in the United States?
24     A   No.
25     Q   Where were you born?
```

## Page 7

```
1            H. Pineda-Lopez       7
2      A   I was born in Honduras, Central
3  America.
4      Q   How old are you?
5      A   Forty-four.
6      Q   Do you have a college degree?
7      A   No.
8      Q   Now, you've known Udel DeGazon for many
9  years, correct?
10     A   That's correct.
11     Q   When you joined N.Y.U. in 1982, Mr.
12 DeGazon was already at N.Y.U., right?
13     A   That's correct.
14     Q   Have you spent your whole career at
15 N.Y.U. in the department of building services?
16     A   Yes, I have.
17     Q   And Mr. DeGazon as well had been in the
18 department of building services throughout your
19 entire career at N.Y.U.?
20     A   That's correct.
21     Q   Did you report to Mr. DeGazon for all
22 the years that you were at N.Y.U. while he was at
23 N.Y.U.?
24     A   No, I did not.
25     Q   What was the first year that you began
```

## Page 8

```
1            H. Pineda-Lopez       8
2  reporting to Mr. DeGazon?
3      A   I don't remember.
4      Q   Would it have been the 1980's?
5      A   Probably.
6      Q   Mr. DeGazon separated from N.Y.U. in
7  2005, right?
8      A   That's correct.
9      Q   So would it be fair to say that from
10 some point in the 1980's until 2005 when Mr.
11 DeGazon separated from N.Y.U., you reported to
12 him?
13     A   That's correct.
14     Q   So you may have had Mr. DeGazon as your
15 boss for twenty years?
16     A   Probably.
17     Q   You know Joey Morelos?
18     A   Yes, I do.
19     Q   At the time that he came into the
20 picture at N.Y.U., you and Mr. DeGazon had already
21 been at N.Y.U. for many years, right?
22     A   That's correct.
23     Q   What is your current position at
24 N.Y.U.?
25     A   Associate director for building
```

## Page 9

```
1            H. Pineda-Lopez       9
2  services.
3      Q   I received many documents from N.Y.U.
4  in the course of this litigation.  I'll show some
5  of them to you, some I probably won't show you.
6          From what I've seen, it looks to me
7  like when you joined N.Y.U. in 1982, you were
8  hired as a clerk/typist, is that correct?
9      A   That's correct.
10     Q   So over the years at N.Y.U. you have
11 progressed from that entry level job to your
12 current position, associate director, correct?
13     A   That's correct.
14     Q   You became associate director in June
15 of 2004?
16     A   I believe so.
17     Q   Prior to being associate director you
18 were operations manager?
19     A   That's correct.
20     Q   Prior to being operations manager, you
21 were manager of building services?
22     A   No.
23     Q   What were you?
24     A   Senior supervisor.
25     Q   If you could help me with the time
```

Page 10

```
 1              H. Pineda-Lopez        10
 2  line, I'd appreciate it.
 3          You became associate director in June
 4  of '04, and prior to that you were operations
 5  manager.  When did you take the position of
 6  operations manager?
 7      A    I don't remember.
 8      Q    Would it have been in the late '90's,
 9  '97, '98?
10      A    Probably.
11      Q    Then prior to becoming operations
12  manager in the late '90's you were manager of
13  building services for several years?
14      A    Right, probably three.
15      Q    You took that position, manager of
16  building services, in the early '90's?
17      A    I think so.
18      Q    Prior to that you were senior
19  supervisor for a number of years?
20      A    That's correct.
21      Q    When you were promoted from operations
22  manager to associate director, that promotion
23  decision was made by Mr. DeGazon, is that correct?
24      A    It was collectively a decision with
25  upper administration.
```

Page 11

```
 1              H. Pineda-Lopez        11
 2      Q    But it was Mr. DeGazon who promoted
 3  you?
 4      A    That's correct, with the approval from
 5  upper management.
 6      Q    I understand.  I hear your testimony.
 7          When you were made operations manager,
 8  did Mr. DeGazon make that promotion decision with
 9  the approval of N.Y.U.?
10      A    The promotion decision was decided with
11  the director of the department back then.
12      Q    But did Mr. DeGazon recommend you for
13  the promotion?
14      A    I don't know.
15      Q    Would it be fair to say then that in
16  the promotions that you received over the years
17  that you reported to Mr. DeGazon, he supported
18  those promotion decisions?
19      A    No.
20      Q    Did he object to you obtaining
21  promotions?
22      A    I don't know.
23      Q    Let me rephrase the question.
24          Am I correct that you're not in a
25  position sitting in this deposition to testify
```

Page 12

```
 1              H. Pineda-Lopez        12
 2  that Mr. DeGazon ever opposed a promotion that you
 3  received?  Is that fair to say?
 4      A    I don't know.
 5      Q    You're not aware of Mr. DeGazon ever
 6  standing in the way of a promotion for you, is
 7  that --
 8      A    I am not aware.
 9      Q    That's my point.
10      A    Right.
11      Q    You're certainly aware of Mr. DeGazon
12  supporting your promotion in June of '04 from
13  operations manager to associate director?
14      A    Yes, I do.
15      Q    Is it your belief that when you became
16  operations manager, Mr. DeGazon supported that
17  promotion?
18      A    I assume.
19      Q    He was your direct supervisor for
20  twenty years, correct?
21      A    Not for twenty years.  I'm not sure if
22  I reported during those twenty something years,
23  for all those years to Mr. DeGazon.  I had several
24  bosses, so I really didn't have -- I didn't report
25  to him directly, I had other people in between us.
```

Page 13

```
 1              H. Pineda-Lopez        13
 2      Q    When do you believe you first started
 3  reporting directly to Mr. DeGazon?  Would it have
 4  been when you became manager of building services?
 5      A    No, when I became an operations
 6  manager, I believe.
 7      Q    You believe that's when you had a
 8  direct line to him?
 9      A    That's correct.
10      Q    So when you were manager of building
11  services, who was your boss?
12      A    I reported directly to the director and
13  to the operations manager then.
14      Q    Was Mr. DeGazon the associate director?
15      A    I believe so.
16      Q    Are you saying you have no reporting
17  relationship with Mr. DeGazon, or indirect?
18      A    Indirect.
19      Q    So let's make sure the record's clear.
20          Would it be fair to say that for many
21  years you had an indirect reporting relationship
22  Mr. DeGazon and for some of those years a direct
23  reporting relationship?
24      A    That's correct.
25      Q    And you've known Mr. DeGazon for at
```

4  (Pages 10 to 13)

Page 30

```
 1              H. Pineda-Lopez       30
 2   not happy with Ms. Fromkin's performance?
 3       A    Mr. Morelos.
 4       Q    Other than Mr. Morelos?
 5       A    No.
 6       Q    Just Mr. Morelos?
 7       A    I don't remember.
 8       Q    How about Ms. Sutowski?
 9       A    She made comments about everybody's
10   performance.
11       Q    Let me make sure --
12       A    Yeah, I don't --
13       Q    Let me make sure you understand my
14   question.
15            You told me Mr. Morelos told you he
16   wasn't happy with Keith Turner, Ms. Sutowski or
17   Ms. Fromkin.  I'm asking if anybody else had that
18   comment about Corie, you've said no, just Mr.
19   Morelos.  About Ms. Sutowski, is there anybody
20   else who made that comment?
21       A    Mr. Turner will make comments about Ms.
22   Sutowski's performance.
23       Q    Other than Mr. Turner, anybody else?
24       A    Not that I recall.
25       Q    I'll look at e-mails, but you have no
```

Page 31

```
 1              H. Pineda-Lopez       31
 2   documents reflecting dates that these things were
 3   said to you?
 4            MR. SHAPIRO:  She made reference to
 5       documents in her answer.
 6       Q    Other than what may have been produced
 7   by N.Y.U., is there anything else out there?
 8       A    No.
 9            MR. SHAPIRO:  She doesn't know what's
10       been produced by N.Y.U., so that's not a fair
11       question.
12       Q    Have you turned over your records to
13   the attorneys that are handling this lawsuit?
14       A    I have attorney documents.
15       Q    So if you had any documents that
16   reflect somebody criticizing Keith Turner, Bo
17   Sutowski or Corie Fromkin, you produced them to
18   your lawyers?
19       A    You are correct.
20            MR. GOLDBERG:  I assume, Peter, you
21       turned them over to me, so I can only operate
22       on the universe that I know.
23       Q    Let's talk about Keith Turner.  You
24   know Keith Turner joined N.Y.U. in 2002, correct?
25       A    I'm not sure of the date.
```

Page 32

```
 1              H. Pineda-Lopez       32
 2       Q    I'm telling you it was 2002.
 3       A    Okay.
 4       Q    Let's put it this way.  Mr. Morelos
 5   joined N.Y.U. and after Ms. Sutowski, Keith Turner
 6   and then Corie Fromkin.  Does that sound right?
 7       A    That sounds correct.
 8       Q    Do you recall that Keith Turner
 9   separated from N.Y.U. in June of '04?
10       A    Yes.
11       Q    You know Keith Turner is American,
12   Caucasian, white male?
13       A    Yes, he is.
14       Q    Did you interview Keith Turner when he
15   applied for a job at N.Y.U.?
16       A    No, I did not.
17       Q    So the first time you met Keith Turner
18   was when he showed up for work?
19            MR. SHAPIRO:  Objection to form.
20       A    I think so.
21       Q    Do you know if Mr. DeGazon interviewed
22   Keith Turner?
23       A    I don't know.
24       Q    So did you ever see Keith Turner's
25   application for employment or resume or other type
```

Page 33

