Exhibit 6

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - x

KEITH TURNER,

                      Plaintiff,

      -against-             Index No.
                           06 CV 1910

NYU HOSPITALS CENTER, NYU MEDICAL CENTER,
NYU SCHOOL OF MEDICINE, AND NYU HEALTH
SYSTEM,

                      Defendants.
- - - - - - - - - - - - - - - - - - - - - x

                      One Battery Park Plaza
                      New York, New York

                      November 29, 2006
                      10:00 a.m.

  DEPOSITION OF UDEL DeGAZON, a witness produced on behalf of the Defendants herein, taken by the attorney for the Plaintiff pursuant to Subpoena at the above-stated time, place and date before Debra Bonavisa, a Notary Public of the State of New York.

             *       *       *

Page 6

```
                 Udel DeGazon              6
 1
 2   so and I will rephrase it.  We will probably be here
 3   most of the day.  If you need a break, say so.  We
 4   will probably take a lunch break.  Let me know when
 5   you feel you need to eat lunch.
 6         Let's move on.  Your name is Udel
 7   DeGazon, correct?
 8      A   Yes, sir.
 9      Q   You are a former employee of NYU,
10   correct?
11      A   Yes, sir.
12      Q   You worked for NYU for many years?
13      A   Yes, sir.
14      Q   You were hired in August 1966, is that
15   right?
16      A   That's correct.
17      Q   Okay.
18         MR. GOLDBERG:  We will mark as
19   Exhibit number 86, Bates N0539.
20         (At this time the above referred to
21      document was marked as Plaintiff's Exhibit
22      86 for identification, as of this date.)
23      Q   NYU produced many documents and some
24   of them I will show you today.  I've already marked
25   eighty-five exhibits before I took your deposition
```

Page 7

```
                 Udel DeGazon              7
 1
 2   so when I show you Exhibits 1 to 85, they were
 3   already marked at other depositions and I will just
 4   reuse them.  Exhibit 86 onwards are documents that
 5   I'm marking today, documents from your personnel file
 6   that were of interest to me.  One of those is
 7   Exhibit 86 which says you were hired in August of
 8   '66 as a training manager, is that accurate?
 9      A   No, sir.
10      Q   Okay.  What was your position when you
11   were hired by NYU?
12      A   Supervisor.
13      Q   So you were not hired as a training
14   manager in August of '66, is that right?
15      A   Yes, sir, that's correct.
16      Q   Did you ever meet someone named Judith
17   B. Goodman at NYU?
18      A   I don't recall that name, sir.
19      Q   So you were hired as a supervisor in
20   1966 and was it for the Department of Building
21   Services?
22      A   Yes, sir.
23      Q   And you spent your entire career at
24   NYU in the Department of Building Services?
25      A   Yes.
```

Page 8

```
                 Udel DeGazon              8
 1
 2      Q   And you separated from NYU in 2005?
 3      A   Yes, sir.
 4         MR. GOLDBERG:  We will mark as
 5   Exhibit number 87 Bates number N0336.
 6         (At this time the above referred to
 7      document was marked as Plaintiff's Exhibit
 8      87 for identification, as of this date.)
 9      Q   I show you Exhibit number 87.  Is that
10   a memo that you submitted to NYU regarding your
11   separation from NYU?
12      A   That is correct.
13      Q   Is that your signature on the memo?
14      A   Yes, sir.
15      Q   So you gave NYU notice in April of '05
16   of your intention to retire in May of '05, correct?
17      A   Yes, sir.
18      Q   And your letter was fairly precise in
19   terms of stating that you had worked at NYU for
20   thirty-eight years and eight months, correct?
21      A   Yes, sir.
22      Q   Over your thirty-eight year career at
23   NYU, did you feel it was important to be precise in
24   your communications?
25         MR. SHAPIRO:  Objection to form.
```

Page 9

```
                 Udel DeGazon              9
 1
 2      Q   You can answer questions that have
 3   those types of objections.
 4         MR. SHAPIRO:  I said objection to
 5      form.  Every now and then I will make an
 6      objection to form.  Unless I tell you don't
 7      answer, you can go ahead and answer.
 8      Q   Was it important to you at NYU to be
 9   precise in your communications?
10      A   Yes.
11      Q   Whether those communications were
12   written or verbal, it was important to you to be
13   precise when you communicated?
14      A   Yes.
15      Q   Was it also important to you to have
16   your subordinates be precise when they communicated
17   in written or verbal form?
18      A   Yes, sir.
19      Q   Would that include correct spelling
20   and grammar in memos and correspondence?
21      A   Yes, sir.
22      Q   Now while you were at NYU did you
23   obtain a college degree?
24      A   Yes, sir.
25      Q   Was that in 1986?
```

Page 10

```
1            Udel DeGazon              10
2       A   Yes, sir.
3           MR. GOLDBERG: We will mark as
4   Exhibit number 88, Bates number N0557.
5           (At this time the above referred to
6           document was marked as Plaintiff's Exhibit
7           88 for identification, as of this date.)
8       Q   Can you identify 88 as a copy of the
9   diploma you received from NYU in 1986?
10      A   That's correct, sir.
11      Q   As a result of being an employee of
12  NYU, did that either eliminate or lessen the tuition
13  you had to pay to get your degree?
14      A   Tuition remission at that time.
15      Q   So you ended up not having to pay
16  anything for the degree?
17      A   We paid just a registration fee.
18      Q   And that was a benefit of being an NYU
19  employee?
20      A   Yes, sir.
21      Q   Did NYU also have a policy under which
22  the children of employees could attend NYU at either
23  a reduced or zero tuition?
24      A   Yes, sir.
25      Q   As of 2004 when Mr. Turner's employment
```

Page 11

```
1            Udel DeGazon              11
2   at NYU ended, do you know what the policy was in
3   terms of children going to NYU?
4       A   I don't know, sir.
5       Q   There was a policy where it was either
6   zero or reduced tuition?
7       A   I don't know, sir.
8       Q   I thought you said there was some
9   policy in place?
10      A   There was, I was in graduate school at
11  NYU when it was still a hundred percent tuition
12  remission and then it became a benefit and of course
13  I couldn't afford it, so the policy had changed as
14  far as it referred to me.
15      Q   Okay. As of April of '05 when you
16  separated from NYU, was your position Director of
17  Building Services?
18      A   Yes, sir.
19      Q   Prior to being Director of Building
20  Services for a period of time you were Associate
21  Director of Building Services?
22      A   Yes, sir.
23      Q   Can you tell me when you first held
24  the position of Associate Director of Building
25  Services?
```

Page 12

```
1            Udel DeGazon              12
2       A   I don't remember the date and the
3   year.
4       Q   Would it be fair to say that you held
5   that position in the 1990's?
6       A   Yes, sir.
7       Q   Did you have it in the 1980's?
8       A   I don't remember.
9       Q   So it's fair to say that in the 1990's
10  you were Associate Director of Building Services and
11  then you were later promoted to Director of Building
12  Services, correct?
13      A   Correct, sir.
14      Q   Am I correct that on April 30th of
15  2004 you were made Interim Director the day that
16  Mr. Joey Morelos was let go from NYU?
17          MR. SHAPIRO: Objection to form.
18      A   Well, I don't know. I don't think I was
19  made an Interim Director. We didn't have a director
20  then, and I don't know what you mean an Interim
21  Director. A director hadn't been chosen on that date
22  when Mr. Morelos separated.
23      Q   If NYU has produced documents that
24  refer to you as Interim Director, would you doubt
25  NYU's records changing your title from Associate
```