```
 1              H. Pineda-Lopez       33
 2   of employment materials?
 3       A    No, I did not.
 4       Q    You did not?
 5       A    I did not.
 6       Q    Let me show you Exhibit number 4, which
 7   is Keith Turner's evaluation in 2003.  There may
 8   be an extraneous page in there, but the evaluation
 9   is within Exhibit 4, as I understand it.  Can you
10   tell me if you've seen that document before?
11       A    Yes, I have.
12       Q    Is your signature on it?
13       A    Yes, it is.
14       Q    Did you prepare the evaluation?
15       A    Yes, I did.
16       Q    So the handwriting that appears, the
17   meets requirements circle, is your circle?  Did
18   you put that score there?
19       A    I assume.
20       Q    The handwritten comments that are on
21   the various pages are your handwritten comments?
22       A    Yes.
23       Q    In terms of the X's giving ratings for
24   specific categories, did you put the X's in the
25   evaluation?
```

Page 94

H. Pineda-Lopez                94

2   Q   You know he's from St. Lucia?
3   A   Correct.
4   Q   And he's black?
5   A   Yes.
6   Q   And Robert Stephen is from St. Lucia
7   and he's black too?
8   A   Correct.
9   Q   Robert Mr. Stephen has been at N.Y.U.
10  from 1997 through the present, correct?
11  A   Correct.
12  Q   He's had no break in employment, right?
13  A   Correct.
14  Q   He's had reporting relationships with
15  you and Mr. DeGazon for his entire period of
16  employment up until Mr. DeGazon's retirement,
17  right?
18  A   Somehow.  There was a time that he
19  didn't have any types with me.  He used to work on
20  the night shift.  So he reported directly to the
21  operation's manager back then, and he didn't have
22  cleaning responsibilities during that period.
23  Q   Certainly for the past several years
24  Mr. Stephen has reported to you and Mr. DeGazon
25  through Mr. DeGazon's separation, right?

Page 95

H. Pineda-Lopez                95

2   A   That's correct.
3   Q   Let me show you Exhibit 31, which is an
4   evaluation for Mr. Stephen from 2001.  Can you
5   tell me if you prepared that document?
6   A   Yes, I did.
7   Q   So just like with the evaluations for
8   Ms. Sutowski and Mr. Turner, this document,
9   Exhibit 31, is something you put together?
10  A   Correct.
11  Q   It's your handwriting?
12  A   Correct.
13  Q   It was signed by you and Mr. DeGazon?
14  A   Correct.
15  Q   At least as early as 2001 Mr. Stephen
16  reported to you?
17  A   Correct.
18  Q   If I have earlier evaluations that have
19  the same signature block, he might have reported
20  to you prior to '01?
21  A   Correct.
22  Q   The handwritten comments are yours?
23  A   Correct.
24  Q   Sometimes you write in script,
25  sometimes you --

Page 96

H. Pineda-Lopez                96

2   A   Most of the time it's in script.
3   Q   The comments in here that I wanted to
4   ask you about is, if I read it correctly, the last
5   part of the comments on page N0174, Mr. Stephen
6   has shown that he is also a leader with
7   potentials.  Is that an S, potentials?
8   A   Potentials.
9   Q   With an, he has an excellent future in
10  our department?
11  A   Correct.
12  Q   When you wrote that in 2001, that's how
13  you felt about Mr. Stephen?
14  A   Correct.
15  Q   He had an excellent future in the
16  department.  For someone who is a supervisor,
17  would that probably mean a promotion to manager?
18  A   Correct.
19  Q   In fact, there was an available manager
20  job in 2001, but Ms. Sutowski got it and there was
21  one in 2002, but Mr. Turner got it?
22  A   Yes.
23  Q   Would you have been supportive of Mr.
24  Stephen if he wanted to be a manager after he got
25  this evaluation?

Page 97

H. Pineda-Lopez                97

2   MR. SHAPIRO:  Objection to form.
3   A   I don't know.
4   Q   Did you think he was ready for manager
5   when you wrote this comment in the evaluation?
6   A   Not back then.
7   Q   When did you think Mr. Stephen was
8   qualified to become manager?
9   A   When the decision was made to promote
10  him.
11  Q   In June of '04?
12  A   Correct.
13  Q   The exceeds performance standards, you
14  gave him that rating?
15  A   Correct.
16  Q   Let me show you Exhibit number 32
17  entitled, confidential staff reduction process.
18  Is that a handbook that you've received at N.Y.U.,
19  or you're familiar with it?
20  MR. SHAPIRO:  Objection to form.
21  A   No, I'm not familiar with it.
22  Q   It contains various policies in there.
23  A   I don't remember seeing this.
24  Q   Would it be fair to say that you're
25  familiar with the policies at N.Y.U. that deal

Page 102

```
1              H. Pineda-Lopez        102
2      A     Correct.
3      Q     Alhaji Majeed is a black male, is that
4   right?
5      A     Yes.
6      Q     Jesse Kilpatrick is a black male?
7      A     Yes.
8      Q     Magdalena Aybar is a black female?
9      A     Yes.
10     Q     Magdalena Kapusta is a white female?
11     A     Yes.
12     Q     Have you ever spoken Spanish with
13  Rafaelina Rodriguez?
14     A     Yes.
15     Q     Have you ever spoken Spanish with Olga
16  Brooks?
17     A     Yes.
18     Q     With Magdalena Aybar?
19     A     Yes.
20     Q     Are there other folks at N.Y.U. that
21  you have spoken Spanish with --
22     A     Yes.
23     Q     -- in the building services department?
24     A     Yes.
25     Q     When Keith Turner worked at N.Y.U., you
```

Page 103

```
1              H. Pineda-Lopez        103
2   spoke Spanish with these folks from time to time?
3           MR. SHAPIRO:  Objection to form.
4      A     Not in the presence of Mr. Turner.
5      Q     But from time to time you spoke Spanish
6   with them, right?
7      A     I might have.
8      Q     Did you know Mr. Turner doesn't speak
9   Spanish?
10     A     Yes, I do.
11     Q     And you knew back then he didn't speak
12  Spanish?
13     A     Right.
14     Q     And you knew Ms. Sutowski didn't speak
15  Spanish?
16     A     Right.
17     Q     These individuals, Rafaelina Rodriguez,
18  according to the chart, had a reporting line up to
19  Ms. Sutowski, Miguel Oliveros had a reporting line
20  up to Ms. Sutowski, is that correct?
21     A     Correct.
22     Q     And Magda Aybar had a reporting line up
23  to Ms. Sutowski, according to this chart?
24     A     Correct.
25     Q     And all these supervisors on the day
```

Page 104

```
1              H. Pineda-Lopez        104
2   shift answered to Ms. Sutowski or Mr. Turner?
3      A     Correct.
4      Q     If Mr. Turner was around and Ms.
5   Sutowski wasn't, supervisors answered to Mr.
6   Turner?
7      A     Right.
8      Q     If Ms. Sutowski was around and Mr.
9   Turner wasn't, the supervisors answered to her?
10     A     Correct.
11     Q     Now, you have an office at N.Y.U. now?
12     A     Yes.
13     Q     When Mr. Turner and Ms. Sutowski were
14  at N.Y.U., am I correct that there was a building
15  across the street from where Mr. Turner had his
16  morning check-ins and across the office you had an
17  office?
18     A     Yes.
19     Q     You had an office, Mr. DeGazon had an
20  office, Mr. Morelos had an office and Ms. Richards
21  got an office as well at some point?
22     A     Yes.
23     Q     Across the street Mr. Turner would have
24  morning check-ins, correct, a daily check-in?
25     A     Correct.
```

Page 105

```
1              H. Pineda-Lopez        105
2      Q     Did you come across the street from
3   time to time and observe the check-ins?
4      A     Yes.
5      Q     That was the responsibility of Mr.
6   Turner and Ms. Sutowski as day shift managers?
7           MR. SHAPIRO:  Objection to form.
8      A     To assign the day shift employees.
9      Q     That was their job, right?
10     A     Yes.
11     Q     Mr. DeGazon also came across the street
12  and watched the check-ins too?
13     A     Not to watch the daily check-ins.
14     Q     He was there when those check-ins
15  occurred, correct?
16     A     There were also people exiting, leaving
17  the previous shift.  So we all give reports.
18     Q     You're saying the night shift?
19     A     Night shift.  We have three shifts in
20  our department, so there is always a briefing.
21     Q     A verbal or written?
22     A     A verbal briefing.
23     Q     That took place in the same area as the
24  daily check-in?
25     A     Correct.
```

Page 106