Page 13

```
1            Udel DeGazon              13
2   Director to Interim Director to Director?
3       A   I wouldn't doubt it, sir.
4           MR. GOLDBERG: We will mark as
5   Exhibit number 89 Bates numbers N0373
6   through N0374.
7           (At this time the above referred to
8           document was marked Plaintiff's Exhibit 89
9           for identification, as of this date.)
10      Q   Mr. DeGazon, NYU produced a lot of
11  documents in this case, one of them is called
12  Confidential Personnel Profile. It's a form and
13  I have forms for you and I have forms for other
14  employees. I'm showing you Exhibit 89 which is one
15  form that pertains to you, according to the document,
16  and it says Interim Acting Director, May 3rd, '04.
17  Does that ring a bell, after Mr. Morelos was laid off
18  or let go by NYU, that NYU placed you in the Interim
19  Director position prior to making you the Permanent
20  Director of Building Services?
21      A   That's correct, sir.
22      Q   And, in fact, according to Exhibit 89,
23  when that occurred NYU raised your salary from
24  $94,917.94 to what appears to me to be $104,409.76;
25  does that sound accurate to you?
```

Page 26

```
1              Udel DeGazon                26
2      A    Yes, sir.
3      Q    You know he's Philippino?
4      A    Yes, sir.
5      Q    You know he's a former employee of
6  NYU?
7      A    Yes, sir.
8      Q    You recall that he joined NYU in or
9  about 2001?
10     A    I don't know exactly when he joined.
11     Q    Would it be fair to say he joined NYU
12 many years after you did?
13     A    That's fair to say, sir.
14     Q    He had been the Director of Building
15 Services during his employment at NYU, correct?
16     A    That's correct, sir.
17     Q    As such he had authority to hire and
18 fire?
19     A    Correct, sir.
20     Q    When Mr. Morelos joined NYU, you were
21 already at NYU for many years as was Miss Pineda,
22 correct?
23     A    Correct, sir.
24     Q    As was a gentleman named Robert
25 Stephen, correct?
```

Page 27

```
1              Udel DeGazon                27
2      A    Correct, sir.
3      Q    When Mr. Morelos was at NYU and he was
4  Director of Building Services, when he was hired you
5  were Associate Director of Building Services and
6  Miss Pineda was the Operations Manager at the time,
7  correct?
8      A    Correct, sir.
9      Q    Mr. Morelos was your boss and
10 therefore Miss Pineda's boss as well, correct?
11     A    Correct, sir.
12     Q    Before Mr. Morelos was hired as
13 Director of Building Services, did you seek that
14 position?
15     A    Yes, sir.
16     Q    Did you apply for that position
17 internally at NYU?
18     A    Yes, sir.
19     Q    And you were denied the position,
20 correct?
21     A    Correct, sir.
22     Q    Who denied you the position, was it
23 Mr. Harney or someone else?
24     A    I don't know, sir.
25     Q    Were there multiple occasions when you
```

Page 28

```
1              Udel DeGazon                28
2  sought that position of Director of Building
3  Services?
4      A    Twice.
5      Q    So you sought it once when Mr. Morelos
6  was hired prior to him being hired, correct?
7      A    Correct, sir.
8      Q    Was there an occasion prior to that
9  when you sought it as well?
10     A    Twice.
11     Q    What was the second occasion?
12     A    The second one was Mr. Morelos, before
13 he came, and the first one was before Mr. Chodrow
14 came.
15     Q    There were two occasions that you
16 sought the position and didn't get it?
17     A    That's correct, sir.
18     Q    Do you recall that Mr. Morelos hired
19 Bozena Sutowski?
20     A    Yes.
21     Q    Do you recall that Mr. Morelos hired
22 Keith Turner?
23     A    Yes.
24     Q    Do you know that Mr. Morelos hired
25 Corie Fromkin?
```

Page 29

```
1              Udel DeGazon                29
2      A    Yes, sir.
3      Q    You know all three of those individuals,
4  correct?
5      A    Yes, sir.
6      Q    And you know Keith Turner is sitting
7  next to me in this room, right?
8      A    Right, sir.
9      Q    Do you recall that on April 30th, 2004
10 NYU terminated the employment of Mr. Morelos?
11     A    I don't know what date it was.
12     Q    Do you recall that there was a date in
13 2004 when you found out that NYU had terminated the
14 employment of Mr. Morelos?
15     A    Yes, sir.
16     Q    And I have shown you documents
17 indicating that you then became the Interim Director
18 of Building Services?
19     A    Yes, sir.
20     Q    You got that position once Mr. Morelos
21 was let go by NYU, correct?
22     A    Correct sir.
23     Q    In June of '04 you were made the
24 Director of Building Services?
25     A    Correct, sir.
```

Page 30

```
                   Udel DeGazon                    30
 2     Q    You promoted Miss Pineda to Associate
 3  Director once you became the Director, correct?
 4     A    Correct, sir.
 5     Q    You promoted Robert Stephen from
 6  Supervisor of Building Services to Manager of
 7  Building Services, correct?
 8     A    Correct, sir.
 9     Q    Miss Pineda testified yesterday that
10  she made a complaint to John Harney about Mr. Morelos.
11          Did you also make a complaint to Mr.
12  Harney about Mr. Morelos?
13          MR. SHAPIRO: Objection to form.
14     A    Yes, sir.
15     Q    Did you make that complaint before or
16  after Miss Pineda made her complaint?
17     A    I don't know.
18     Q    Did you make that complaint in 2004?
19     A    Yes, sir.
20     Q    What did you tell Mr. Harney?
21     A    I don't remember my exact words.
22     Q    What was the gist of your complaint?
23     A    That there was tremendous turmoil in
24  our department.
25     Q    You blamed Mr. Morelos for that?
```

Page 31

```
                   Udel DeGazon                    31
 2     A    Yes, sir.
 3          MR. SHAPIRO: Objection to form.
 4     Q    Anything else you recall conveying to
 5  Mr. Harney?
 6     A    No, sir.
 7     Q    Did you suggest to Mr. Harney that
 8  Mr. Morelos should be let go from NYU?
 9     A    No, sir.
10     Q    Did you have a proposed solution for
11  the turmoil that you were telling Mr. Harney about?
12     A    No, sir.
13     Q    You wanted to let Mr. Harney know
14  there was turmoil in the department and you blamed
15  Mr. Morelos for that?
16     A    Yes, sir.
17     Q    How many years has Mr. Harney been at
18  NYU?
19     A    I don't know.
20     Q    Was he a long time employee like
21  yourself?
22     A    Yes, sir.
23     Q    What is his race?
24     A    Caucasian.
25     Q    What was the race of Mr. Chodrow?
```

Page 32

```
                   Udel DeGazon                    32
 2     A    Caucasian.
 3     Q    Do you know if Mr. Chodrow was American
 4  born in this country?
 5     A    Yes.
 6     Q    Did you ever complain about him?
 7     A    No, sir.
 8     Q    Would it be fair to say you were not
 9  happy when you were denied the position of Director of
10  Building Services on two occasions?
11     A    That's fair to say.
12     Q    Were you happy when you got the
13  position?
14     A    Yes, sir.
15     Q    When you were rejected and Mr. Chodrow
16  was hired, you were happy with that?
17     A    That's fine, sir, I was.
18     Q    When you were rejected and Mr. Morelos
19  was hired, you were happy with that as well?
20     A    Yes, sir.
21     Q    Did you ever complain to Human
22  Resources about Mr. Morelos?
23     A    No, sir, not that I recall.
24     Q    Why did you pick Mr. Harney to make
25  your complaint to?
```