```
 1              H. Pineda-Lopez      106
 2     Q    The briefing would come from the shift
 3  that just finished?
 4     A    Right, and instructions for the one
 5  coming in.
 6     Q    And the briefing was to whom?
 7     A    To the management staff.
 8     Q    Which included who?
 9     A    Manager and supervisors from the night
10  shift reporting back to us, to Mr. DeGazon and to
11  me, and following instructions to the day shift
12  for any activities that were not completed on the
13  previous shift. It is a hospital, so we operate
14  twenty-four hours a day, and we must give reports
15  of the daily activities in all three shifts.
16     Q    Did Keith Turner and Ms. Sutowski
17  themselves speak with the managers from the night
18  shift when there was a transition?
19     A    From time to time, yes.
20     Q    So they could get the information
21  directly from their peers at night, and that would
22  be Mr. Trujillo?
23     A    Correct.
24     Q    Now, you say there were three shifts.
25  Ms. Sutowski and Mr. Turner were on the day shift,
```

Page 107

```
 1              H. Pineda-Lopez      107
 2  right?
 3     A    Correct.
 4     Q    Mr. Trujillo was on the night shift?
 5     A    Yes.
 6     Q    Was there another shift?
 7     A    Yes.
 8     Q    Was there a manager for that other
 9  shift?
10     A    The manager for the night shift
11  oversees the evening shift as well.
12     Q    Mr. Trujillo covered both shifts?
13     A    Both.
14     Q    He would interface with Mr. Turner and
15  Ms. Sutowski before going home?
16     A    Yes.
17     Q    I'm going to mark another exhibit, and
18  I'm going to ask you to identify which documents
19  in the exhibit you've seen before by bates number.
20  So what I'll do is put this in front of you and
21  have you go through it. This is bates numbers
22  N0840 through N0873.
23         (Whereupon, bates stamps N0840 through
24     N0873 were marked as Plaintiff's Exhibit 46
25     for identification, as of this date.)
```

Page 108

```
 1              H. Pineda-Lopez      108
 2         MR. GOLDBERG: I'm showing the witness
 3  the set of e-mails that N.Y.U. produced that
 4  they say were on Mr. Odom's computer.
 5         What I would like to do is put this in
 6  front of the witness, give her some Post-Its
 7  and have you mark which pages you've seen
 8  prior to this deposition, and I'm not talking
 9  about preparing for the deposition, I'm
10  talking about seeing them prior to preparing
11  for this deposition, in other words, the time
12  frame of the documents, and you can put
13  Post-Its on the pages and I'll come back in.
14  I'll take ten minutes, give you some time to
15  look it over and then come back in.
16         (Whereupon, a short break was taken.)
17         MR. GOLDBERG: We took a break to give
18  Ms. Pineda a chance to look at Exhibit 46.
19     Q    Ms. Pineda, you've looked over Exhibit
20  46?
21     A    Yes.
22     Q    I asked you to put Post-Its on pages
23  you had seen on or about the date of those
24  documents. You put a Post-It on bates stamp 849,
25  which appears to me to look like it's two pages of
```

Page 109

```
 1              H. Pineda-Lopez      109
 2  e-mails, an e-mail that spills over to the second
 3  page, 850. Did you see 849 and 850 on or about
 4  the date on the e-mails?
 5     A    Yeah, I got the e-mail.
 6     Q    So there are a couple of e-mails on
 7  that page that say from Hilda. One is to Joey
 8  Morelos, one is to Bo Sutowski. So you wrote
 9  those two e-mails?
10     A    Correct.
11     Q    And 849 and 850, the e-mail to Bo
12  Sutowski from April 9th, 2004, is a warning?
13     A    It is -- I am requesting a meeting to
14  Mr. Morelos to discuss the incidents that I listed
15  there.
16     Q    Let me break it down for you this way.
17         There's two e-mails that say from you.
18  One says from you to Joey Morelos, one says from
19  you to Bozena Sutowski, that's 849 and 850. The
20  e-mail from you to Bo Sutowski is something --
21  it's an e-mail in which you're criticizing her.
22  Is that fair to say?
23     A    Correct.
24     Q    My question to you is, that e-mail to
25  her, is it your testimony that that e-mail is
```

28  (Pages 106 to 109)

ab667ae4-9039-4e5e-9f07-341b7b6122f9

Page 118

```
 1           H. Pineda-Lopez      118
 2   cc'd to Mark Parauda raising some complaints?  Did
 3   you notice that?
 4      A    Yes.
 5      Q    Did you know Mr. Mark Parauda to be a
 6   H.R. representative?
 7      A    Yes, I did.
 8      Q    Did you know what his title was?  You
 9   told me Mr. Odom was associate director.  Do you
10   know what Mr. Parauda's title was?
11      A    Human relations manager.
12      Q    Do you know if one of them reported to
13   the other one?
14      A    Mark Parauda reports to Reggie Odom.
15      Q    Is Reggie Odom still at N.Y.U.?
16      A    Yes.
17      Q    And is Mr. Parauda still at N.Y.U.?
18      A    Yes, he is.
19      Q    I don't think I have a full set of the
20   documents with respect to H.R. matters, and I'm
21   not criticizing your counsel, I just don't think I
22   have a full set.  So I'll ask you, have you ever
23   seen any set of documents that were sent to or
24   received from H.R. by Ms. Sutowski, Ms. Fromkin or
25   Mr. Turner?
```

Page 119

```
 1           H. Pineda-Lopez      119
 2      A    No.
 3      Q    Did you ever have meetings with human
 4   resources concerning union employees, and I'm
 5   excluding Mr. Turner now and Ms. Sutowski and Ms.
 6   Fromkin?  Did you ever have meetings with H.R.
 7   when there were issues with union employees?
 8      A    Yes, I have.
 9      Q    To the extent there were issues, H.R.
10   knew how to reach you and sit down and talk to
11   you?
12      A    Yes.
13           MR. SHAPIRO:  Objection to form.
14      Q    And they did, right?
15      A    Yes.
16      Q    When I look at the file that N.Y.U.
17   produced for you, I saw that you had filed a
18   complaint early on in your employment at N.Y.U.,
19   correct?
20      A    Correct.
21      Q    N.Y.U., had they addressed the
22   complaint?
23      A    Yes, they did.
24      Q    It was resolved to your satisfaction?
25      A    Yes.
```

Page 120

```
 1           H. Pineda-Lopez      120
 2      Q    Do you know why Mr. Morelos was let go
 3   on April 30th of 2004?
 4      A    No.
 5      Q    When did you find out that that had
 6   occurred?
 7      A    When I came back to work.
 8      Q    So you found out about Mr. Morelos's
 9   separation and Ms. Fromkin's separation when you
10   came back to work?
11      A    Correct.
12      Q    Did you and Mr. Morelos have
13   disagreements on issues from time to time?
14      A    Nothing that I can recall.  Nothing
15   major.
16      Q    Did you consider yourself to be in good
17   standing with Mr. Morelos?
18      A    I think so.
19      Q    Were you satisfied with him as a boss?
20      A    No.
21      Q    Did you ever share that with anyone?
22      A    Once I did.
23      Q    Who did you share that with?
24      A    Mr. John Harney.
25      Q    When did you speak to Mr. Harney?
```

Page 121

```
 1           H. Pineda-Lopez      121
 2      A    I don't recall the date.
 3      Q    It was before Mr. Morelos lost his job,
 4   correct?
 5      A    Yes.
 6      Q    Who was John Harney at the time?  What
 7   was his position at N.Y.U.?
 8      A    I don't know.
 9      Q    What is his position now?
10      A    Senior V.P.
11      Q    What did you tell him, to the best of
12   your recollection?
13      A    I told him how ineffectively he was
14   running the department, all the other things that
15   were happening in the department, and that I
16   wasn't used to, as a veteran of N.Y.U.,
17   inappropriate behavior, very poor work ethics,
18   bringing incompetent staff to work at the hospital
19   that didn't have any clue of what they were doing.
20   The downfall that I was seeing that was happening
21   in front of me.
22      Q    That sounds like a very serious
23   complaint.  Did you document it?
24      A    No.
25      Q    Did you ask Mr. Harney to take any
```

Page 126

```
 1        H. Pineda-Lopez    126
 2   policies were followed as to Keith Turner?
 3        A    Yes.
 4        Q    Followed as to Ms. Sutowski?
 5        A    Yes.
 6        Q    Followed as to Ms. Fromkin?
 7        A    Yes.
 8        Q    Are you aware of any instances where
 9   N.Y.U.'s written policies were not followed?
10        A    No.
11        Q    If you were aware of a violation of
12   N.Y.U.'s written policies, would you take action
13   to correct that?
14        A    Yes.
15        Q    What action would you take?
16        A    Would call the ethic committee hotline.
17        Q    Would you report that to human resources?
18        A    Yes.
19        MR. GOLDBERG: Okay.  This is a logical
20   time for a lunch break.  If we can come back
21   at one-thirty.
22        (Whereupon, a lunch break was taken.)
23        MR. GOLDBERG:  I'm going to have these
24   marked.
25        (Whereupon, Plaintiff's Exhibits 47
```

Page 127