Page 33

```
                   Udel DeGazon                    33
 2     A    He was the Director of Building
 3  Services, he was administration or in charge.
 4     Q    He was a higher level position than
 5  Director of Building Services?
 6     A    Yes, sir.
 7     Q    Was he Mr. Morelos' boss?
 8     A    Overall, yes.
 9     Q    Was there someone directly above Mr.
10  Morelos?
11     A    John Schlingheyde.
12     Q    Was there someone above Mr.
13  Schlingheyde?
14     A    John Harney.
15     Q    Was there someone above John Harney?
16     A    The CEO of the medical center was.
17     Q    At the time that you stopped working
18  at NYU, do you have a sense as to what the annual
19  revenues were? Were they in the millions, billions?
20     A    I have no idea.
21     Q    There were thousands of employees at
22  NYU?
23     A    Yes, sir.
24     Q    Did you document your complaint to
25  Mr. Harney?
```

Page 42

```
                  Udel DeGazon              42
 1
 2    Turner from NYU?
 3       A    I did, sir.
 4       Q    Was anyone else involved in that
 5    decision?
 6       A    No, sir.
 7       Q    So the decision to hire Mr. Turner was
 8    made by Mr. Morelos and the decision to let Mr.
 9    Turner go from NYU was made by you, correct?
10       A    Yes, sir.
11       Q    When did you make that decision to
12    separate Mr. Turner from NYU?
13       A    I was asked to cut the budget. I don't
14    remember the date, I was asked to cut the budget
15    and I had to eliminate, reduce staff, and at that
16    point a decision was made. I don't know the dates,
17    I don't recall the dates.
18       Q    Let me ask you some questions about
19    Bozena Sutowski, but before I do, I want to make sure
20    I show you a lot of documents today. I hope I don't
21    leave any out. Let me show you Exhibit 4. Do you see
22    that that's a performance evaluation for Mr. Turner
23    from 2003?
24            (Document handed.)
25       A    Yes, sir.
```

Page 43

```
                  Udel DeGazon              43
 1
 2       Q    Mr. Turner reported to Miss Pineda as
 3    of 2003 and she reported to you and both of you
 4    signed the evaluation?
 5       A    That's correct.
 6            MR. SHAPIRO: Objection to form.
 7       Q    Am I correct that you read the
 8    evaluation before signing it?
 9       A    Yes, sir.
10       Q    So you knew Mr. Turner had received a
11    "meets requirements" rating from Miss Pineda in
12    September of '03?
13       A    Correct, sir.
14       Q    Exhibit number 5, can you identify that
15    as a memo that you sent out in March of '03?
16       A    Yes, sir.
17       Q    Exhibit number 6, can you identify that
18    as a NYU staff handbook that you had when you worked
19    at NYU?
20            MR. SHAPIRO: Objection to form.
21       Q    Did you have that document when you
22    worked at NYU?
23       A    Yes, sir.
24       Q    Were you familiar with the policies in
25    there?
```

Page 44

```
                  Udel DeGazon              44
 1
 2       A    As much as possible.
 3       Q    Did you comply with the policies in
 4    that document?
 5       A    Yes, sir.
 6       Q    Let me show you what was later marked
 7    as Exhibit 32, which actually was -- I'm splitting it
 8    into two separate documents as per Mr. Shapiro's
 9    comments this morning. The first part I'm putting in
10    front of you which is Bates numbers N0563 through
11    N0578. Can you tell me if you are familiar with that
12    material?
13            (Document handed.)
14       A    I don't recall seeing this document.
15       Q    Okay. How about the second part of
16    Exhibit 32 which contains various Human Resources
17    policies and procedures from November of '03. Do you
18    recall this material when you were at NYU?
19            Let me back up a step, let me ask you
20    another question. When you were at NYU were you
21    generally familiar with the written policies that
22    covered you and your department?
23       A    Yes, sir.
24       Q    Even if I show you documents today,
25    two years later that you don't recall, when you were
```

Page 45

```
                  Udel DeGazon              45
 1
 2    at NYU you were generally familiar with the policies
 3    that applied to your area, correct?
 4            MR. SHAPIRO: Objection.
 5       A    I would agree with that.
 6       Q    In thirty-eight years of experience
 7    you probably knew a lot about the policies of NYU
 8    because you were there for so many years?
 9            MR. SHAPIRO: Objection to form.
10       A    I would think so.
11       Q    You knew your way around the facility,
12    you were an expert, right?
13            MR. SHAPIRO: Objection to form.
14       A    If you say so, sir.
15       Q    You didn't get lost at NYU?
16       A    No, sir.
17       Q    So Exhibit 32, do you recall these
18    Human Resource materials?
19       A    I have seen them.
20       Q    You see it's from November of 2003?
21       A    Yes.
22       Q    So you had these materials available
23    to you, right?
24       A    Yes, sir.
25       Q    Did you always comply with the written
```

**Page 50**

```
 1              Udel DeGazon              50
 2   spelling from time to time?
 3       A    Yes, sir.
 4       Q    In your opinion did those problems
 5   render her unqualified to be at NYU?
 6       A    No, sir.
 7       Q    Did it render her unqualified for any
 8   of her positions?
 9       A    No, sir.
10       Q    Did you ever give her a warning for
11   her problem with her spelling?
12       A    No, sir.
13       Q    Let me show you what was marked as
14   Exhibit number 9, the Confidential Personnel Profile
15   for Keith Turner.
16            (Document handed.)
17       Q    You signed off on this document on the
18   bottom left-hand corner?
19       A    Yes, sir.
20       Q    And the date that you signed this
21   document, was it July 23rd of '04?
22       A    I don't know, sir.
23       Q    Okay.
24       A    It was typed.
25       Q    The date is typed in, so you don't know
```

**Page 51**

```
 1              Udel DeGazon              51
 2   when you signed it?
 3       A    Yes.
 4       Q    You may have signed it after the fact?
 5       A    I may have signed it after the fact.
 6       Q    Miss Pineda said she filled out the
 7   information on this form on the right-hand side, the
 8   termination. Did you sign this document after reading
 9   Miss Pineda's assessment in that document?
10       A    Yes, sir.
11       Q    That was the procedure at NYU, right?
12       A    Yes, sir.
13       Q    So if Miss Pineda did her work on
14   August 3rd of '04, is it likely you signed the
15   document after she did her work on the document?
16       A    That's correct, sir.
17       Q    So the July 23rd, '04 date may very
18   well be wrong?
19       A    Yes, sir.
20       Q    When you signed off on this document,
21   did you approve of the information that Miss Pineda
22   put on the form?
23       A    Yes, sir.
24       Q    So you knew that Miss Pineda had given
25   Mr. Turner a score of fair for quality, poor for
```

**Page 52**

```
 1              Udel DeGazon              52
 2   quantity, good for attendance and fair for
 3   cooperation?
 4       A    As indicated.
 5       Q    And you knew that Miss Pineda had
 6   written on this document, unacceptable level of
 7   performance?
 8       A    As indicated.
 9       Q    And you knew that Miss Pineda had
10   checked the boxes for "no" to prevent NYU from hiring
11   Mr. Turner?
12       A    As indicated.
13       Q    And you approved all of that, correct,
14   sir?
15       A    Yes, sir.
16       Q    So the only handwriting on this
17   document that belongs to you is your signature, Udel
18   DeGazon, correct?
19       A    Yes, sir.
20       Q    And you knew that this document would
21   become part of Mr. Turner's personnel file, right?
22            MR. SHAPIRO: Objection to form.
23       Q    That's where it goes?
24            MR. SHAPIRO: Objection to form.
25       A    Yes, sir.
```