```
 1        H. Pineda-Lopez    127
 2   through 78 were marked for identification, as
 3   of this date.)
 4        Q    We're back on the record.  We've all
 5   had our lunch break.  Ms. Pineda, the same
 6   instructions that I gave to you this morning apply
 7   with equal force in this afternoon's portion.
 8        Based on your testimony this morning, I
 9   went and pulled out a bunch of memos that came
10   from you or Mr. DeGazon to various individuals,
11   and I'm going to show you those and ask you very
12   basic questions about them.
13        My format, so that there's no
14   surprises, would be to show you the document, ask
15   you if you've seen it before and ask you if you
16   issued it, and ask you if it was a warning to
17   anyone, and if so, to who.
18        With that in mind, Exhibit number 47,
19   is that a document that you issued --
20        A    Yes.
21        Q    -- on or about the date of the
22   document?
23        A    Yes.
24        Q    Was that document a warning to anyone,
25   and if so, to who?
```

Page 128

```
 1        H. Pineda-Lopez    128
 2        A    Let me read it.
 3        To both managers.
 4        Q    Exhibit 47 is a warning you issued to
 5   Pierre Noel and Bozena Sutowski on December 12th,
 6   2001?
 7        A    Yes.
 8        Q    Did you provide this document to anyone
 9   other than the two employees and their files?
10        A    That's correct, just the file.
11        Q    Did it go to anyone else?
12        A    No, just to them and their files.
13        Q    Did either employee respond to this?
14        A    I have no recollection.
15        Q    So Ms. Sutowski joined N.Y.U. in
16   October of 2001 and you gave her a warning
17   December 12th, 2001, is that your testimony?
18        A    Yes.
19        Q    Mr. Noel, do you know how long he had
20   been at N.Y.U.?
21        A    No.
22        Q    Do you know when he separated from
23   N.Y.U.?
24        A    No.
25        Q    Did he quit, was he fired?
```

Page 129

```
 1        H. Pineda-Lopez    129
 2        A    Don't remember.
 3        Q    Is it fair to say when he left, that
 4   opened up a slot that Mr. Turner filled?
 5        A    Yes.
 6        Q    Exhibit 48, is that a document that you
 7   issued on or about January 18th, 2002?
 8        A    Yes.
 9        Q    Is that a warning?
10        A    This was a request to Mr. Trujillo, Mr.
11   Noel and Ms. Sutowski.
12        Q    My question was, was it a warning.
13   Your answer is no?
14        A    No.
15        Q    In Exhibit 47, did you place anybody's
16   job in jeopardy?
17        A    No.
18        Q    Exhibit 49, this document purports to
19   be issued by Mr. DeGazon.  Had you seen that
20   document on or about December 14th, 2002?  Did you
21   get a copy of it?
22        A    Yes, I did get a copy.
23        Q    Was that document a warning?
24        A    This document was issued by Mr.
25   DeGazon, so he would be the one to answer that
```

Page 130

H. Pineda-Lopez          130

1
2  question.
3      Q    You have no opinion on the document?
4      A    No.
5      Q    Is your answer the same as to Exhibit
6  number 50, you have no opinion on the document?
7      A    Correct.
8      Q    Is your answer the same as to Exhibit
9  number 51?
10     A    Yes, that's correct.
11     Q    These are documents that you got copies
12 of when they were issued?
13     A    Correct.
14     Q    Take a look at Exhibit number 52.  Is
15 any of the handwriting yours?
16     A    No.
17     Q    Do you know whose handwriting it is?
18 Is the second page Mr. DeGazon's handwriting?
19     A    This is our secretary, Olga, and this
20 is the handwriting for Mr. DeGazon.
21     Q    Do you know whether that document is a
22 warning to anybody?
23     A    I don't know.
24     Q    How about Exhibit 53?
25     A    Yeah, this is a warning.

Page 131

H. Pineda-Lopez          131

1
2      Q    To who?
3      A    To the people I addressed the e-mail
4  to.
5      Q    To Joey Morelos?
6      A    Let me see.
7      Q    He's a cc.  Did he get --
8      A    No, to Ms. Sutowski, to Mr. Pierre
9  Noel, and that's it.  Cc to Mr. Morelos.
10     Q    Did you place anybody's job in jeopardy
11 with this document?
12     A    No.
13     Q    So you issued Exhibit 53, right, that
14 came from you?
15     A    Yes.
16     Q    How about Exhibit 54, did you issue
17 that document?
18     A    Yes, I did.
19     Q    Is that a warning?
20     A    Yes, this is a warning to Ms. Sutowski,
21 Bo Sutowski.
22     Q    Did you place her job in jeopardy in
23 this document?
24     A    No.
25     Q    Exhibit 55, is that something you

Page 132

H. Pineda-Lopez          132

1
2  issued?
3      A    Yes.
4      Q    When I say issued, I mean you issued
5  this to the people listed on or about the date
6  that it's dated?
7      A    Correct.
8      Q    And that applies to all the documents
9  I'm showing you?
10     A    Correct.
11     Q    Is this a warning?
12     A    Yes.
13     Q    Am I correct that the persons who are
14 listed in these memos as recipients or cc's, those
15 are the people who got copies of the document?
16     A    Correct.
17     Q    Did you place Mr. Noel's job or Ms.
18 Sutowski's job in jeopardy with this e-mail?
19     A    No.
20     Q    This memo came from Mr. Morelos,
21 Exhibit 56.  Am I correct that you don't have an
22 opinion on that document?
23     A    Correct.
24     Q    Exhibit 57 came from Mr. DeGazon.  Do
25 you have any opinion on that document?

Page 133

H. Pineda-Lopez          133

1
2      A    No.
3      Q    Exhibit 58, that's a document you
4  issued?
5      A    Yes.
6      Q    Is that document a warning, and if it's
7  not a warning and it's something else, like a
8  request or instructions, just tell me?  You've
9  already done that with one of the documents where
10 you said it was not a warning, it was a request.
11     A    It's a request to another -- to a
12 previous request.  It's a reminder, because they
13 were not following it.
14     Q    It was a reminder?
15     A    Right.
16     Q    Did you place anybody's job in jeopardy
17 with Exhibit 58?
18     A    No.
19     Q    Exhibit 59?
20     A    This is from Mr. DeGazon.
21     Q    So you have no opinion on it?
22     A    No.
23     Q    By the way, just so I'm clear, when you
24 send a memo like this and you send it to someone,
25 you cc, do you cc to let --

34  (Pages 130 to 133)

Page 134

```
 1          H. Pineda-Lopez      134
 2     A    This is not a cc, it's an e-mail.
 3     Q    When you cc someone on your memos, it's
 4  to let them know what's going on?
 5     A    Correct.
 6          MR. SHAPIRO:  Objection to form.
 7     Q    Is this a warning, and if it's
 8  something else, just tell me?
 9     A    Yes, this is a follow-up.  I forwarded
10  an e-mail that Bo sent me regarding the cleansing
11  of the ED and I forwarded to Mr. Trujillo to make
12  him aware of an area where we had some
13  discrepancies.
14     Q    This is not a warning, it's just
15  information?
16     A    Well, it can be taken as a warning,
17  letting him know that there is a discrepancy in an
18  area that is under his responsibility.  So, yes,
19  it is a warning.
20     Q    I am not telling you that it should be
21  a warning or not, I'm only asking you, when you
22  send it, is it to place Mr. Trujillo on warning or
23  someone else or are you just sending it to pass
24  along information or instructions?  It's your
25  testimony, that's what we're here for.
```

Page 135

```
 1          H. Pineda-Lopez      135
 2     A    To let him know there was a discrepancy
 3  in the areas of his responsibility.
 4     Q    So it was criticism of Mr. Trujillo?
 5     A    Correct.
 6     Q    You didn't place his job in jeopardy
 7  with this document?
 8     A    No, I didn't.
 9     Q    And it's not really a warning, it's
10  just criticism?
11          MR. SHAPIRO:  Objection to form.
12     A    Yes.
13     Q    Exhibit 61, can you tell me, is it your
14  handwriting on this document or someone else's?
15     A    No, Mr. DeGazon's handwriting here, and
16  this is from one of our secretary's.
17     Q    So you have no opinion on this
18  document?
19     A    No.
20     Q    Exhibit 62, and again, just so we're
21  clear, if it's not a warning and it's something
22  else, just tell me.  I want to know from your
23  testimony what these memos are?
24     A    This is a warning to Mr. Turner and Ms.
25  Sutowski.
```

Page 136

```
 1          H. Pineda-Lopez      136
 2     Q    Did you place their jobs in jeopardy
 3  with this memo?
 4     A    No.
 5     Q    Did you receive any responses to the
 6  memos I've shown you so far, any written
 7  responses?
 8          MR. SHAPIRO:  The ones she sent you
 9  mean?
10          MR. GOLDBERG:  Yes.
11     A    None that I can recall.
12     Q    Now, there was a transition on a daily
13  basis from the day to night shift, right?
14     A    Right.
15     Q    Did you and Mr. DeGazon come everyday
16  to the four o'clock transition between Mr. Turner
17  and Mr. Trujillo?
18     A    I made it my duty.
19     Q    That was really a briefing between the
20  managers, correct?
21     A    I oversee the cleaning of the
22  department.
23     Q    Let me show you Exhibit 63.
24     A    It's Mr. DeGazon.
25     Q    Again, so no opinion on that?
```

Page 137