**Page 53**

```
 1              Udel DeGazon              53
 2       Q    So, Mr. DeGazon, once you signed off
 3   on this document, which I gather occurred in August
 4   after Miss Pineda filled it out, you knew this
 5   document would prevent NYU from ever rehiring Mr.
 6   Turner, right?
 7            MR. SHAPIRO: Objection to form.
 8       A    Yes, sir.
 9       Q    You did not allow NYU to rehire Mr.
10   Turner, correct?
11            MR. SHAPIRO: Objection to form.
12       A    Correct, sir.
13       Q    You felt that way the day Mr. Turner
14   was let go?
15       A    As indicated on the form, sir.
16       Q    You felt that way in August of 2004
17   for sure. Did you feel that way on June 14th of
18   2004 when you advised Mr. Turner that his job was
19   over?
20       A    Yes, sir.
21       Q    Did you feel that way about Mr. Turner
22   even before June 14, '04? At some point did you
23   come to the conclusion that you wanted Mr. Turner --
24   it was time for him to leave NYU and you didn't want
25   to see him back?
```

Page 74

Udel DeGazon    74

2  A  I don't know, sir.
3  Q  Did you ever make a comment to her,
4  either in jest or seriously, about whether she
5  believed in Christ?
6  A  No, sir.
7  Q  What is your religion?
8  A  Catholic.
9  Q  That's the same religion as Miss Pineda,
10 correct?
11 A  I don't know, sir.
12 Q  Was it Mr. Harney who advised you that
13 Mr. Morelos had been let go by NYU?
14 A  Yes, sir.
15 Q  He was the one who let you know that
16 you were now Interim Director?
17 A  Yes, sir.
18 Q  Let's talk a little bit more about
19 Corie Fromkin. I have a Confidential Personnel
20 Profile form for her that is not signed, but let me
21 show it to you just to see if it's something you may
22 have seen even though it doesn't appear to have your
23 signature on it. Is that something that you've seen
24 before?
25 A  No, sir.

Page 75

Udel DeGazon    75

2  Q  Do you know whose handwriting is at
3  the top of the document?
4  A  Yes, sir.
5  Q  Whose handwriting is that?
6  A  Jackie Richards.
7  Q  Jacqueline Richards put together the
8  confidential profile form regarding Miss Fromkin's
9  separation from NYU?
10     MR. SHAPIRO: Objection to form.
11 A  I don't know, sir.
12 Q  She certainly wrote on this document?
13 A  Yes, sir.
14 Q  So as far as you understood NYU says
15 it discharged Miss Fromkin for cause, is that right,
16 as far as you understood?
17 A  As far as I understood, sir.
18 Q  Her position was not eliminated, she
19 was simply fired for cause and she was replaced by
20 Jacqueline Richards, right?
21 A  That is correct, sir.
22 Q  Likewise, NYU fired Miss Sutowski for
23 cause; that's your position, right?
24 A  That's correct, sir.
25 Q  And her position was not eliminated

Page 76

Udel DeGazon    76

2  either, correct?
3  A  Correct, sir.
4  Q  Let me ask you some questions about
5  Robert Stephen. His application for employment is
6  marked as Exhibit 33 and he wrote on it, social
7  contact, U. DeGazon. As you testified you referred
8  him to NYU to seek employment, right?
9     MR. SHAPIRO: Objection to form.
10 A  Correct, sir.
11 Q  Did you look at his application for
12 employment when he applied for a job in '97? Were
13 you involved in that process with him?
14     MR. SHAPIRO: Objection to form.
15 A  Yes, sir.
16 Q  Did you recommend him for employment
17 to NYU?
18 A  Yes, sir.
19 Q  He said that he knew you from, I think
20 he used the phrase, a cultural club or a culture club.
21 Can you tell me how you knew Mr. Stephen prior to
22 him joining NYU?
23 A  A club made up of St. Lucians.
24 Q  What was the name of the club?
25 A  Iyalona.

Page 77

Udel DeGazon    77

2  Q  Can you spell that?
3  A  I-y-a-l-o-n-a.
4  Q  Does that word have any meaning?
5  A  Yes.
6  Q  What does it mean?
7  A  It's Carib for St. Lucia, we are part
8  Carib descendents.
9  Q  So if Mr. Stephen applied to NYU in
10 '97, when do you think you first met him prior to '97;
11 would it have been '96, '95?
12 A  I don't remember.
13 Q  So you knew him socially through this
14 club?
15 A  Yes, sir.
16 Q  The club was made up of St. Lucians?
17 A  Yes, sir.
18 Q  It was people who were from St. Lucia?
19 A  Yes, sir.
20 Q  When he applied for a job you also saw
21 -- I gather you saw his resume, Exhibit 34?
22     MR. SHAPIRO: Objection to form.
23 Q  Did you see his resume as well when he
24 applied for a job?
25 A  Probably did, sir.

Page 110

```
                Udel DeGazon           110
 1
 2    A    I don't remember that, sir.
 3    Q    You let Mr. Turner go on June 14th of
 4  '04 allegedly to eliminate his position and save NYU
 5  money less than one month after this memo?
 6         MR. SHAPIRO: Objection to form.
 7    A    That's correct.
 8    Q    You have a memo in May seeking to
 9  raise people's salaries and simultaneously you were
10  being asked to cut and save money, is that fair to
11  say?
12    A    Not fair to say, sir.
13         MR. SHAPIRO: Objection to form.
14    Q    What is the date that NYU asked you to
15  have some reduction in force in 2004?
16    A    When I became Director, I don't
17  remember the date.
18    Q    You became Interim Director on April
19  30th?
20    A    It was in May.
21    Q    In May you were asked to try to cut
22  some money where possible, right?
23    A    I believe that's when it happened.
24    Q    In the same month you sent this e-mail
25  about salaries in your department, correct?
```

Page 111

```
                Udel DeGazon           111
 1
 2    A    If the dates show that, sir.
 3    Q    It does. And, in fact, on May 25th,
 4  2004 when you wrote this e-mail about management
 5  salaries, Keith Turner was a member of the management
 6  staff of the department, correct?
 7    A    I assume that, sir.
 8    Q    And Bozena Sutowski was a member of
 9  the management staff in the department as well,
10  right?
11    A    I would assume that, sir.
12    Q    And obviously since you generated this
13  e-mail to Mitzi Puskas, you obviously had access to
14  the salary information on the people in your
15  department, correct?
16         MR. SHAPIRO: Objection to form.
17    A    Correct, sir.
18    Q    And in response to your e-mail from
19  May 25th you got e-mails back and one of them came
20  on June 8th of 2004, about a week before Mr. Turner
21  and Miss Sutowski lost their jobs. That's the June
22  8th, 2004 e-mail; do you see that?
23    A    Yes.
24    Q    In that e-mail Miss Puskas indicated
25  to you that she felt Mr. Trujillo was being paid
```

Page 112

```
                Udel DeGazon           112
 1
 2  below market data and she recommended a raise for
 3  him. Do you see that in her e-mail?
 4    A    Yes, sir.
 5    Q    And it also recommended an increase to
 6  the salary of Miss Pineda, correct?
 7    A    If it shows that there, sir.
 8    Q    And it said if you're comfortable with
 9  these recommendations put through the CPP, the
10  Confidential Personnel Profiles, did you do so to
11  get raises for Ms. Pineda and Mr. Trujillo? If the
12  documents indicate that you put those forms in for
13  raises, then you don't dispute you did it, you just
14  don't have the documents?
15    A    Yes, sir.
16    Q    Right. Now on the very same date that
17  you got the response from Miss Puskas, June 8th of
18  '04, you had a supervisors' meeting, isn't that true?
19    A    I don't recall, sir.
20    Q    Let me show you Exhibit number 84. Is
21  that a two page document that you prepared?
22         (Document handed.)
23    A    Yes, sir.
24    Q    And Keith Turner's name is on the top
25  of that document; do you see that?
```