```
 1          H. Pineda-Lopez      137
 2     A    Right.
 3     Q    Exhibit 64?
 4     A    This one was written to me -- by me to
 5  Mr. Turner and Ms. Sutowski.
 6     Q    This followed up on a meeting you had
 7  with them?
 8     A    Correct.
 9     Q    Am I correct that this is to follow-up
10  on a meeting you had the day before?
11     A    Correct.
12     Q    Is this document a warning to them?
13     A    Yes, it is.  I would put their job in
14  jeopardy if they didn't make adjustments.
15     Q    You're saying your intention from this
16  memo to place both of their jobs in jeopardy?
17     A    To let them know if they don't correct
18  their behavior, further disciplinary action would
19  be taken.
20     Q    Am I correct that the memo itself does
21  not say, if you don't do this, further
22  disciplinary action would be taken?
23          MR. SHAPIRO:  Objection to form.
24     Q    It doesn't actually say that?
25     A    It doesn't say it, but if you read
```

35 (Pages 134 to 137)

Page 138

1           H. Pineda-Lopez      138
2  between the lines, it is telling you it is not
3  acceptable behavior as managers.
4      Q   I'm just asking you, the document on
5  its face doesn't say, your jobs are in jeopardy,
6  or if you don't do X, Y, Z, you would lose your
7  job?
8      A   Correct, it doesn't say it that way.
9      Q   It doesn't say it that way.
10         The memos that I've shown you so far,
11 did you type them up or did someone type them for
12 you?
13     A   Only if I look at them would I be able
14 to tell you.
15     Q   Memos that are issued by you, if you
16 didn't type them, somebody would type --
17     A   No, I would give them my written memo
18 and they would type, but then on the initials, I
19 would see the initials of the person who did that
20 it.  If there were no initials, then it was done
21 by me.
22     Q   Exhibit number 65?
23     A   This is a warning for both managers,
24 Mr. Turner and Ms. Sutowski.
25     Q   It says, failure to follow this

Page 139

1           H. Pineda-Lopez      139
2  directive will result in further discipline
3  action.  Did you take any further discipline
4  against Mr. Turner or Ms. Sutowski based on the
5  subject matter?
6      A   I don't recall.
7      Q   Is it fair to say you don't recall
8  taking action against them based on what's in this
9  memo?
10     A   I don't remember.
11     Q   Exhibit 66?
12     A   This is a verbal e-mail to Ms. Sutowski.
13     Q   So was this a warning to Ms. Sutowski,
14 or just some other type of communication?
15     A   A warning.
16     Q   Exhibit 67, are those Mr. DeGazon's
17 notes?
18     A   Yes.
19     Q   Did you attend a meeting with Mr.
20 DeGazon and Ms. Sutowski on October 28th of 2003?
21 That's what the note purports to say.
22     A   Can I see?
23     Q   Sure.
24         Please don't ask your attorney for
25 anything?

Page 140

1           H. Pineda-Lopez      140
2      A   I'm not asking, I'm showing him.
3      Q   I understand, but if you want to talk
4  to him, you should do it on a break.
5      A   Okay.
6      Q   I just want to know if these are notes
7  Mr. DeGazon prepared.  Have you seen them prior to
8  me showing them to you?  Do you recognize the
9  handwriting?
10     A   Yes, I do, that's his handwriting, and,
11 yes, I was in that meeting.
12     Q   Was the meeting requested by Ms.
13 Sutowski or by somebody else?
14     A   I don't recall.
15     Q   So you don't recall what led to the
16 meeting?
17     A   No.
18     Q   Did you make any notes from the
19 meeting?
20     A   Not that I remember.
21     Q   Other than looking at the notes here,
22 do you have any independent recollection of the
23 meeting?
24     A   No.
25     Q   So this is something that's not written

Page 141

1           H. Pineda-Lopez      141
2  to Ms. Sutowski or Mr. Turner, it's just Mr.
3  DeGazon's notes?
4      A   Correct.
5      Q   Take a look at Exhibit 68.
6      A   This is a warning to Ms. Sutowski.
7      Q   Exhibit 69?
8      A   This is a warning to Ms. Sutowski giving
9  her a deadline.
10     Q   So that's not a warning, that is
11 something other than a warning?
12     A   No.
13         MR. SHAPIRO:  Objection to form.
14     Q   Is it a warning?
15     A   I am letting her know that she still
16 has some employees that have not had their annual
17 assessment as a requirement, so she's not
18 following instructions, and now this time I'm
19 giving her a deadline and I am making a copy for
20 her file so she knows I mean business.
21     Q   I just wanted a yes or no.  If this is
22 just instructions to her or criticism, that's just
23 what it is?
24     A   Yes.
25     Q   So you don't construe this as a

Page 142

```
 1            H. Pineda-Lopez      142
 2  warning?
 3     A    No.
 4     Q    Exhibit number 70?
 5     A    Yes, this memo was written by me to Ms.
 6  Sutowski, Bo Sutowski.
 7     Q    Was this intended to be a warning to
 8  her?
 9     A    Yes.
10     Q    I have never seen any memo of this
11  nature to Mr. Turner.  Did you ever write a memo
12  of this type to Mr. Turner?
13          MR. SHAPIRO:  Objection to form.
14     A    I don't remember.
15     Q    Exhibit 71?
16     A    This is a warning to Ms. Bo Sutowski.
17     Q    Exhibit 72, which is a few pages long,
18  so please flip through it and tell me if that's a
19  warning?
20          MR. SHAPIRO:  She can't say it's a
21     warning because it's --
22          MR. GOLDBERG:  Yes.
23     Q    If you could break it down as to the
24  bates stamp numbers.  It was produced as a stapled
25  document.  Was any part of that intended to be a
```

Page 143

```
 1            H. Pineda-Lopez      143
 2  warning to anyone?
 3     A    This had all e-mails addressed to
 4  various people, including myself.
 5     Q    Is there any correspondence in here
 6  that you construe to be a warning to Ms. Sutowski?
 7  I don't think there is, but I wanted to ask you.
 8     A    Well, that file -- those e-mails, they
 9  went into her file for a reason.  There were
10  complaints from several areas in regards to Ms.
11  Sutowski's performance, or lack of performance.
12     Q    It was not given to Ms. Sutowski?
13     A    That probably led to one of the memos
14  that you showed me before.
15     Q    My point is these memos were not issued
16  to Ms. Sutowski herself as a form of a warning?
17     A    No.
18     Q    Correct?
19     A    Correct.
20     Q    Take a look at Exhibit 73.
21     A    These are complaints in regards to Bo's
22  lack of performance.
23     Q    Again, it's similar to the prior one in
24  that it's material about Ms. Sutowski, but not
25  given to her as a warning, correct?
```

Page 144

```
 1            H. Pineda-Lopez      144
 2     A    Correct.
 3          MR. SHAPIRO:  Objection to form.
 4     Q    Exhibit 74?
 5     A    This is a warning to different
 6  managers.
 7     Q    To Ms. Sutowski, Mr. Turner and Mr.
 8  Trujillo, right?
 9     A    Correct.
10     Q    Did this place anybody's job in
11  jeopardy?
12     A    No.
13     Q    Exhibit number 75?
14     A    This is a warning to Ms. Sutowski.
15     Q    What was the reason Ms. Sutowski was
16  terminated?
17     A    Overall performance.
18     Q    So it wasn't absenteeism?
19     A    Overall performance.
20     Q    Was this document intended to place Ms.
21  Sutowski's job in jeopardy?
22     A    Yes, it did.
23     Q    In looking through Ms. Sutowski's file
24  that was produced by N.Y.U., I saw Exhibit 76.  Do
25  you know what that is?
```

Page 145