Page 113

```
                Udel DeGazon           113
 1
 2    A    Yes, sir.
 3    Q    You gave this document to Mr. Turner,
 4  right?
 5    A    I don't know, sir.
 6    Q    Well, it's your handwriting?
 7    A    No, it's not, sir, this isn't.
 8    Q    Well, the document other than the
 9  Keith Turner --
10         MR. SHAPIRO: Mr. Turner.
11    Q    Do you know who wrote that?
12    A    I don't know, sir.
13    Q    Other than Mr. Turner at the top
14  left-hand corner, the rest of the document is your
15  handwriting?
16    A    Yes, sir.
17    Q    I will represent to you that the Bates
18  numbers on these documents came from the document
19  production that my firm sent to your attorneys,
20  therefore the document was in Keith Turner's
21  possession and we produced it in this lawsuit. It
22  says, are you a coward?
23         That's your handwriting?
24    A    Yes, sir.
25    Q    At the end of the document, who went
```

### Page 114

```
                                  Udel DeGazon                  114
 2   to the meeting on June 8th, 2004 at 9:00 o'clock
 3   a.m.?
 4       A    Supervisors?
 5       Q    Yes, who went to that meeting?
 6       A    The supervisors.
 7       Q    Did you prepare this document?
 8       A    If my memory serves me right, this
 9   document was prepared for the supervisors to make
10   them aware of how to go about supervising the 1199
11   employees as part of it.  I don't have it in front of
12   me to read, I don't remember everything that was
13   written there by me.
14       Q    I don't see any reference -- you can
15   look at the document.
16       A    Uh-huh.
17       Q    Since you wrote it, I don't see any
18   reference to 1199 in your two page document.  It's
19   entitled, it has the word Commitment on the first
20   page.
21       A    Yes, sir.
22       Q    It ends with, are you a coward?  Do you
23   have any reason to deny that Mr. Turner was at this
24   meeting on June 8th, 2004?
25       A    I have no proof of that, sir.
```

### Page 115

```
                                  Udel DeGazon                  115
 2       Q    You have no reason to deny it either,
 3   correct, sir?
 4       A    No reason.
 5       Q    Since Mr. Turner produced this document,
 6   he obtained it from someone, correct?  He got the
 7   document, right?
 8       A    Right.
 9       Q    And it's your handwriting?
10       A    Right.
11       Q    Okay.  Did you personally distribute
12   copies of this to the people who attended the
13   meeting?
14       A    Maybe I did.
15       Q    You just gave it to Keith Turner?  Is
16   it possible you just gave it to him?
17       A    Only him?
18       Q    Yes, I'm asking you.
19       A    No, sir.
20       Q    So you think you gave it to everyone?
21       A    Yes, sir.
22       Q    The identical document to everyone?
23       A    Yes, sir.
24       Q    Do you have any proof that you gave
25   this to everybody at the meeting?
```

### Page 116

```
                                  Udel DeGazon                  116
 2       A    No, sir.
 3       Q    You don't know who wrote the word Mr.
 4   Turner on the top?
 5       A    No, sir.
 6       Q    Let's see if I understand your
 7   testimony.  There was a meeting June 8th of 2004 but
 8   you don't have a list of who went to the meeting, is
 9   that right?
10       A    The document shows that, sir.
11       Q    Do you recall who was at the meeting?
12       A    No, sir.
13       Q    Okay.  You wrote this note for that
14   meeting?
15       A    Yes, sir.
16       Q    Mr. Turner has a copy of it but you
17   don't have a list of who else has a copy of it, fair
18   to say?
19       A    Fair to say, sir.
20       Q    You wrote, are you a coward?
21       A    That's written there, sir.
22       Q    Was that meant to be encouragement or
23   a threat or something else?
24            MR. SHAPIRO:  Objection to form.
25       A    No, sir.
```

### Page 117

```
                                  Udel DeGazon                  117
 2       Q    That to me seems rather intimidating.
 3   What was the intent of writing, are you a coward?
 4            MR. SHAPIRO:  Objection to form.
 5       A    I don't remember what the words were
 6   intended to send to the staff, but if my memory
 7   serves me right we were talking here about
 8   commitment to the department and we cannot be
 9   cowards in doing our jobs because the phrase stands
10   by itself without a sentence.
11       Q    Am I correct that prior to your
12   becoming Interim Director and then director you
13   never issued a document like this to the staff?
14            MR. SHAPIRO:  Objection to form.
15       Q    As an Associate Director you never
16   gave out a document that said, are you a coward?
17       A    Fair to say.
18            MR. SHAPIRO:  Objection to form.
19       Q    The first time you gave out a document
20   like this was on June 8th of '04?
21       A    The record shows that, sir.
22       Q    It says here, "Are you afraid to make
23   your plans public?"  Can you tell me what you meant
24   when you wrote that?
25       A    I'm afraid I don't have the right
```

Page 118

```
1                Udel DeGazon            118
2    frame of mind to remember what these sentences
3    applied towards.
4        Q    Would it surprise you if Keith Turner,
5    when he received a copy of this document, felt that
6    this was an intimidating document coming from you?
7            MR. SHAPIRO: Objection to form. He
8        can't testify about what Mr. Turner's
9        emotions were.
10       Q    Would it be reasonable in your opinion,
11   as a thirty-eight year employee of NYU and a manager
12   for many years, would it be reasonable for an
13   employee to be intimidated by receiving a document
14   from the head of the department that closes with the
15   phrase, are you a coward?
16           MR. SHAPIRO: Objection to form.
17       Q    Could someone be intimidated by this?
18           MR. SHAPIRO: Objection to form.
19       A    I have no idea, sir.
20       Q    Do you think that as Director or
21   Interim Director it would be reasonable for an
22   employee to be intimidated by you if you made
23   statements that they felt were inappropriate?
24           MR. SHAPIRO: Objection to form.
25       A    I don't know, I can't answer that,
```

Page 119

```
1                Udel DeGazon            119
2    sir.
3        Q    Now let me show you Exhibit 85 which
4    I believe are a package of materials that Mr. Turner
5    received on the day he was informed his job was
6    ending. Can you tell me if you had seen any of those
7    materials on or about June 14th of '04? Did you see
8    those before?
9            (Documents handed.)
10       A    No, sir.
11       Q    Did you know that Mr. Turner received
12   the package of materials from NYU on June 14th, '04?
13       A    No, sir.
14       Q    You met with Mr. Turner on June 14th
15   of '04, the date he was advised his job was ending,
16   correct?
17       A    If that was the date, yes, sir.
18       Q    When you met with Mr. Turner on June
19   14th, was anybody else in the room?
20       A    I think Ms. Pineda was there.
21       Q    What did you say to Mr. Turner about
22   the end of his employment when you met with him at
23   the end of June 14th, '04? Tell me the gist of what
24   you said to Mr. Turner on the day he lost his job at
25   NYU.
```