```
 1            H. Pineda-Lopez      145
 2     A    It's a report of her work performance.
 3     Q    Were you monitoring Ms. Sutowski's
 4  attendance?
 5     A    At one time point I did.
 6     Q    Because your memo of September 5th
 7  accuses her of excessive absenteeism?
 8     A    Yes, because she received a memo.
 9     Q    So this wasn't given to Ms. Sutowski
10  herself, it was just in her file?
11     A    Just in her file.
12     Q    Exhibit 77, is your handwriting on this
13  document?
14     A    Yes.
15     Q    Was this more monitoring of Ms.
16  Sutowski's absenteeism or attendance?
17          MR. SHAPIRO:  Objection to form.  Why
18     don't you look at the whole document before
19     you answer the question.
20     Q    Yes.  This was produced.  I just want
21  to understand what it is.
22     A    Yes, similar report to the one you
23  showed me before, and this time I'm making Jackie
24  aware that Bo did not have anymore sick time, but
25  she continued getting paid even though she didn't
```

1          H. Pineda-Lopez        146
2   have more sick time, and I have noted here I was
3   asking for one of the secretaries to write a
4   correction notice in regards to Bo's poor
5   attendance performance.
6      Q    You wanted a secretary to write up --
7      A    A correction notice.  That's what I
8   normally do.  I make a request from me and she
9   would do the typing.
10     Q    Did you ask Ms. Fromkin to do that for
11  Keith Turner?
12     A    We are talking about Ms. Sutowski.
13     Q    I know, but you don't recall right now?
14     A    No.
15     Q    Take a look at Exhibit 78.  You see
16  that's a doctor's note from Ms. Sutowski for May
17  13th, '04?
18     A    Correct.
19     Q    It looks like it was stamped, received
20  May 14th.  Did you receive this?  You were cc'd on
21  the document.
22     A    I don't remember.
23     Q    Did Ms. Sutowski have some medical
24  issues that required a doctor's note?
25     A    I don't know.

1          H. Pineda-Lopez        147
2          (Whereupon, bates stamp N0722 was
3   marked as Plaintiff's Exhibit 79 for
4   identification, as of this date.
5          Bates stamp N0713 was marked as
6   Plaintiff's Exhibit 80 for identification, as
7   of this date.
8          Bates stamp N0717 was marked as
9   Plaintiff's Exhibit 81 for identification, as
10  of this date.
11         Bates stamp N0729 was marked as
12  Plaintiff's Exhibit 82 for identification, as
13  of this date.)
14     Q    Exhibit 79, is that a document you
15  issued to Keith Turner?
16     A    Yes, it is.
17     Q    That's from March of '03?
18     A    Correct.
19     Q    Was that intended to be a warning?
20     A    Yes, it was.
21     Q    Was that intended to place Keith
22  Turner's job in jeopardy?
23     A    To make him aware he had an issue.
24     Q    But it didn't threaten his job, did it?
25         MR. SHAPIRO:  Objection to form.

1          H. Pineda-Lopez        148
2      A    No.
3      Q    Did it threaten his job?
4      A    No.
5      Q    You got from Keith Turner Exhibit 80,
6   which was a memo about the beepers?
7          MR. SHAPIRO:  Objection to form.
8      Q    Did you ever receive that?  You're
9   listed as a recipient.
10     A    Yes, I did receive it.
11     Q    Exhibit 81, is that something you sent
12  to Keith Turner about holiday schedules?
13     A    Yes, that was given by me to Mr.
14  Turner.
15     Q    That wasn't a warning, right?
16     A    I am making him aware that employees
17  need to be placed on holidays and the schedule is
18  not done.
19     Q    It's instructions?
20     A    No, that's a warning.
21     Q    Does it place his job in jeopardy?
22     A    It might be in the future, if he
23  continued doing that.
24     Q    But the document itself didn't --
25     A    No.

1          H. Pineda-Lopez        149
2      Q    And there wasn't a problem with this
3   after you issued the memo?
4          MR. SHAPIRO:  Objection to form.
5      A    Repeat that?
6      Q    There wasn't a subsequent problem after
7   May 21st of '03?
8          MR. SHAPIRO:  Objection to form.
9      A    I don't know.
10     Q    Well, I haven't shown you another memo
11  about this, have I?
12     A    No.
13     Q    Exhibit 82, is that some kind of
14  attendance sheet regarding Keith?
15     A    Yes.
16     Q    Was that generated in January, 2004?
17     A    Yes.
18     Q    Is that the type of document that you
19  had access to for generating?
20     A    Yes.
21     Q    To generate these kind of reports, did
22  you have some kind of access code?
23     A    It is a departmental database.
24     Q    And you had access to it?
25     A    Yes.

Page 162

```
 1            H. Pineda-Lopez      162
 2      Q    Explain to me what you mean by the
 3 amount of years at the hospital.
 4      A    He was one of the least senior people
 5 in the hospital, and also, his performance was
 6 very poor.
 7      Q    His last evaluation had a meets
 8 requirements, correct?
 9      A    Correct.
10      Q    So that's not indicative of poor
11 performance?
12      A    He had a lot of -- if you review his
13 evaluation, he has a lot of comments that I made
14 there, not enough to fail his evaluation, because
15 I gave him the benefit of the doubt that he was
16 trying to improve, and that improvement never
17 arrived.
18      Q    Mr. Turner was not fired for cause,
19 correct?
20      A    Correct.
21      Q    According to N.Y.U.'s documents, Mr.
22 Turner's discharge was unrelated to performance?
23      A    Correct.
24           MR. SHAPIRO:  Objection to form.
25      Q    According to N.Y.U.'s documents and
```

Page 163

```
 1            H. Pineda-Lopez      163
 2 your own testimony, Mr. Turner's separation from
 3 N.Y.U. was solely the decision by N.Y.U. to
 4 eliminate his position, correct?
 5      A    Correct.
 6           MR. SHAPIRO:  Objection to form.
 7      Q    With respect to Mr. Turner's seniority
 8 at N.Y.U., Mr. Turner and Ms. Sutowski were the
 9 only two day managers in building services,
10 correct?
11      A    Correct.
12      Q    So it wasn't a question of keeping Mr.
13 Turner or keeping someone who had the job of
14 cleaning toilets at the hospital, correct?
15           MR. SHAPIRO:  Objection to form.
16      Q    Am I correct on that?
17      A    You're correct.
18      Q    So according to N.Y.U.'s documents,
19 because I'm not testifying, I'm just questioning
20 you, N.Y.U. made the decision that it could manage
21 with just one manager of building services,
22 correct?
23           MR. SHAPIRO:  Objection to form.
24      Q    Am I correct?
25      A    Yes.
```

Page 164

```
 1            H. Pineda-Lopez      164
 2      Q    And the decision you and Mr. DeGazon
 3 made was that that person should be Robert
 4 Stephen, correct?
 5           MR. SHAPIRO:  Objection to form.
 6      A    The decision was that Mr. Turner will
 7 never be able to carry out his responsibilities
 8 with one less manager.  He was already struggling
 9 with the assistance of Bo Sutowski in his current
10 position.  So eliminating one and leaving him as
11 the only manager in charge of the day shift would
12 have been chaotic.  We would have had a
13 catastrophe.
14      Q    So when the decision was made to
15 separate Mr. Turner from N.Y.U., was the decision
16 made at that time that there was going to be a day
17 manager, but it wouldn't be Mr. Turner?
18      A    I don't know that.
19      Q    Was a decision made that there would be
20 no day manager?
21      A    The decision was made that we had to
22 give back to the hospital a certain amount of
23 money.  There was a certain percentage in salaries
24 that we had to give back to administration in
25 savings, so both, you know, positions -- Bo
```

Page 165

```
 1            H. Pineda-Lopez      165
 2 Sutowski was terminated and Mr. Turner was laid
 3 off.
 4      Q    How come you didn't just eliminate Ms.
 5 Sutowski's job?
 6      A    You're asking the wrong person.
 7      Q    No, I'm not, because you told me you
 8 and Mr. DeGazon made the decision to fire for
 9 cause, so my question to you, as a decision maker,
10 is why was Ms. Sutowski fired for cause and not
11 had her job eliminated?
12           MR. SHAPIRO:  Objection to form.  If
13      you believe that that's not a decision that
14      you were empowered to make, don't accept that
15      because he says that you have to feel that
16      way.  If you can answer and you know, fine,
17      if not, --
18      A    Like I said to you before, there was a
19 certain amount of money that we had to give back
20 in savings, and we gave that back.
21      Q    I understand that, but couldn't you
22 have given back more money if you had eliminated
23 Ms. Sutowski's job as well and said to -- well, if
24 you eliminate a job, it's your testimony that
25 gives back money to N.Y.U., is that true?
```

42 (Pages 162 to 165)

Page 170

```
 1            H. Pineda-Lopez      170
 2      A    Correct.
 3      Q    She didn't read that in a fortune
 4   cookie, she was informed?
 5           MR. SHAPIRO: Objection to form.
 6      A    No, she was informed.
 7      Q    When she was informed, she wasn't told,
 8   you're job is being eliminated?
 9           MR. SHAPIRO: Objection to form.
10      A    Yes.
11      Q    When Keith Turner was let go, he was
12   given layoff papers which I showed you, right?
13      A    Correct.
14           MR. SHAPIRO: Objection to form.
15      Q    The message delivered to Mr. Turner and
16   Ms. Sutowski, they got different messages on June
17   14th, '04?
18      A    Correct.
19           MR. SHAPIRO: Objection to form.
20      Q    On June 14, '04 you and Mr. DeGazon had
21   already selected Robert Stephen to become day
22   manager?
23           MR. SHAPIRO: Objection to form.
24      A    Not true.
25      Q    What day did you decide --
```

Page 171