Page 120

```
1                Udel DeGazon            120
2        A    That we have to reduce staff and his
3    position was being eliminated.
4        Q    Did you then refer him to Human
5    Resources to go see Mark Paruda?
6        A    Yes, sir.
7        Q    So you understood that after he met
8    with you, Mr. Turner went over to see Mark Paruda and
9    got this document?
10           MR. SHAPIRO: Objection to form.
11       A    The records show that, sir.
12       Q    Before you advised Mr. Turner his job
13   was ending, you had previously fired Miss Sutowski
14   that same day, correct?
15           MR. SHAPIRO: Objection to form.
16       A    Yes, sir.
17       Q    When you met with Miss Sutowski, was
18   Miss Pineda in the room?
19       A    Yes, sir.
20       Q    What did you tell Miss Sutowski about
21   the end of her job?
22       A    The gist of it was, you did
23   unacceptable performance.
24       Q    Did you also refer her to Human
25   Resources as well?
```

Page 121

```
1                Udel DeGazon            121
2        A    Yes, sir.
3        Q    So you told Miss Sutowski that she was
4    being fired for poor performance for cause, and you
5    told Mr. Turner he was being laid off due to the
6    elimination of his position.
7        A    Correct, sir.
8        Q    When you told that to Mr. Turner did
9    you also mention that there were budgetary reasons?
10       A    Yes, sir.
11       Q    So Miss Sutowski's job still existed
12   but Mr. Turner's job was eliminated; is that your
13   testimony?
14       A    It is, sir.
15       Q    When you met with Mr. Turner, am I
16   correct that you didn't say to Mr. Turner, we're
17   eliminating your job but I'm placing you in
18   Miss Sutowski's position; you didn't say that to
19   Mr. Turner, correct?
20       A    No, sir.
21       Q    Did you say that to Mr. Turner?
22       A    No, sir.
23       Q    After you had this meeting with
24   Mr. Turner and he left and went to HR, that's the
25   last time that you had any communication with Mr.
```

Page 122

```
                   Udel DeGazon              122
 1
 2   Turner, correct?
 3      A    Correct, sir.
 4      Q    That's the last time you had seen
 5   Mr. Turner other than sitting in this deposition and
 6   seeing him across the table, correct?
 7      A    Correct, sir.
 8      Q    After you told Mr. Turner that he was
 9   being let go for financial reasons, elimination of
10   his position, am I correct that you never contacted
11   Mr. Turner to rehire him or recall him for
12   reemployment at NYU, correct?
13      A    Correct, sir.
14      Q    You never had anybody at NYU do that
15   for you?
16      A    Correct, sir.
17      Q    And to your knowledge NYU never reached
18   out to Mr. Turner to bring him back to NYU?
19      A    I don't know, sir.
20      Q    Mr. Turner never came back to NYU to
21   work, as far as you know, after June 14th of '04,
22   correct?
23      A    Correct, sir.
24      Q    With respect to Miss Sutowski, after
25   you fired Miss Sutowski you never saw her again,
```

Page 123

```
 1                 Udel DeGazon              123
 2   correct?
 3      A    Correct, sir.
 4      Q    And you never reached out to Miss
 5   Sutowski to bring her back to NYU, either rehiring or
 6   recalling her, correct?
 7      A    Correct, sir.
 8      Q    Am I correct you never had anyone at
 9   NYU reach out to Miss Sutowski to bring her back to
10   NYU?
11      A    I don't recall that, sir.
12      Q    To your knowledge that never happened?
13      A    Never happened to my knowledge.
14      Q    And if I were to show you, which I
15   will, the organizational chart from June of '06 which
16   postdates your retirement, you don't see Miss
17   Sutowski and Mr. Turner in the chart, right, they are
18   not there?
19          MR. SHAPIRO:  Give him a chance to
20      read that.
21      A    I don't see their names there, sir.
22      Q    And, of course, Ms. Pineda and Mr.
23   Stephen are still at NYU, they could obviously tell
24   you if Mr. Turner and Ms. Sutowski were to return,
25   you socialize with them, you see them?
```

Page 124

```
 1                 Udel DeGazon              124
 2      A    I didn't ask.
 3      Q    Okay.  Now let me show you Exhibits 38
 4   and 39.  Are these two e-mails that you sent out on
 5   June 18th, 2004?
 6          (Documents handed.)
 7      A    I sent this e-mail, sir.
 8      Q    All right.  And you sent Exhibit number
 9   39 as well?
10      A    There's something odd about this e-mail,
11   sir.
12      Q    Miss Pineda and Mr. Stephen both
13   received them and testified to that over the past
14   two days.  I am just asking you to verify you sent
15   these e-mails out since two witnesses both testified
16   they got them?
17          MR. SHAPIRO:  Don't worry about what
18      the other witnesses said.  If you can say you
19      sent them, fine.
20      A    These are interesting e-mails.  I don't
21   even type like this, I don't even write like this.
22      Q    In this deposition your attorney can
23   ask you questions later.  My questions to you are
24   very, very simple.  I've already questioned two other
25   witnesses that reported to you about these exact
```

Page 125

```
 1                 Udel DeGazon              125
 2   documents, both said they got them.  You sent these
 3   two e-mails, correct, sir?  If you didn't, it's your
 4   testimony.
 5      A    Maybe I sent them, sir.
 6      Q    Okay.  Looking at these two e-mails,
 7   the first one, which is Exhibit number 38, was from
 8   June 18th, 2004 at 5:52 a.m.  You typically started
 9   your day rather early, 6:00 a.m. or 6:30 a.m.?
10      A    6:30 a.m.
11      Q    It was typical for you to be at work
12   early in the morning and I understand that the
13   check-ins occurred early in the morning, is that
14   right as well, the daily check-ins?
15          MR. SHAPIRO:  Objection to form.
16      A    What time?
17      Q    Well, you tell me.
18      A    The employees started work at 8:00
19   o'clock so the supervisor was required to start at
20   7:00 o'clock, start checking in the people.
21      Q    In the first e-mail, Exhibit 38, June
22   14th of '04 at 6:52 a.m., you indicated that
23   yesterday Mr. Harney had told you that he was now
24   the new Director of the Building Services Department,
25   and the word yesterday, as I understand it, would mean
```

Page 126

```
                    Udel DeGazon            126
 1
 2   you found out on June 17th, the day before the e-mail,
 3   right, sir?
 4       A   Right, sir.
 5       Q   You were acting Interim Director and
 6   now you are told now you are the Director, right?
 7       A   Right, sir.
 8       Q   You said in your e-mail that you were
 9   announcing the promotion of Miss Pineda to Associate
10   Director, which you've already testified to earlier
11   today you promoted her, right?
12       A   That's correct, sir.
13       Q   And then in the second e-mail which is
14   Exhibit 39, which is the same day, 3:12 p.m., you then
15   announced the promotion of Mr. Stephen to Manager of
16   Building Services. That was the promotion you decided
17   to make, right, sir?
18       A   That's correct, sir.
19       Q   And these e-mails went to Keith Turner
20   and Bozena Sutowski, both of whom had been let go
21   four days earlier? You see Mr. Turner's name is in
22   the string and Ms. Sutowski?
23       A   I saw that, sir.
24       Q   Mr. Turner's name is in the beginning
25   of the e-mail string, even though it's alphabetized
```

Page 127

```
                    Udel DeGazon            127
 1
 2   as to the other employees, you see that as well?
 3       A   I see his name is at the very
 4   beginning.
 5       Q   When you send e-mails over the years
 6   that you've been at NYU, I don't want to say you sent
 7   e-mails for thirty-eight years, would it be fair to
 8   say you did have a block of names for the e-mail
 9   strings so you could push a button and send an
10   e-mail to everybody in the department without typing
11   all the names, right, sir?
12       A   Right, sir.
13       Q   And likewise, could add names to that
14   string if you felt like it?
15       A   Yes, sir.
16       Q   Or add names or delete names from the
17   string?
18       A   Indeed, sir.
19       Q   Would you also agree with me, Mr.
20   DeGazon, that after an employee separates from NYU
21   they are supposed to be taken out of the NYU e-mail
22   system to avoid access after they are no longer with
23   NYU?
24       A   I would think so, sir.
25       Q   Would you agree that NYU, to protect
```