```
 1            H. Pineda-Lopez      171
 2      A    I don't know.
 3      Q    Do you have any documents showing the
 4   decision to be made?
 5      A    I don't remember.
 6      Q    Wasn't that a pretty big decision?
 7      A    Of course.
 8      Q    How come you don't remember it?
 9      A    I don't remember the date.
10           MR. SHAPIRO: Objection to form.
11      Q    When you laid off Mr. Turner and you
12   fired Ms. Sutowski for cause both on June 14, '04,
13   did you come to work that day?
14      A    I believe so.
15      Q    On that day there was no day manager
16   anymore, correct, both were let go?
17      A    Correct.
18      Q    Was it your intention there would be
19   somebody coming to work after June 14 who would be
20   the day manager?
21      A    No.
22      Q    It was your intention there would be no
23   day manager at all?
24           MR. SHAPIRO: Objection to form.
25      A    Correct.
```

Page 172

```
 1            H. Pineda-Lopez      172
 2      Q    It was your intention there would be no
 3   day manager anymore, correct?
 4      A    That was not known.  I didn't know
 5   that, what was going to happen on the following
 6   day.  All I knew is that I didn't have two day
 7   shift managers and, therefore, I was in front of
 8   the whole operation of the cleaning department.
 9   So that I knew.
10      Q    Let me show you what was previously
11   marked as Exhibit number 9.  Can you tell me if
12   you signed the bottom left-hand corner of that
13   confidential personnel profile for Mr. Turner?
14      A    Yes, that's my signature.
15      Q    What's the date that you signed it?
16      A    August 3rd, 2004.
17      Q    Did you sign it anywhere else on the
18   document?  You signed it once, correct?
19      A    Yes.
20      Q    Did you fill in any other information
21   on the document other than the signature?
22      A    No, just my signature.  Let me see.
23   I'm sorry.
24      A    I did his termination evaluation.
25      Q    Let me see what you're referring to as
```

Page 173

```
 1            H. Pineda-Lopez      173
 2   the termination evaluation.
 3           Is that the bottom right-hand section
 4   of the document?
 5      A    Correct, where you see the Xs.
 6      Q    There's a place on the bottom of
 7   Exhibit 9 where it says termination, and then it
 8   says evaluation.  It has an E, G, F and P.  Can
 9   you tell me what that stands for?
10      A    Can I see it?
11      Q    Yes.  You did this on the day that you
12   signed the form?
13      A    Okay.  Yes.
14      Q    This was all filled out on August 3rd
15   of 2004?
16      A    Right.  So quality, I gave him a rating
17   of fail.
18      Q    F is fail?
19      A    Right.  Quantity, poor, attendance,
20   good, cooperation, fair.  That's my evaluation.
21      Q    F is fair?
22      A    Fail.
23      Q    F-A-I-L?
24      A    Right.
25      Q    Is there a document that has those
```

44  (Pages 170 to 173)

ab667ae4-9039-4e5e-9f07-341b7b6122f9

```
1           H. Pineda-Lopez       174
2  letters defined? I mean, is there a document that
3  says what's E, excellent?
4      A    Correct.
5      Q    G is good, F is fail and P is poor?
6      A    Yes.
7      Q    I thought F was fair.
8      A    Fair.
9      Q    P is poor?
10     A    Yes.
11     Q    P is a failing grade?
12     A    Yes.
13     Q    E, G and F are passing grades?
14     A    Right.
15     Q    So you gave Mr. Turner one failing
16 grade for quantity?
17     A    Correct.
18     Q    You did that on August 3rd, 2004?
19     A    Yes.
20     Q    About two months after he was let go,
21 right?
22     A    When I was asked to evaluate him on
23 that piece of paper.
24     Q    You did it August 3rd, 2004?
25     A    Correct.
```

```
1           H. Pineda-Lopez       175
2      Q    At the bottom it says, unacceptable
3  level of performance. Is that your handwriting
4  too?
5      A    Very small letters.
6      Q    It looks like your handwriting to me.
7      A    Yes.
8      Q    You wrote unacceptable level of
9  performance. Then it says rehire indication and
10 it looks like you checked off no?
11     A    Correct.
12     Q    So when you did this form on August 3rd
13 of '04 in your capacity as -- you were associate
14 director at this point, right?
15     A    Correct.
16     Q    You gave Keith these scores, you gave
17 him a fair for quality, a poor for quantity, a
18 good for attendance and a fair for cooperation,
19 correct?
20     A    Correct.
21     Q    You checked the boxes for no as to
22 whether N.Y.U. should rehire him, correct?
23     A    Correct.
24     Q    And you wrote down unacceptable level
25 of performance, right?
```

```
1           H. Pineda-Lopez       176
2      A    Correct.
3      Q    Somebody wrote, looks to me like it
4  says, already done. Is that your handwriting?
5      A    No.
6      Q    You see Mr. DeGazon's signature?
7      A    Yes.
8      Q    He signed this July 23rd of '04,
9  correct?
10     A    Correct.
11     Q    After you did this, this document went
12 to Mr. Turner's personnel file?
13         MR. SHAPIRO: Objection to form.
14     Q    What did you do with the document after
15 you --
16     A    I don't know.
17     Q    You did something with it, right?
18     A    I gave it back to the secretary.
19     Q    Who was the secretary?
20     A    Jacqueline Richards.
21     Q    The office coordinator?
22     A    Correct.
23     Q    You see it was stamped received in
24 payroll August 30th of '04, right?
25     A    Correct.
```