Page 128

```
                    Udel DeGazon            128
 1
 2   the integrity of its computer system, is supposed to
 3   delete people from the system regardless of why they
 4   separate from NYU, correct?
 5       A   I believe that's the protocol.
 6       Q   In fact, in your department you had an
 7   IT person, correct?
 8       A   Yes, sir.
 9       Q   And his name was?
10       A   Rodrigo Fuentes.
11       Q   He's no longer with NYU?
12       A   Yes, sir.
13       Q   He's in Florida?
14       A   Yes, sir.
15       Q   He was at NYU in June of '04, right,
16   sir?
17       A   Yes, sir.
18       Q   And then he resigned?
19       A   Yes, sir.
20       Q   He wasn't fired for cause?
21       A   No, sir.
22       Q   And you put Keith Turner's name at the
23   beginning of this string so he would get this e-mail,
24   didn't you, sir?
25           MR. SHAPIRO: Objection to form.
```

Page 129

```
                    Udel DeGazon            129
 1
 2       A   The records show that, sir.
 3       Q   You also made sure Miss Sutowski got a
 4   copy of it as well?
 5           MR. SHAPIRO: Objection to form.
 6       A   The records show that, sir.
 7       Q   After firing Miss Sutowski for cause
 8   and letting Mr. Turner go, you notified the two of
 9   them of your promotion, Miss Pineda's promotion and
10   Mr. Stephen's promotion; didn't you, sir?
11           MR. SHAPIRO: Objection to form.
12       Q   That's what the record shows, sir?
13       A   This record shows that, sir.
14       Q   And you told Mr. Turner four days
15   before this that the manager's job was eliminated and
16   then four days later there's a brand-new manager at
17   NYU, Mr. Stephen. Isn't that what the record shows?
18           MR. SHAPIRO: Objection to form.
19       A   Yes, sir.
20       Q   You didn't wake up on June 18th, 2004
21   and decide, I want Mr. Stephen for manager. That was
22   something you wanted to do earlier and you were able
23   to put that through on June 18th, 2004; you were
24   allowed to do that, sir?
25           MR. SHAPIRO: Objection to form.
```

33 (Pages 126 to 129)

Page 130

```
                  Udel DeGazon           130
 1
 2     A    It's speculation.
 3     Q    The decision to promote Mr. Stephen was
 4  one that you had to think about it, sir?
 5     A    That's correct.
 6     Q    Mr. Stephen testified you talked to him
 7  about the idea of moving up the ladder?
 8          MR. SHAPIRO: Objection to form.
 9     A    If you say so, sir.
10     Q    Did he want to be promoted to manager?
11     A    I would assume that.
12     Q    From knowing him socially and as an
13  employee, was it your understanding that he wanted to
14  be promoted?
15          MR. SHAPIRO: Objection to form.
16     A    I mean, he never expressed it to me.
17     Q    Was he receptive to the promotion?
18     A    Yes, sir.
19     Q    And the promotion gave him a raise, I
20  believe, of $7,000 or so, right?
21     A    If the record shows that, sir.
22     Q    Okay. I will show you those records.
23  Would you agree with me that Mr. Turner and Miss
24  Sutowski were not happy to lose their jobs at NYU,
25  neither one celebrated when you told them that their
```

Page 131

```
                  Udel DeGazon           131
 1
 2  jobs were ending?
 3     A    That's right, sir.
 4     Q    They didn't give you a high five, that
 5  they were happy?
 6          MR. SHAPIRO: Objection to form.
 7     A    No, sir.
 8     Q    Now, if I show you the Confidential
 9  Personnel Profile for Mr. Stephen, Exhibits 40 and 41,
10  Mr. Stephen's promotion is reflected in Exhibit 40
11  showing him going from supervisor to manager and
12  getting a $7,000 raise to 47,600. Can you look at
13  Exhibit 40 and see if that information is reflected
14  on there?
15          (Documents handed.)
16     A    It does, sir.
17     Q    Did you sign off on that document?
18     A    Yes, sir.
19     Q    So you let go Mr. Turner, who was
20  making $60,000, right, according to his file?
21     A    Yes, sir.
22     Q    And promoted Mr. Stephen and now he's
23  making 47,600 in the manager's slot, right, sir?
24     A    Right, sir.
25     Q    There's a $13,000 difference between
```

Page 132

```
                  Udel DeGazon           132
 1
 2  the two salaries?
 3     A    Right, sir.
 4     Q    At an entity with thousands of
 5  employees?
 6     A    Yes, sir.
 7          MR. SHAPIRO: Objection to form.
 8     Q    At a time when you've already had
 9  memos going with the compensation analyst resulting
10  in raises for Miss Pineda and Mr. Trujillo, correct?
11          MR. SHAPIRO: Objection to form.
12     A    The record shows that, sir.
13     Q    Basically what I'm saying to you, sir,
14  you've got memos in which people are getting raises,
15  Pineda and Trujillo, with thousands of dollars going
16  up and a tiny little decrease when you replaced Mr.
17  Turner with Mr. Stephen, a $13,000 spread, is that
18  right?
19          MR. SHAPIRO: Objection to form.
20     A    The numbers show that, sir.
21     Q    So Mr. Stephen was fortunate enough to
22  get this $7,000 raise in June of '04 and six months
23  later got another raise to $49,000 and change in
24  Exhibit 41, his annual merit increase?
25          (Document handed.)
```

Page 133

```
                  Udel DeGazon           133
 1
 2     Q    Is that right, sir? And you signed
 3  off on that exhibit too?
 4     A    Merit increase, sir.
 5     Q    Right. So, Mr. DeGazon, when you let
 6  Mr. Turner go and supposedly eliminated his position
 7  there, really was no dollar savings because Mr.
 8  Stephen was a manager four days later making only
 9  a few dollars less, and other people in the
10  department were getting raises anyway, right, sir;
11  is that what the record shows?
12     A    Mr. Stephen replaced Miss Sutowski.
13     Q    That's your testimony?
14     A    That's correct.
15          MR. SHAPIRO: What do you want, not his
16  testimony? Everything is his testimony.
17          MR. GOLDBERG: I would like the truth.
18          MR. SHAPIRO: The truth has not come
19  out of your mouth.
20     Q    There really wasn't a dollar savings
21  with these changes you made?
22          MR. SHAPIRO: Objection to form.
23     A    Yes, sir.
24     Q    If there was a dollar savings, Mr.
25  DeGazon, at an entity the size of NYU, the savings
```

### Page 142

```
1             Udel DeGazon              142
2    and answered.
3       A    That's mine.
4       Q    And Exhibit number 67, are these notes
5    that you prepared on October 28th of 2003?
6       A    That's mine.
7       Q    And these are notes from a meeting you
8    had with Miss Sutowski and Miss Pineda in October of
9    2003?
10      A    According to that.
11           MR. SHAPIRO: Objection to form.
12      Q    According to that. Were your notes
13   true and accurate?
14      A    Yes, sir, if my handwriting is there.
15      Q    Okay. Let me show you now Exhibit
16   number 80. This is an e-mail that Mr. Turner sent
17   and you are listed as a cc. Do you believe you
18   received that since you are listed on it as a cc?
19           (Document handed.)
20      A    I may have, sir.
21           MR. GOLDBERG: I need about a
22      ten minute break just to see what I've got
23      left. I'm certainly in the home stretch.
24           (At this time a brief recess was
25      taken.)
```