```
1           H. Pineda-Lopez       177
2      Q    The form also had a check next to
3  layoff, that box. Was that there when you filled
4  out the form or did you put that there?
5      A    Should have been completed before it
6  got to me.
7      Q    So at which time it got to you, it was
8  to fill out the termination evaluation and whether
9  to rehire or not?
10     A    Correct.
11     Q    Then it was for you to sign and, in
12 fact, Mr. DeGazon's signature occurred before
13 yours, is that right, because it's dated July
14 23rd?
15     A    It looks like it.
16     Q    I didn't fill out that section, this
17 is --
18     A    I did say that before.
19     Q    So Mr. DeGazon signed this before
20 knowing what was going to be filled out by you in
21 the form or did he already know?
22         MR. SHAPIRO: Objection to form.
23     Q    Did he already know what you were going
24 to write?
25     A    How would he know?
```

ab667ae4-9039-4e5e-9f07-341b7b6122f9

Page 178

H. Pineda-Lopez          178
1
2    Q    I don't know.  Did you discuss it with
3 him?
4    A    No.
5    Q    So he signed a blank check?
6    MR. SHAPIRO:  Objection to form.
7    A    That's not a check, it's a C.P.P.
8    Q    He signed it not knowing if you were
9 going to say something nice or nasty about Mr.
10 Turner?
11    A    Correct.  Nothing nasty there.  Just
12 the plane truth.
13    Q    In your opinion.
14    A    Yeah, that's my opinion.
15    Q    It's interesting to me that the last
16 evaluation you gave Mr. Turner was meets
17 requirements.  Was this evaluation meets --
18    MR. SHAPIRO:  Objection to form.
19    Q    It doesn't have that choice, but if you
20 were doing an evaluation on August 4th, --
21    MR. SHAPIRO:  Objection to form.
22    Q    You never gave Mr. Turner an annual
23 evaluation in 2004 because he had been fired or
24 laid off prior to the next evaluation that he was
25 entitled to, correct?

Page 179

H. Pineda-Lopez          179
1
2    A    Right.
3    Q    When you filled out this form, you
4 filled this out so that Mr. Turner would not be
5 rehired by N.Y.U., correct?
6    MR. SHAPIRO:  Objection to form.
7    A    Correct.
8    Q    You filled this out knowing that if
9 anyone at N.Y.U. looked at this form, they might
10 not rehire Mr. Turner because of what you put on
11 this, correct?
12    A    Correct.
13    Q    What was the basis for your filling out
14 this form two months after Mr. Turner had been
15 laid off to decide that he was not qualified for
16 employment at N.Y.U.?
17    MR. SHAPIRO:  Objection to form.
18    Q    What did you base that assessment on?
19    A    On his past performance.
20    Q    Which you had rated as a meets
21 requirements in his last evaluation?
22    A    I would have failed him.
23    Q    But you had given him a meets
24 requirements in September of '03?
25    A    Right.  That was a year after he was

Page 180

H. Pineda-Lopez          180
1
2 hired.
3    Q    So your assessment of Mr. Turner that
4 led to these scores was subsequent to the
5 September of '03 evaluation.  What time period did
6 you basis this on?
7    MR. SHAPIRO:  Objection to form.
8    A    From the period from -- I'm sorry, I
9 can't remember the dates of that evaluation.
10    Q    September of '03?
11    A    From September, '03 to present.
12    Q    So you evaluated Mr. Turner subsequent
13 to his evaluation from September of '03 through
14 his termination date that he failed to meet
15 standoffs for that period of time?
16    A    That's correct.  He didn't make any
17 improvements on any of the comments that I cited
18 on his evaluation from 2003.
19    Q    Did you feel this way about Mr. Turner
20 on June 14th, '04 when he was laid off?
21    A    Yes, I did.
22    Q    But you did not seek to have him
23 terminated for cause, is that correct?
24    MR. SHAPIRO:  Objection to form.
25    A    The decision was made that he was going

Page 181

H. Pineda-Lopez          181
1
2 to be laid off.
3    Q    The decision by you and Mr. DeGazon?
4    A    Correct.
5    Q    When the decision was made to lay Mr.
6 Turner off on June 14th, 2004, am I correct that
7 you and Mr. DeGazon also had the opinion that you
8 would not rehire Mr. Turner if that opportunity
9 presented itself?
10    MR. SHAPIRO:  Objection to form.
11    Q    Am I correct?
12    A    That was never discussed.
13    Q    Well, you felt in August of '04 that
14 Mr. Turner was not eligible for rehire, correct?
15    A    Correct.
16    Q    Did you feel that way June 15th, 2004,
17 the day after Mr. Turner was laid off?
18    A    Yes, I did.
19    Q    So as soon as Mr. Turner was laid off,
20 you felt he's not coming back?
21    A    Correct.
22    MR. SHAPIRO:  Objection to form.
23    Q    And Mr. DeGazon agreed with you?
24    MR. SHAPIRO:  Objection to form.
25    A    Never asked him.

ab667ae4-9039-4e5e-9f07-341b7b6122f9

Page 198

H. Pineda-Lopez          198

1
2  you ever send any type of memos to Mr. Stephen?
3       A    I don't remember.
4       Q    Is it possible you did?
5       A    Probably.
6       Q    Since he was a supervisor who reported
7  to you for several years, is it possible you sent
8  him written criticism or feedback when he was a
9  supervisor?
10      A    I don't remember.
11      Q    It's possible you did, correct?
12      A    I don't remember.
13      Q    There were complaints concerning the
14  patient transport area when Mr. Stephen was a
15  supervisor, correct?
16      MR. SHAPIRO:  Objection to form.
17      A    There is still complaints.
18      Q    But there were complaints when he was a
19  supervisor there?
20      A    Not abnormal complaints.
21      Q    But there were complaints?
22      A    Certain delays, certain delays.
23      Q    Did you consider Mr. Stephen to be
24  accountable for the performance of the patient
25  transport area?

Page 199

H. Pineda-Lopez          199

1
2       A    Of course.
3       Q    So if there were complaints, those
4  would fall at his doorstep, right?
5       MR. SHAPIRO:  Objection to form.
6       A    I will address them with him --
7       Q    Did you?
8       A    -- as the charge person.
9       Q    Did you?
10      A    I probably did.  Don't remember.
11      MR. GOLDBERG:  I might have five
12  minutes left.  I'm going to take a five
13  minute break.
14      We certainly reiterate our request for
15  any written communications from Ms. Pineda or
16  Mr. DeGazon to Mr. Stephen, given his
17  testimony about receiving written criticism.
18      (Whereupon, a short break was taken.)
19      Q    Ms. Pineda, since you had been Mr.
20  Turner's direct supervisor, would you agree that
21  it was for you to give any warnings to Mr. Turner,
22  that was for you to do as his direct supervisor?
23      A    Anyone in my position or above my
24  position had something to do with Mr. Turner.
25      Q    So you are saying anyone in your

Page 200

H. Pineda-Lopez          200

1
2  position or above had the right to evaluate Mr.
3  Turner and form an opinion of his performance?
4       A    Yes.
5       Q    And that could include Mr. Morelos?
6       A    Correct.
7       MR. GOLDBERG:  At this point I don't
8  have any other questions for you.  Let me
9  just give you a couple of words of caution.
10      Number one, if Peter asks you
11  questions, I may have follow-ups.  If he
12  doesn't, then you'll be leaving today.
13  Secondly, if there are new documents produced
14  that I cannot deal with through letters with
15  Mr. Shapiro, there's always the risk of
16  having to recall you.  I've heard of
17  additional documents that I'm calling for.
18      MR. SHAPIRO:  I have a quick follow-up.
19  CROSS EXAMINATION BY PETER SHAPIRO, ESQ.:
20      Q    Do you recall this morning that Mr.
21  Goldberg asked you some questions whether any
22  employees had made any critical comments about Mr.
23  Turner?  Do you recall being asked that?
24      A    Yes, I do.
25      Q    On reflecting on the answer that you

Page 201

H. Pineda-Lopez          201

1
2  gave to Mr. Goldberg, have you thought of any
3  additional complaints by other employees?
4       A    There were complaints made from the
5  management staff in regards to Mr. Turner's
6  performance and the way he lead the group.
7       Q    The way he led the group?
8       A    Right.
9       Q    Who are the people you're referring to
10  as the management staff?
11      A    Ms. Aybar, Magdalena Aybar, Ms.
12  Magdalena Kapusta, Mr. Anthony Lewis, Mr.
13  Rafaelina Rodriguez, and I would have to look at
14  the table of organization to see if there were any
15  other names.  But these were some of the employees
16  that were having a difficult time working under
17  Mr. Turner's leadership.
18      Q    Are you able to make any estimate of
19  how often you received those type of comments from
20  the management staff about Mr. Turner?
21      A    Often.  Often they would come to me
22  with concerns.  They felt that they were not being
23  trained properly, guided properly, their questions
24  were not answered properly.  They felt that Mr.
25  Turner didn't have the skills to manage them as

51  (Pages 198 to 201)

Page 202

```
 1           H. Pineda-Lopez      202
 2  supervisors. He was very insecure about his
 3  abilities as a manager. He showed a lot of
 4  inexperience in the cleaning field.
 5           Employees even joked around -- There
 6  was a particular day that we had a flood and
 7  things we had -- in the cleaning business we had
 8  to pick up the water from the floor, and Mr.
 9  Turner had no clue how to use the equipment or to
10  assist or show the staff how to use the equipment.
11  He just had no knowledge of the activities in the
12  health care environment.
13           Many times, you know, he just
14  struggled. He didn't know how to address
15  questions or how to provide feedback. You know,
16  it was very obvious that he was really having a
17  difficult time adjusting to his new work
18  environment.
19           He never worked at a hospital before,
20  he had a hard time adjusting to the pace of the
21  place. I know that he tried and, you know, I gave
22  him the benefit of the doubt, because he had some
23  aches and pains, you know, he would say he had a
24  bad knee or bad back.
25           So during the first year of employment
```

Page 203

```
 1           H. Pineda-Lopez      203
 2  I gave him the benefit of the doubt, and I really
 3  hoped that he was going to succeed as a manager.
 4  He's a very charismatic man, very nice man.
 5  Unfortunately, he wasn't made to work in a
 6  hospital setting. He just didn't have the
 7  qualities, and I tried to work with him,
 8  but I wasn't as successful.
 9        MR. SHAPIRO: I don't have any further
10  questions.
11  CONTINUED EXAMINATION BY MR. GOLDBERG:
12     Q   Ms. Pineda, you mentioned Anthony
13  Lewis. He was the brother-in-law of Robert
14  Stephen, right?
15     A   Yes.
16     Q   Who hired him?
17     A   I'm not too sure.
18     Q   Rafaelina Rodriguez, she's one of the
19  supervisors with whom you spoke Spanish, right?
20     A   Not the only one.
21     Q   In fact, you told Keith Turner one day
22  he should learn to speak Spanish?
23        MR. SHAPIRO: Objection to form.
24     A   No, I would never say that. I would
25  never say that.
```

Page 204

```
 1           H. Pineda-Lopez      204
 2     Q   And Ms. Kapusta and Ms. Aybar, who
 3  hired them?
 4     A   Actually, Mr. Morelos brought Ms.
 5  Aybar, and she's still currently employed.
 6  Kapusta was brought in by Bo Sutowski.
 7     Q   Would you agree that one of the most
 8  important skills for your job is communication?
 9     A   Definitely.
10     Q   The ability to communicate effectively
11  in written form and verbally?
12     A   Correct.
13     Q   The ability to make sure that when you
14  communicate with somebody, there's no ambiguity
15  about what you mean?
16     A   Correct.
17     Q   And you just laid out under your
18  attorney's questioning some more criticism of Mr.
19  Turner, but notwithstanding all that criticism
20  that you just laid out, you still gave him a
21  meeting requirements evaluation?
22        MR. SHAPIRO: Objection to form.
23     A   Like I said, --
24     Q   Did you or not?
25     A   Like I said, it was a year after I made
```

Page 205

```
 1           H. Pineda-Lopez      205
 2  that evaluation, and in that evaluation I did
 3  write some comments, some areas where he needed
 4  immediate improvement, and I also gave him the
 5  benefit of the doubt because he didn't have any
 6  hospital experience. So I was hoping that in time
 7  he will mature and he will learn everything that
 8  was under his job description.
 9     Q   Then you said, Ms. Pineda, after Mr.
10  Turner was laid off you made the assessment that
11  he wasn't qualified to be at N.Y.U., but there was
12  only one memo in 2004 that's been produced
13  criticizing Mr. Turner?
14        MR. SHAPIRO: Objection to form.
15     A   There are other memos.
16     Q   Not from 2004.
17     A   I don't remember the dates, but there
18  were other memos and e-mails.
19
20
21
22
23        (Continued on following page to
24  allow for signature and jurat.)
25
```