### Page 143

```
1             Udel DeGazon              143
2            MR. GOLDBERG: Let's mark one more
3       document as an exhibit and that would be
4       Exhibit number 96, Bates numbers N0338 to
5       N0339.
6            (At this time the above referred to
7       documents were marked as Plaintiff's Exhibit
8       96 for identification, as of this date.)
9       Q    Having gone through many hours with me
10   in this deposition, have you now thought through as
11   to when you made the decision to let Miss Sutowski
12   go? Do you have a better time frame than what you
13   said earlier or no better time frame?
14      A    No better time frame.
15      Q    Do you have a better time frame as to
16   when you made the decision to let Mr. Turner go?
17      A    No, sir.
18      Q    Okay. Since Miss Sutowski's position
19   was not eliminated, can you tell me why you didn't
20   simply assign Mr. Turner to Miss Sutowski's position
21   on June 14th, 2004?
22      A    Mr. Turner's evaluation showed that his
23   performance was unacceptable.
24      Q    That evaluation was prepared two months
25   after he was let go, wasn't it, sir?
```

### Page 144

```
1             Udel DeGazon              144
2            MR. SHAPIRO: Objection to form.
3       A    I don't recall.
4       Q    Let me show it to you, sir, the
5    evaluation that you're talking about.
6            MR. SHAPIRO: How do you know that
7       that's the evaluation that he's talking
8       about? Why don't you ask him rather than
9       telling him?
10           MR. GOLDBERG: Let me do the dep,
11      Peter. If you want to ask him I will stay
12      as late as you want.
13           MR. SHAPIRO: I don't want you to tell
14      him things that he hasn't testified to.
15      Q    Look at Exhibit number 9. This
16   document, Ms. Pineda signed it August 3rd of 2004. Is
17   this the evaluation that you're saying was the basis
18   for you not assigning Mr. Turner to Miss Sutowski's
19   position on June 14th of 2004?
20           MR. SHAPIRO: Objection to form.
21      A    That, and in addition, information
22   from Miss Pineda his performance was unacceptable.
23      Q    Would you agree with me you didn't
24   have this evaluation in front of you on June 14th of
25   2004, you didn't have this until August of '04?
```

### Page 145

```
1             Udel DeGazon              145
2       A    That's correct, sir.
3       Q    In addition, the evaluation that you
4    did have on Mr. Turner that was in writing was the
5    2003 evaluation that says "meets requirements". That
6    was the annual evaluation that existed as of the
7    date of Mr. Turner's separation. He had not received
8    an annual evaluation in '04, isn't that correct,
9    sir?
10           MR. SHAPIRO: Objection to form.
11      A    The record doesn't show he didn't have
12   one, it doesn't show what his performance was.
13      Q    Just so we're clear, the only annual
14   evaluation that existed on the date of Mr. Turner's
15   separation from NYU was the one from '03, correct?
16           MR. SHAPIRO: Objection to form.
17      A    If the record shows that there's no
18   other one.
19      Q    Since Mr. Turner got annual evaluations
20   and he was hired in September of '02, then it is
21   understandable that he got one in September of '03,
22   right, sir?
23      A    That's correct.
24      Q    And the next one, had he still been at
25   NYU, would have been September of '04?
```

```
                                                Page 146
1           Udel DeGazon           146
2      A    That's correct, sir.
3      Q    It's understandable that there wasn't
4  an annual evaluation in '04 because September hadn't
5  rolled around as of the date he was let go, right?
6      A    Correct, sir.
7      Q    The only evaluation that you would
8  have had available to you of Mr. Turner was Exhibit
9  number 4, right?
10     A    Annual evaluation, sir, yes, that is
11 correct.
12     Q    And that is what the handbook provides
13 for annual performance evaluations, Exhibit number 6,
14 correct?
15          MR. SHAPIRO: Objection to form.
16     A    As stated in the book, so be it, sir.
17     Q    Fine. So you're saying Miss Pineda
18 said things to you that made you decide not to place
19 Mr. Turner in Miss Sutowski's position?
20          MR. SHAPIRO: Objection to form.
21     A    She was apprising me of the
22 performance.
23     Q    What did she say to you and what did
24 you say to her?
25     A    I don't remember exactly what she said
```

```
                                                Page 147
1           Udel DeGazon           147
2  and when she said it. The general thesis was that
3  they were not performing up to standard and she had
4  specific issues with their performance.
5      Q    And again, Mr. DeGazon, you didn't
6  prepare any document explaining your decision not to
7  place Mr. Turner in Miss Sutowski's position?
8           MR. SHAPIRO: Objection to form.
9      A    Correct, sir.
10     Q    And you agree with me that it was
11 within your power as Director with authority to hire
12 and fire to have simply placed Mr. Turner in Miss
13 Sutowski's position if you wanted to; you had that
14 authority, sir?
15          MR. SHAPIRO: Objection to form.
16     A    I had that authority.
17     Q    And since Mr. Turner was not fired for
18 cause but was, in your testimony and the documents,
19 was told he was being laid off, nobody at NYU would
20 have stopped you had you simply said, Mr. Turner, you
21 have Miss Sutowski's position now, correct?
22          MR. SHAPIRO: Objection to form.
23     Q    Because you had the power to do so?
24     A    That's correct, sir.
25     Q    And as I understand it, you are unable
```

```
                                                Page 148
1           Udel DeGazon           148
2  in this deposition to say to me, on this date
3  Miss Pineda said this to me and this is why I didn't
4  place Mr. Turner in Miss Sutowski's position, is
5  that right?
6           MR. SHAPIRO: Objection to form.
7      A    That's correct, sir.
8      Q    And Miss Pineda's comments about Mr.
9  Turner were her subjective opinion about Mr. Turner,
10 correct?
11          MR. SHAPIRO: Objection to form.
12     A    She was his superior.
13     Q    Correct. She was his superior who gave
14 him a "meets requirements" in '03, correct?
15          MR. SHAPIRO: Objection to form.
16     A    In '03, sir.
17     Q    That's right. And the handbook, when
18 it talks about evaluations of performance, to my
19 reading of it, on page number 11 says, that NYU and
20 I will quote "appraised each employee on the job
21 performance annually," right?
22          MR. SHAPIRO: He's got to look at it
23      if you're going to ask him questions about
24      it.
25     Q    Isn't that what it says in the staff
```

```
                                                Page 149
1           Udel DeGazon           149
2  handbook on page 8?
3           (Document handed.)
4      A    It says so there, sir.
5      Q    And when you decided not to place
6  Mr. Turner in Miss Sutowski's position, am I correct
7  that based upon what I've shown you, you weren't
8  staring at some document that you read that said,
9  Mr. Turner can't get this job, because the evaluation
10 was from '03 and the Personnel Profile Form had not
11 yet been done, so you had no document in front of
12 you when you made the decision; is that fair to say?
13     A    Not fair to say, sir.
14     Q    What did you have in front of you?
15     A    He was continuously being evaluated by
16 his superior, Miss Pineda.
17     Q    What documents did you have in front
18 of you?
19     A    I don't have them now. She probably
20 may have had documents and his files may have had
21 documents to show his performance maybe in the form
22 of memos, I don't know.
23     Q    But you don't have any specific
24 recollection of any specific document that you based
25 your decision on, is that right?
```