UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  X

KEITH TURNER,                                    :

          Plaintiff,                          :

  -against-                                      :

NYU HOSPITALS CENTER, NYU MEDICAL          :        06 Civ. 1910 (GBD)
CENTER, NYU SCHOOL OF MEDICINE, and
NYU HEALTH SYSTEM,                              :

          Defendants.                        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  X

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

EDWARDS ANGELL PALMER & DODGE LLP
David R. Marshall
Rachel B. Jacobson
Attorneys for Defendants
750 Lexington Avenue
New York, New York 10022
212.308.4411
dmarshall@eapdlaw.com

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ iii

PRELIMINARY STATEMENT ......................................................................................... 1

STATEMENT OF FACTS .................................................................................................. 2

    A.    The Building Services Department ..................................................................... 2

    B.    Morelos Becomes Director And Puts Three Outsiders Into Management Positions ............................................................................................................... 2

    C.    Turner Commences Employment As Building Services Manager ...................... 3

    D.    Turner's Performance Issues At NYUHC ......................................................... 4

    E.    Turmoil In The Management Of The Department ............................................... 6

    F.    NYUHC's Budget Reduction Mandate .............................................................. 8

    G.    The Department After The Reorganization and Reduction In Force ................... 9

ARGUMENT ..................................................................................................................... 10

    I.    PLAINTIFF CANNOT PROVE RACE OR NATIONAL ORIGIN DISCRIMINATION ........................................................................................... 10

        A.    Applicable Legal Principles................................................................... 10

        B.    Plaintiff Was Not Laid Off Because He Is White And American-Born ......................................................................................................... 12

            1.    Plaintiff Cannot Show That The Stated Reasons For His Layoff Are False ................................................................... 12

            2.    Plaintiff Cannot Show That Bias Against American-Born Whites Was The Real Reason For NYUHC's Decision To Lay Him Off................................................................................ 15

                a.    There Is No Evidence Of Discriminatory Remarks ......... 15

                b.    Similarly-Situated Employees Not Treated More Favorably Due To Race ..................................................... 15

                c.    Pineda's Use of Spanish At Work Does Not Show Bias ................................................................................... 17

                d.    Attendance At Morning Check-In Is Not Discriminatory ................................................................. 18

                e.    Asking, "Are you a Coward," Does Not Show Discriminatory Motive or Conduct.................................... 19

                f.    Receipt Of A Post-Layoff Email Is Not Evidence of Discriminatory Animus.................................................... 19

# TABLE OF CONTENTS
### (continued)

**Page**

C.   Plaintiff Cannot Show That His Ineligibility For Rehire Was Discriminatory ........................................................................................ 20

    1.   Pineda Had Legitimate Reasons For Listing Plaintiff As Ineligible For Rehire ...................................................................... 20

    2.   Plaintiff Cannot Show Disparate Treatment In His Rehire Eligibility ................................................................................... 20

II.   PLAINTIFF CANNOT PROVE HIS RETALIATION CLAIM ...................... 21

A.   Applicable Standards ............................................................................ 21

B.   Plaintiff Did Not Engage In Protected Activity .................................... 22

    1.   Complaints About Favoritism Are Not Statutorily Protected ...... 22

    2.   References to Supervisor And Employee Being Of Same National Origin Insufficient To Put Employer On Notice Of Discrimination Claim ................................................................ 23

C.   Defendant Has Articulated Legitimate-Non Retaliatory Reasons for Turner's Layoff and Ineligibility for Rehire And Plaintiff Cannot Point To Any Evidence Of Pretext ............................................ 24

    1.   No Evidence of Disparate Treatment Based Upon Complaints To Odom ................................................................ 24

    2.   There Is No Evidence Of Hostility To Protected Complaints of Discrimination .................................................. 24

CONCLUSION ........................................................................................................ 25

## TABLE OF AUTHORITIES

**Page(s)**

CASES

Andonissamy v. Hewlett-Packard Co.,
    547 F.3d 841 (7th Cir. 2008) ...........................................................................................23

Aspilaire v. Wyeth Pharm., Inc.,
    612 F. Supp.2d 289 (S.D.N.Y. 2009)........................................................................22, 23

Attenborough v. Constr. & Gen. Bldg. Laborers' Local 79,
    691 F. Supp.2d 372 (S.D.N.Y. 2009)...............................................................................17

Baguer v. Versus Broad. Sys. Inc.,
    2010 US. Dist. LEXIS 69212 (S.D.N.Y. July 12, 2010) .................................................15

Barbagallo v. Gen. Motors Corp.,
    1996 WL 19004 (S.D.N.Y. Jan. 17, 1996) ......................................................................17

Beers v. NYNEX Materials Enters. Co.,
    1992 U.S. Dist. LEXIS 240 (S.D.N.Y. Jan. 13, 1992)....................................................14

Bickerstaff v. Vassar Coll.,
    196 F.3d 435 (2d Cir. 1999)............................................................................................11

Brooks v. Leake & Watts Org., Inc.,
    2005 U.S. Dist. LEXIS 16229 (S.D.N.Y. Aug. 1, 2005) .................................................13

Chavez v. Iberia Foods Corp.,
    2007 U.S. Dist. LEXIS 47449 (S.D.N.Y. Jun. 28, 2007) ................................................15

Chism v. Con-Way Freight Inc.,
    2009 U.S. Dist. LEXIS 88202 ........................................................................................15

Clarke v. One Source Facility Servs., Inc.,
    168 F. Supp.2d 91 (S.D.N.Y. 2001).................................................................................19

Crawford v. Dep't of Invest.,
    2007 U.S. Dist. LEXIS 73022 (S.D.N.Y. Oct. 1, 2007), aff'd 324 Fed. Appx. 139 (2d.
    Cir. 2009) .........................................................................................................................14

Dister v. Cont'l Group, Inc.,
    859 F.2d 1108 (2d Cir. 1988)..........................................................................................11

Edwards v. City of N.Y.,
    2005 U.S. Dist. LEXIS 34376 (S.D.N.Y. Dec. 19, 2005) ..........................................10, 12

# TABLE OF AUTHORITIES
(continued)

Page(s)

Fincher v. Depository Trust and Clearing Corp.,
  604 F.3d 712 (2d Cir. 2010).................................................................21

Fitzpatrick v. N.Y. Cornell Hosp.,
  2002 U.S. Dist. LEXIS 25166 (S.D.N.Y. Jan. 9, 2003)...........................20

Forrest v. Jewish Guild for the Blind,
  3 N.Y.3d 295, 786 N.Y.S.2d 382 (2004) ..............................................10

Hanna v. N.Y. Hotel Trades Council,
  851 N.Y.S.2d (2008)...........................................................................21

Hines v. Hillside Children's Ctr.,
  73 F. Supp.2d 308 (W.D.N.Y. 1999) ...................................................13

Holt v. Gamewell Corp.,
  797 F.2d 36 (1st Cir. 1986).................................................................13

Hunter v. Citibank,
  862 F. Supp. 902 (E.D.N.Y. 1994), aff'd 60 F.3d 810 (2d Cir. 1995)....................10

James v. N.Y. Racing Ass'n,
  233 F.3d 149 (2d Cir. 2000)......................................................11, 13, 16

King v. Bratton,
  2004 U.S. Dist. LEXIS 26011 (E.D.N.Y. Aug. 25, 2004)........................18

Krasner v. HSH Nordbank AG,
  680 F. Supp.2d 502 (S.D.N.Y. 2010).....................................................22

McDonnell Douglas Corp. v. Green,
  411 U.S. 792 (1973)............................................................................10

McLellan v. E.I. Dupont de Nemours & Co.,
  2006 U.S. Dist. LEXIS 94233 (W.D.N.Y. Sept. 22, 2006) ......................14

Neal v. Roche,
  349 F.3d 1246 (10th Cir. 2003) ..........................................................17

Nowak v. Int'l Truck and Engine Corp.,
  406 F. Supp.2d 954 (N.D. Ill. 2005).....................................................15

Pacheco v. N.Y. Presbyterian Hosp.,
  593 F. Supp.2d 599 (S.D.N.Y. 2009).....................................................18

# TABLE OF AUTHORITIES
### (continued)

Page(s)

Pathare v. Klein,
  2009 U.S. App. LEXIS 21408 (2d Cir. Sept. 30, 2009) ........................................................17

Phipps v. Comp. Cmtg. Dev. Corp.,
  2005 U.S. Dist. LEXIS 1672 (S.D.N.Y. Feb. 4, 2005)..........................................................25

Reeves v. Sanderson Plumbing Prods., Inc.,
  530 U.S. 133 (2000)...............................................................................................................11

Renz v. Grey Adver., Inc.,
  135 F.3d 217 (2d Cir. 1997)...................................................................................................15

Ruhling v. Tribune Co.,
  2007 WL 28283 (E.D.N.Y. Jan. 3, 2007) ...............................................................................22

Silva v. Peninsula Hotel,
  509 F. Supp.2d 364 (S.D.N.Y. 2007)................................................................................19, 20

St. Mary's Honor Ctr. v. Hicks,
  509 U.S. 502 (1993)...............................................................................................................11

Trotman v. CBS Radio, Inc.,
  2007 U.S. Dist. LEXIS 73641 (S.D.N.Y. Sept. 27, 2007)..................................................16, 21

Valentine v. Standard & Poor's,
  50 F. Supp. 2d 262 (S.D.N.Y. 1999), aff'd 205 F.3d 1327 (2d. Cir. 2007)............................14

Viola v. Philips Med. Sys. of N. Amer.,
  42 F.3d 712 (2d Cir. 1994).....................................................................................................13

Weinstock v. Columbia Univ.,
  224 F.3d 33 (2d Cir. 2000).....................................................................................................11

Wimes v. Kaleida Health,
  157 Fed. Appx. 327 (2d Cir. 2005).........................................................................................22

## PRELIMINARY STATEMENT

Plaintiff Keith Turner ("Turner"), who is white, used his and his wife's personal friendship with Joseph Morelos, the new Director of the Building Services Department ("Department") at NYU Hospital Center ("NYUHC" or "Hospital"), to obtain a job managing the Hospital's housekeeping staff, despite the fact that Turner did not meet several of the stated requirements for the position and had never before worked in a hospital. Morelos hired his friend Turner instead of a black supervisor, Robert Stephen, who, by virtue of his prior work experience in the Department, met several of the very job requirements Turner lacked. In rejecting this seasoned supervisor, Morelos rejected the recommendation of the Department's long-time Associate Director, Udel DeGazon (who is black), that Stephen be promoted into the job. In fact, Morelos made a habit of hiring into key positions individuals with no prior work experience in the heavily-regulated and demanding environment of a 24/7, acute-care hospital, who ultimately failed to perform. One such hire was Bozena Sutowski, who co-managed the dayshift staff with Turner and is white. Not surprisingly, Morelos was terminated in April 2004. DeGazon replaced him.

In June 2004, a Hospital-wide layoff was announced and the heads of various departments selected twenty-eight employees for layoff, most of them people of color. DeGazon selected Turner for layoff. He also discharged Sutowski for poor performance and replaced her with Stephen. Because Stephen and DeGazon are both from St. Lucia, Turner alleges that he was selected for layoff, and not recalled into Sutowski's position or made eligible for rehire, because he is white and American-born. He also alleges that because he once complained about DeGazon's purported "favoritism" in the Department, his layoff and non-re-hire were retaliatory. Those allegations are entirely without merit because the undisputed or incontrovertible evidence shows that NYUHC had legitimate reasons for the actions about which Turner complains and there is no evidence that those reasons were pretexts for discrimination or retaliation.

## STATEMENT OF FACTS[1]

### A.  The Building Services Department

The Department provides cleaning, patient transport, and laundry services to patients and

staff at NYUHC.  The Department is responsible for providing these services while protecting

patients from accident, injury and infection in accordance with guidelines established by the

Joint Commission on Accreditation of Healthcare Organizations ("JCAHO").  (Pineda Dec. ¶ 4.)

The Department employs approximately 250 unionized staff members on three shifts, twenty-

four hours a day, seven day a week.  (Pineda Dec. ¶ 3).  While Turner was employed in the

Department, supervision was supplied by fourteen supervisors, three shift managers, an

Operations Manager, an Associate Director, and a Director.  (Pineda Dec. ¶ 8, Ex. 7).

### B.  Morelos Becomes Director And Puts Three Outsiders Into Management Positions

In 2001, Joseph Morelos was hired as the Director of the Department.  (Morelos Tr. 5).

Prior to joining NYUHC, he spent most of his thirty-year career in the hotel industry, with only

five years' work in a hospital setting.  (Odom Dec. ¶ 26, Ex. 7).  Morelos was chosen over Udel

DeGazon, the Department's long-time Associate Director.  (DeGazon Tr. 26-28).  DeGazon

immigrated to the United States from Saint Lucia in 1961 and became a United States citizen in

1966, after serving four years in the United States Air Force.  (DeGazon Dec. ¶ 2-3).  DeGazon

began working for NYUHC as a Department supervisor in 1966.  (DeGazon Tr. 7).

As Director, Morelos filled three key management positions with candidates from outside

NYUHC who lacked any experience in a hospital setting:  Corie Fromkin, who had previously

worked in the film and music industries, became the Department's Office Manager (Fromkin Tr.

---

[1] The complaint and deposition testimony of Plaintiff are accepted as true solely for the purposes of this motion. References to "Pineda Dec.," "Odom Dec.," and "DeGazon Dec." are to the Declarations and exhibits ("Ex.") of Hilda Pineda, Reginald Odom, and Udel DeGazon submitted in support of Defendant's motion for summary judgment.  References to "Pl. Tr.," "Morelos Tr.," "Fromkin Tr.," "Stephen Tr.," "Pineda Tr.," "Parauda Tr.," and "Odom Tr." are to the deposition transcripts of Keith Turner, Joseph Morelos, Corie Fromkin, Robert Stephen, Udel DeGazon, Hilda Pineda, Mark Parauda, and Reginald Odom, excerpts of which are Exhibits 1-8 to the Declaration of David R. Marshall ("Mar. Dec.").   "Mar. Ex." refers to exhibits attached to the Marshall Declaration.

7-8, Mar. Ex. 10); Bozena Sutowski, who had spent her entire career in the hotel industry,
became a Building Services Manager (Morelos Tr. 8; Odom Dec. ¶ 27, Ex. 8); and Keith Turner
became the second Building Service Manager.  (Morelos Tr. 37; Pl. Tr. 17-18).

According to Morelos, DeGazon had recommended Department supervisor Robert
Stephen for the position that Morelos eventually gave to Turner. (Morelos Tr. 9-14).  Although
Stephen had excellent performance evaluations since becoming a Department supervisor in 1997,
and management experience at a prior employer, Morelos rejected Stephen as unqualified.
(Stephen Tr. 25-33, Mar. Ex. 11, 12; Morelos Tr. 12-13).  Instead, Morelos solicited an
application from Turner, whom he knew socially because Morelos had worked for Turner's wife
at the Intercontinental Hotel. (Morelos Tr. 14; Pl. Tr. 12-13).  Turner had no prior hospital work
experience.  He spent the previous 15 years working in the food and beverage industry, never
remaining at one job for more than about 2 years.  (Pl. Tr. 6, 14-15, Mar. Ex. 13.)  Despite the
fact that the Building Services Manager position required "[k]nowledge of waste management,
infection control and JCAHO," which Turner's resume clearly showed he did not have, Morelos
deemed Turner qualified for the position.  (Morelos Tr. 29-30, 37, Mar. Ex. 13, 14).

## C.  Turner Commences Employment As Building Services Manager

Turner began work in September 2002, reporting indirectly to DeGazon and directly to
Hilda Pineda, the Operations Manager who had worked in the Department since 1982.  (Pl. Tr.
17-18; Pineda Tr. 9-10).  Turner and Sutowski shared the management duties.  (Pl. Tr. 18).  They
were responsible for distributing work assignments and promptly responding to unscheduled
service requests from Hospital staff throughout the day, for which they carried a beeper.  (Pl. Tr.
22-23; Pineda Dec. ¶ 5).  They had to keep daily reports and a logbook, which tracked the
progress of special housekeeping projects.  (Pineda Dec. ¶ 5).  They also had to document
probationary employee training progress and ensure that proper disciplinary procedures were

followed.  (Pl. Tr. 22-23; Pineda Dec. ¶ 5).

Each morning Sutowski and Turner conducted check-in for the Department staff, during which they signed staff in, assigned them work, and gave them supply closet keys.  (Pl. Tr. 19-20; DeGazon Dec. ¶ 6).  The night shift manager provided a briefing at that time about issues that arose since the previous dayshift.  (Pineda Tr. 105-07).  DeGazon attended the check-in every morning, a practice he had followed for more than 20 years.  (Pl. Tr. 36-37; DeGazon Dec. ¶ 6).  This enabled him to greet and observe all of the staff, including those on the night shift, with whom he would not otherwise interact regularly.  (DeGazon Dec. ¶ 7).

**D.  Turner's Performance Issues At NYUHC**

Turner's performance problems were apparent within one month of his employment at NYUHC.  On October 2, 2002, Turner was reminded of daily reporting and log book procedures.  (Pl. Tr. 71-74, Mar. Ex. 15 at 710).  Later, he was counseled about failing to complete the Department's holiday schedule on time and failing to respond to pages in a timely manner.  (Pl. Tr. 71-75, Mar. Ex. 15 at 713, 714, 717).  Turner's September 2003 annual performance evaluation noted 13 separate areas in which he was rated "needs improvement." (Pl. Tr. 95-97, Mar. Ex. 16).  On that evaluation, Pineda reinforced that Turner needed to "monitor that all reports are submitted by his supervisors," and, commented that "special projects are not documented as requested."  (Mar. Ex. 16).

Turner was also ineffective in managing the Department staff, and Pineda received complaints from the supervisors about him.  (Pl. Tr. 79; Pineda Tr. 201-02).  Turner was counseled about the staff's "unacceptable" execution of cleaning duties, their failure to complete their full shifts, and Turner's failure to take any corrective action with them.  (Pl. Tr. 71-74, Mar. Ex. 15 at N711, 712, 722).  Turner was also advised orally by DeGazon and Pineda that he needed to use the disciplinary process more often to correct his subordinates' performance

4

problems, (Pl. Tr. 30-31), and when he received his September 2003 performance review, he was
again instructed that he needed improvement in "counseling the supervisors and employees" and
"implement[ing] the Medical Center's disciplinary process in an appropriate and timely manner."
(Mar. Ex. 16). Turner admits that he disagreed with DeGazon and Pineda's strict adherence to
NYUHC's disciplinary procedures. (Pl. Tr. 30-32).

Turner also had difficulties working with his co-manager, Sutowski. (Pl. Tr. 33-35;
Pineda Dec. ¶ 8). On April 9, 2003, Pineda met with Turner and Sutowski to discuss their lack
of cooperation and communication. She told them they needed to work on communicating better
with one another to improve their performance, and highlighted eleven areas in which one or
both of them were failing to meet expectations. (Pl. Tr. 78-79, Mar. Ex. 15 at 723-724). Pineda
also set out the division of their responsibilities, making Sutowski responsible for the patient
floors in Tisch Hospital and Turner responsible for the sterile areas of the Hospital. (Pl. Tr. 78-
82, Mar. Ex. 15 at 724; Pineda Dec. ¶ 8). Turner admits he did not adhere to this division of
responsibilities. (Pl. Tr. 81-84). Despite Pineda's efforts, they continued to have difficulty
working together. (Pineda Dec. ¶ 8).

In September 2003, Turner received his annual performance evaluation, which noted 13
different areas in which he was rated "needs improvement." (Pl. Tr. 95-97, Mar. Ex. 16).
Among them were his failure to timely complete and review performance evaluations, to develop
staff inservice training, and to ensure that the daily logbook was being maintained regarding
special cleaning projects. Turner's inexperience in the housekeeping field was also reflected in
his evaluation, as Pineda specifically noted that Turner needed to learn how to use certain
cleaning equipment so that he could teach and correct other staff. (Mar. Ex. 16). Recognizing
that Turner had no prior experience in the medical or housekeeping fields, and hoping that he
would correct his performance deficiencies with more time on the job, Pineda gave Turner an

overall score of "meets expectations." (Pineda Tr. 162, 202-203; Pineda Dec. ¶ 9).

After September 2003, however, Turner continued to have performance problems. Pineda had to review with Plaintiff the procedures for signing in employees, covering for absent employees, and bed tracking. (Pineda Dec. ¶ 10, Ex. 9; Pl. Tr. 70-74, Mar. Ex. 15 at N725). In April 2004, Turner was counseled about not keeping up-to-date records, in this case of probationary employees' progress, and not answering pages in a timely manner. (Pineda Dec. ¶ 11, 12 Ex. 11-13). In the nine months after his evaluation, Turner showed none of the improvement Pineda wanted him to make. (Pineda Tr. 201-03).

### E.  Turmoil In The Management Of The Department

In 2004, the Employee Relations Department received complaints about the Department's management. Fromkin complained to Mark Parauda, an Employee Relations Manager, about DeGazon's management style. (Parauda Tr. 67-68). Parauda received a memo by Sutowski alleging that Pineda showed "favoritism" towards others and disliked Sutowski because she thought Sutowski was "badmouthing" her. (Parauda Tr. 99, Mar. Ex. 17).

In or about April 2004, Morelos told Reginald Odom, the Vice President of Human Resources, that people in the Department were not working well together, specifically mentioning Fromkin and DeGazon, and he asked Odom to meet with Fromkin. (Morelos Tr. 55-56; Odom Tr. 47-49). Odom commenced a "climate survey" of the Department, interviewing Fromkin as a first step. (Odom Tr. 49; Odom Dec. ¶ 4). Fromkin reported that DeGazon was difficult to work with and his management style was outdated. (Odom Tr. 52). She said that she and Morelos wanted to change things, but DeGazon wanted to continue doing things the way they had been done for years. (Odom Tr. 52). Fromkin also reported comments made by

DeGazon that she found offensive.[2]  (Fromkin Tr. 48; Odom Tr. 51).  Fromkin did not say that DeGazon was discriminating against her, only that he showed "favoritism" towards certain employees, such as Jacqueline Richards.  (Fromkin Tr. 51-52).  Fromkin directed Odom to other employees she felt shared her views, specifically, Sutowski, Turner, and Jesse Kilpatrick and Alhaji Majeed, two black supervisors.  (Fromkin Tr. 42, 46, Mar. Ex. 18).

Turner reported to Odom that the Department environment was intense and that he found DeGazon's management style to be militaristic.[3]  (Odom Tr. 57-58, 61).  Kilpatrick reported to Odom that DeGazon exhibited "favoritism" towards employees.  (Odom Tr. 62).[4]  No one reported to Odom that there was discrimination in the Department.  (Odom Dec. ¶ 9).  Odom's interviews did, however, confirm that there was a deep divide in the Department -- a "Udel DeGazon camp" and a "Joey Morelos camp."  (Odom Tr. 67-71).  Based on his interviews, Odom felt that any organization development training would be fruitless because the divide in the Department was so deep.  Instead, he told John Harney, the Vice President who oversaw the Department, that Harney would have to pick a supervisor he would support.  (Odom Dec. ¶ 12.)

Harney was already aware of problems in the Department, in part because Pineda had complained to him about Morelos' conduct at a meeting in late April 2004.  (Odom Dec. ¶ 12; Pineda Dec. ¶ 15).  Then, on April 29, 2004, Pineda was taken to the Hospital's emergency room after she became physically ill from inappropriate comments Morelos made about her.  (Pineda

---

[2] Fromkin testified at her deposition that she reported to Odom two comments made by DeGazon about her appearance – that DeGazon called her "skinny white girl," a nickname first given to her by the staff, and that he commented that her pants were too tight.  (Fromkin Tr. 31-32).

[3] While Turner's testimony about his meeting differs from Odom's in certain immaterial respects, both confirm that Turner did not complain about discrimination.  Turner testified that he reported to Odom that there was "favoritism" in the Department, but that he did not use the word "racist" because Odom is black.  (Pl. Tr. 49-50).  He testified, "I used words like favoritism being – I said being from St. Lucia, describing that Mr. Stephen was of the same race and of the same national origin."  (Pl. Tr. 50).  He believed Mr. Odom knew how he and Ms. Sutowski felt because they were both Caucasian, and were both complaining about the same unfair treatment.  (Pl. Tr. 51).  It is undisputed, however, that a black supervisor also complained to Odom about favoritism toward employees other than himself (Odom Tr. 62-63).

[4] Odom did not interview Majeed or Sutowski.  (Odom Tr. 70, 118).  Sutowski met with Parauda on or around April 16, 2004.  (Parauda Tr. 64-65).

Dec. ¶ 16).  When Harney met with Odom and learned his views about the Departmental divide,

he decided to terminate Morelos' employment.  On April 30, 2004, Harney asked Morelos to

resign.[5] Harney then named DeGazon the Interim Director. (Odom Tr. 98-100; Odom Dec. ¶ 12.)

## F.  NYUHC's Budget Reduction Mandate

On June 2, 2004, an "urgent budget memo" was sent to all NYUHC Vice Presidents from

Dr. Eric Rackow, the President of NYUHC, mandating that all departments immediately

decrease their personnel budgets by 2% because the Hospital was already over budget for the

year. (Odom Dec. ¶ 16, Ex. 3).  Dr. Rackow also directed department heads to consider reducing

managerial staff to expand the span of control for supervisors and managers so that they were

supervising an appropriate number of employees.  (Odom Dec. ¶ 16, Ex. 3).

In response to Dr. Rackow's directive, DeGazon examined the Department's

management staff to identify which positions he could cut to save salary in the budget and

expand the span of control.  (DeGazon Dec. ¶ 14).  DeGazon determined that one of the two

dayshift manager positions could be eliminated.  Turner had a smaller span of control than

Sutowski (2 supervisors as compared to Sutowski's 4 supervisors), making his duties more

readily transferable.  (Pineda Dec. ¶ 19; DeGazon Dec. ¶ 15-16.)  Turner also received a higher

salary than Sutowski, providing greater savings by eliminating his position from the budget.

(DeGazon Dec. ¶ 16).  DeGazon decided to eliminate Turner's position.  (DeGazon Tr. 42).

DeGazon next assessed whether Turner or Sutowski could effectively serve as manager

with the larger span of control and determined that neither could do so.  (DeGazon Dec. ¶ 17-18).

Neither of them was performing well in their current positions, with shared responsibilities, so it

---

[5] On the same day Morelos was terminated, Fromkin was also terminated.  (Fromkin Tr. 62).  Jacqueline Richards, a secretary in the Department, brought Odom documentation indicating that Fromkin was not actually reporting her days off on attendance sheets.  Fromkin was absent from work on at least four occasions in 2004, but had marked herself as present.  (Odom Tr. 87, 93; Odom Dec. ¶ 14).  Falsifying such documentation is grounds for dismissal. (Odom Dec. ¶ 13, Ex. 2).  On the same day that DeGazon was named Interim Director, Odom advised him to discharge Fromkin, which they did together that day.  (Odom Tr. 87-90).

was clear to DeGazon that neither of them was capable of successfully executing the increased responsibilities of the consolidated manager position.  (Pineda Tr. 164; Mar. Ex. 15; Pineda Dec. ¶ 7-13, Ex. 3-16; DeGazon Tr. 143-144; DeGazon Dec. ¶ 17-18).  DeGazon decided to layoff Turner because his position had been eliminated and to terminate Sutowski because her performance was unsatisfactory.  (DeGazon Tr. 75-76, 119-120).  As a result of this decision Turner received severance pay while Sutowski did not.  (Parauda Tr. 50-52, Mar. Ex. 19).

On June 14, 2004, DeGazon and Pineda notified Turner that his job was being eliminated for budgetary reasons.  (Pl. Tr. 123; DeGazon Tr. 119-120).  DeGazon instructed him to go to Human Resources.  (Pl. Tr. 123).  Turner met with Parauda, who gave him documentation concerning the layoff and his severance.  (Pl. Tr. 123-125; Parauda Tr. 38, Mar. Ex. 20).  Because Turner was a non-union employee, he needed to contact the Recruiting Department if he wanted to be considered for other positions at the Hospital. Turner, however, never contacted Recruiting or applied for another position.  (Odom Dec. ¶ 20, 22.)

As part of his overall budget reduction plan, DeGazon eliminated Pineda's Operations Manager position and promoted her to Associate Director.  (DeGazon Tr. 30; DeGazon Dec. ¶ 22).  Pineda also took over Turner's prior management responsibilities in NYUHC's HCC and IRM (Rusk) buildings.  (Pineda Dec. ¶ 22).  Stephen was promoted from Supervisor to dayshift Manager.  (DeGazon Tr. 30).  DeGazon selected Stephen for the position based on Stephen's 7 years of Hospital experience and successful job performance.  Stephen also had management experience prior to joining NYUHC, and worked well with Pineda.  (DeGazon Dec. ¶ 20.)  He was assigned to all of Sutowski's prior responsibilities, along with Turner's prior responsibilities in the sterile areas of Tisch Hospital building.  (Pineda Dec. ¶ 21).

**G.**     **The Department After The Reorganization and Reduction In Force**

NYUHC's June 2004 reduction in force resulted in the layoff of approximately 28

9

employees, the majority of whom were people of color.  (Odom Dec. ¶ 17).  None was rehired by

the Hospital (Odom Dec. ¶ 18).  Two months after Turner was discharged, Pineda and DeGazon

completed termination paperwork indicating that Turner was ineligible for rehire.  (DeGazon Tr.

50-52, Mar. Ex. 21).  They based their decision on his performance deficiencies, as described in

his 2003 evaluation and the emails and counselings he had received, and because he failed to

improve despite repeated intervention on their part.  (Pineda Tr. 172-180; DeGazon Tr. 50, Mar.

Ex. 21).  Non-union employees are not automatically eligible for rehire upon layoff, and

managers in each department are permitted to make their own judgment as to a departing

employee's eligibility for rehire.  (Odom Dec. ¶ 23).

Since the restructuring, the Department's performance has improved.   In 2003, the

Department did not win Full Accreditation, the highest accreditation rating JCAHO can award.

By contrast, in 2006, JCAHO awarded NYUHC "Full Accreditation" (Pineda Dec. ¶ 4, Ex. 1.)

## ARGUMENT

## I.   PLAINTIFF CANNOT PROVE RACE OR NATIONAL ORIGIN DISCRIMINATION

### A.   Applicable Legal Principles

Claims brought under the federal, New York State, and New York City human rights

laws are analyzed under the well-established analytical framework set forth in McDonnell

Douglas Corp. v. Green, 411 U.S. 792 (1973); Forrest v. Jewish Guild for the Blind, 3 N.Y.3d

295, 305, 786 N.Y.S.2d 382, 390, n. 3 (2004) ("federal case law in this area" is "helpful to the

resolution" of each of plaintiff's federal, state and city law claims); accord Hunter v. Citibank,

862 F. Supp. 902, 908 (E.D.N.Y. 1994), aff'd 60 F.3d 810 (2d Cir. 1995); Edwards v. City of

N.Y., 2005 U.S. Dist. LEXIS 34376 at *34 fn.8 (S.D.N.Y. Dec. 19, 2005) (courts look to Title

VII case law to resolve Section 1981 claims).  Once a defendant has articulated a legitimate

nondiscriminatory reason for the adverse action about which the plaintiff complains, the burden

shifts to the plaintiff to prove that the defendant intentionally discriminated against him. James v. N.Y. Racing Ass'n, 233 F.3d 149, 153-154 (2d Cir. 2000). "The plaintiff must produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action." Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000) (quotations and brackets omitted). It is axiomatic that "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated remains at all times with the plaintiff." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507 (1993) (citation omitted).

Summary judgment will be granted to the employer "unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination." James, 233 F.3d at 154. According to the United States Supreme Court in Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 146-147 (2000), "[I]t is not enough . . . to *dis*believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination." (quoting St. Mary's, 509 U.S. at 519) (emphasis in the original)). The inquiry into the employer's stated reason for the plaintiff's discharge is not, however, a license to scrutinize the wisdom of the employer's decision. "[I]t is not the function of a fact-finder to second-guess business decisions" by the employer concerning its performance expectations. Dister v. Cont'l Group, Inc., 859 F.2d 1108, 1116 (2d Cir. 1988). In determining whether a plaintiff has carried his burden of proving that there is a genuine factual issue as to unlawful bias on the part of an employer, a court must be careful to "distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture." Bickerstaff v. Vassar Coll., 196 F.3d 435, 448 (2d Cir. 1999).

In the instant case, Turner complains that he was selected for layoff and not re-hired

because he is white and because he is not from the island of St. Lucia. In support of his *prima facie* case of reverse discrimination, Turner cites the fact that the decision to eliminate his dayshift manager's position and consolidate most of his duties with those of the second dayshift manager's position was made by Udel DeGazon, a black man from St. Lucia, who gave the consolidated position to Turner's black co-worker from St. Lucia, Robert Stephen. No trial is warranted, however, because Turner cannot carry his burden of proving that NYUHC's stated reasons for eliminating his position and not rehiring him were false and that the real reason was discrimination against American-born whites. Edwards, 2005 U.S. Dist. LEXIS 34376 at *36-37 ("If plaintiff does not meet this burden, plaintiff's discrimination claims must fail.").

**B.  Plaintiff Was Not Laid Off Because He Is White And American-Born**

  1.  Plaintiff Cannot Show That The Stated Reasons For His Layoff Are False

It is undisputed that Plaintiff's position was eliminated as part of a Hospital-wide reduction-in-force triggered by a directive to all departments from the Hospital's president (an American-born white man) to cut their personnel costs by 2% to address a budgetary shortfall. (Odom Dec. ¶ 16, Ex. 3). The Hospital president cited a consultant's report finding that the Hospital had more employees per patient than competing hospitals and directed his department heads to increase span of control by trimming management staff. (Odom Dec. ¶ 16, Ex. 3). In response, DeGazon decided that he could eliminate Turner's position, which was the higher paid of the two dayshift positions with the smaller span of control, and consolidate most of the duties of the two positions. (DeGazon Dec. ¶ 16). He could fill the consolidated position with a veteran Department supervisor, Robert Stephen, whose undisputed record of more favorable job evaluations, greater NYUHC seniority, and longer work experience in a hospital setting demonstrated that Stephen was more qualified for the position than Turner. (DeGazon Dec. ¶ 20). Stephen was also more qualified than Bozena Sutowski, the second dayshift manager who

was discharged for poor performance on the same day Turner was laid off. This restructuring

enabled DeGazon to cut a position and give Stephen a promotional pay increase that nevertheless

kept his salary below that of both Turner and Sutowski. (DeGazon Dec. ¶ 20.) DeGazon further

reduced salary expense by promoting Hilda Pineda into the vacant position of Associate

Director, eliminating Pineda's old job of Operations Manager, and giving her some of Turner's

duties. (DeGazon Dec. ¶ 22).

When, as here, an employer selects a position for elimination because it is the higher paid

position, and distributes the duties of that position to the incumbent's co-workers, no inference of

a discriminatory motive can be drawn. See Brooks v. Leake & Watts Org., Inc., 2005 U.S. Dist.

LEXIS 16229 at *14 (S.D.N.Y. Aug. 1, 2005) citing Holt v. Gamewell Corp., 797 F.2d 36, 38

(1st Cir. 1986) (high salary as criterion for discharge to reduce expense is not discriminatory);

James, 233 F.3d at 152 (no inference of discrimination where employer distributed laid off

plaintiff's duties to other employees). Plaintiff cannot deny his layoff was triggered by the need

to reduce personnel costs and managerial staff in response to a budgetary shortfall. He cannot

contradict DeGazon's opinion that eliminating Turner's position was a reasonable way to meet

that need. And, he cannot dispute that DeGazon had sound reasons to believe that Stephen was

more qualified than Turner (or Sutowski) to hold the single dayshift manager position.

Consequently, Turner cannot withstand summary judgment. Simply pointing to the skin color or

birthplace of the individuals involved in those legitimate business decisions will not sustain

Turner's burden of proof. Hines v. Hillside Children's Ctr., 73 F. Supp.2d 308, 321 (W.D.N.Y.

1999) (the fact that Plaintiff was black and decision maker was white is insufficient, by itself, to

establish an inference of discrimination). Viola v. Philips Med. Sys. of N. Amer., 42 F.3d 712,

717 (2d Cir. 1994) (no discrimination inferred where employer "implemented a business-

justified company-wide reduction in its work force in response to changes in business emphasis

and economic necessities, and it relied on upon non-discriminatory guidelines in selecting the employees to be fired"); accord McLellan v. E.I. Dupont de Nemours & Co., 2006 U.S. Dist. LEXIS 94233 at *119 (W.D.N.Y. Sept. 22, 2006). Likewise, Turner cannot carry his burden by citing his own or Morelos' positive opinion of Turner's qualifications or performance. Beers v. NYNEX Materials Enters. Co., 1992 U.S. Dist. LEXIS 240 at *33 (S.D.N.Y. Jan. 13, 1992) ("A new manager is allowed to appraise an employee's work according to his or her own expectations, even if those expectations are contrary to a prior manager's expectations."); Valentine v. Standard & Poor's, 50 F. Supp. 2d 262, 284 (S.D.N.Y. 1999), aff'd 205 F.3d 1327 (2d. Cir. 2007) ("[P]laintiff's subjective disagreement with his reviews is not a viable basis for a discrimination claim.")

Similarly, no inference of discriminatory pretext can be inferred from the fact that Plaintiff had received an overall satisfactory rating on his 2003 annual evaluation because DeGazon and Pineda testified at deposition that Plaintiff did not improve after that evaluation, despite being advised that his performance needed improvement. (DeGazon Tr. 146-47; Pineda Tr. 162, 201-03). In addition, a simple comparison of Turner's and Stephen's last evaluations shows that Stephen's was far better than Turner's. (Mar. Ex. 11, 16). Moreover, as Pineda testified without contradiction, she believed that Turner's difficulties in handling the dayshift manager's job when he shared the work with Sutowski indicated that he was not likely to succeed in the consolidated position, with its greater duties and span of control. (Pineda Tr. 164). See Crawford v. Dep't of Invest., 2007 U.S. Dist. LEXIS 73022 at *13 (S.D.N.Y. Oct. 1, 2007), aff'd 324 Fed. Appx. 139 (2d. Cir. 2009) (recent positive review failed to show pretext in plaintiff's selection for layoff due to poor performance where his superiors documented their dissatisfaction with his work and retained those with better records).

2.   Plaintiff Cannot Show That Bias Against American-Born Whites Was The Real
        Reason For NYUHC's Decision To Lay Him Off

   a.   There Is No Evidence Of Discriminatory Remarks

There is no evidence whatsoever that anyone who issued the June 2004 cost-cutting

directive or selected Turner for layoff made any racial or ethnic remark in connection with either

of those decisions.  See Chavez v. Iberia Foods Corp., 2007 U.S. Dist. LEXIS 47449 at *21

(S.D.N.Y. Jun. 28, 2007) ("Proof of pretext cannot rest upon statements . . . by decisionmakers

unrelated to the decisional process itself.").  Turner testified that he did not hear DeGazon or

Pineda make any derogatory comments about Caucasians or Americans.  (Pl. Tr. 113-15).

Although Fromkin testified that DeGazon referred to her as a "skinny white girl," this comment

is a reference to Fromkin's appearance, not a racial slur or an expression of a racial stereotype.

Chism v. Con-Way Freight Inc., 2009 U.S. Dist. LEXIS 88202 at *31-34 (N.D. Ill. Sept. 24,

2009 (white supervisor's reference to "little black girl" and to Plaintiff as "Sheniqua" did not

show racial animus); Nowak v. Int'l Truck and Engine Corp., 406 F. Supp.2d 954, 963 (N.D. Ill.

2005) (use of the term "old timers" did not show age bias because it was a "descriptive rather

than evaluative term.").  Even if the term "skinny white girl" could be construed as racist, this

isolated remark – which is not about or directed at Turner and is unrelated to the layoff decision -

- is not enough to infer that race played any role in the decision to lay Turner off.  See Renz v.

Grey Adver., Inc., 135 F.3d 217, 224 (2d Cir. 1997) (isolated remarks not directed at plaintiff do

not establish discrimination in presence of strong, non-discriminatory reason for job action).

   b.   Similarly-Situated Employees Not Treated More Favorably Due To Race

Where there is no direct evidence of bias, and the Plaintiff cannot identify any evidence

that he was treated differently from similarly-situated employees who were not in his protected

class, summary judgment is appropriate.  Baguer v. Versus Broad. Sys. Inc., 2010 US. Dist.

LEXIS 69212 at *5 (S.D.N.Y. July 12, 2010).  Here, there is no evidence of disparate treatment.

Disparate treatment in the layoff selection process cannot be proved because the majority of the employees whose positions were eliminated in or around June 2004 were non-white. Thus, twenty-eight employees in the Hospital were laid off, more than two-thirds of whom were people of color. (Odom Dec. ¶ 17). The Hospital rehired none of them. (Odom Dec. ¶18). In addition, it is incontrovertible that DeGazon and Pineda have discharged for cause, or selected for layoff, employees who were black or Hispanic, as well as whites. (Pineda Dec. ¶ 23-24, Ex. 19-27). For example, over the years, the following individuals who are not white have been selected or recommended for discharge by DeGazon and/or Pineda: Alberto Rosa and Frank Trujillo, both Hispanic; Asa Bennett, black; Albert Kirton, Saint Lucian, (Pineda Dec. ¶ 23). In the face of this indisputable evidence, a reasonable juror could not infer a discriminatory animus against whites from the fact that Turner was laid off or that Sutowski and Fromkin were discharged for cause. See Trotman v. CBS Radio, Inc., 2007 U.S. Dist. LEXIS 73641 at *29 (S.D.N.Y. Sept. 27, 2007) (dismissing race discrimination claim where evidence did not establish that African-Americans were treated any differently than whites).

Robert Stephen's selection for the dayshift manager position is not evidence of disparate treatment because Stephen was not similarly-situated to Turner or Sutowski. Unlike them, Stephen had seven years' experience working in the highly-regulated hospital environment. His annual evaluations were better. And, his salary was lower than Turner's or Sutowski's. (DeGazon Dec. ¶ 20.) Because of these differences, Stephen was not similarly-situated to Turner or Sutowski and his selection for the consolidated position cannot be considered disparate treatment. See James, 233 F.3d at 152 (no inference of age discrimination where younger employee hired after plaintiff's layoff had some of the same duties as plaintiff, but that "the overall reorganization resulted in [the younger employee] assuming a different grouping of responsibilities, for lower pay, than [plaintiff].") Indeed, there is nothing in the record that even

remotely suggests that DeGazon or Pineda lacked a good faith belief that Stephen was more qualified than Turner or Sutowski for the consolidated dayshift position. See Barbagallo v. Gen. Motors Corp., 1996 WL 19004 at *3-4 (S.D.N.Y. Jan. 17, 1996) (granting summary judgment for employer where demonstrated that Plaintiff was not qualified to fill any of the vacant positions available at the time of the layoff); Pathare v. Klein, 2009 U.S. App. LEXIS 21408 at *6 (2d Cir. Sept. 30, 2009) (dismissing disparate treatment claim where "[a] reasonable employer may have promoted the candidates selected" for promotion over Plaintiff).

Turner mistakenly rests his discrimination claim on the assertion that DeGazon preferred Stephen because they were friends and belonged to the Iyalona club, a social club for immigrants from St. Lucia. (DeGazon Tr. 76-77; Stephen Tr. 28-29). It is well-settled that favorable treatment of a friend or relative at work is not unlawful where that favorable treatment does not extend to all members of the friend's or relative's racial or ethnic class. Here, there is not a scintilla of evidence that DeGazon bestowed favorable treatment on St. Lucians or blacks as a class. Indeed, there is no evidence that any other St. Lucians were treated preferentially by DeGazon. On the contrary, DeGazon's discharge of other black or St. Lucian employees shows that he did not  exempt them as a class from termination. Neal v. Roche, 349 F.3d 1246, 1251 (10th Cir. 2003) ("an employer's actions based on loyalty to a friend or relative . . . are not considered 'discriminatory' even where they benefit the non-protected friend or relative at the expense of a more qualified, protected person"); see also Attenborough v. Constr. & Gen. Bldg. Laborers' Local 79, 691 F. Supp.2d 372, 383-384 (S.D.N.Y. 2009) (adverse action against employees of alleged discriminator's race who were not his friends refutes race claim).

### c.   Pineda's Use of Spanish At Work Does Not Show Bias

Turner offers as purported evidence of racial bias that Pineda spoke Spanish in front of him and once told him he should learn to speak Spanish. (Pl. Tr. 57-58). Turner admits,

however, that he has no evidence that Pineda used Spanish in connection with work-related matters.  (Pl. Tr. 58).  He cannot contradict Pineda's testimony that she never spoke Spanish to non-Spanish speakers nor conducted business in Spanish in the presence of non-Spanish-speaking subordinates (Pineda Dec. ¶ 3), testimony that Robert Stephen corroborated at his deposition.  (Stephen Tr. 28).  Pineda's use of Spanish when talking to other Spanish-speakers in the workplace cannot support an inference of discriminatory animus toward Turner.  Indeed, it is well-settled that employees have the right to speak their native language in the workplace, absent a legitimate reason to prohibit them from doing so.  Pacheco v. N.Y. Presbyterian Hosp., 593 F. Supp.2d 599 (S.D.N.Y. 2009).  Turner's personal discomfort is not such a reason.

    d.   Attendance At Morning Check-In Is Not Discriminatory

Turner alleges that DeGazon's presence at the Department's daily check-in was "unnecessary and harassment" because DeGazon would "stand in the corner with Mr. Stephen . . . conversing with him," although he could not recite any specific comment made by DeGazon during check-in that showed hostility toward Turner or American-born whites.  (Pl. Tr. 37-41). The assertion that this conduct is evidence of discrimination is not only nonsensical on its face, but also completely contradicted by the incontrovertible fact that DeGazon has attended the morning check-in for more than 20 years, regardless of the race and national origin of the managers who ran the meeting.  (DeGazon Dec. ¶ 6).  Moreover, Turner cannot contradict DeGazon's legitimate reason for attending that meeting, which provided the only regular opportunity DeGazon had in one place at one time to observe, greet and, if necessary, make general interest announcements to managers, supervisors and staff members from both day and night shifts. (DeGazon Dec. ¶ 7).  Thus, no inference of discriminatory animus can be drawn from DeGazon's presence at the daily check-in.  See King v. Bratton, 2004 U.S. Dist. LEXIS 26011 at *20 (E.D.N.Y. Aug. 25, 2004) (supervisory scrutiny did not demonstrate animus where

the type of review at issue was not out of the ordinary and both Caucasians and African-Americans were subjected to the scrutiny); Clarke v. One Source Facility Servs., Inc., 168 F. Supp.2d 91, 98 (S.D.N.Y. 2001)( "Even if Plaintiff was subjected to extra scrutiny or even if there was a "crusade" against him, he must show that Defendant's actions were motivated specifically by racial discrimination.")

    e.  Asking, "Are you a Coward," Does Not Show Discriminatory Motive or Conduct

Turner alleges that DeGazon discriminated against him when he asked at a meeting of managers and supervisors held on June 8, 2004, "Are you a coward?"  (Pl. Tr. 139-143, Mar. Ex. 22).  Turner asserts that "the only point to this meeting was again to further harass [him]."  (Pl. Tr. 141).  The assertion that this meeting is evidence of discriminatory motive or treatment is entirely undermined by the fact that other managers and supervisors, including those who were black and Hispanic, were required to attend the meeting and were asked the same question.  (Pl. Tr. 140; DeGazon Tr. 113-15).  Thus, it is patently false for Turner to claim that this meeting is evidence of discrimination against him personally or American-born whites generally. Significantly, Turner could not recall any other statements or comments made by DeGazon at this meeting, making his claim of discrimination rest entirely on his own purely personal and speculative feeling that the question was directed at him.  (Pl. Tr. 141-42).  It is well-settled that a plaintiff's subjective belief that he was not treated fairly, without more, "is simply not enough to demonstrate pretext."  Silva v. Peninsula Hotel, 509 F. Supp.2d 364, 386 (S.D.N.Y. 2007).

    f.  Receipt Of A Post-Layoff Email Is Not Evidence of Discriminatory Animus

Equally misplaced is Turner's reliance on an email announcing Stephen's promotion, which was also sent to Black, Hispanic and Saint Lucian employees, to show discrimination. (Mar. Dec. Ex. 9, ¶ 54; DeGazon Tr. 125 27, Mar. Ex. 23).  The email does nothing to support Turner's claim, not only because it was sent to many individuals of various races and origins, but

also because it makes no mention of race or national origin.  (Mar. Ex. 23).  Although Turner

may have been offended by receipt of the email, by Stephen's promotion, or by both, his

subjective belief that the action was tainted by an unlawful motive cannot support his burden of

proof.  Silva, 509 F. Supp. 2d at 386.

### C.   Plaintiff Cannot Show That His Ineligibility For Rehire Was Discriminatory

#### 1.   Pineda Had Legitimate Reasons For Listing Plaintiff As Ineligible For Rehire

Pineda had a legitimate, non-discriminatory reason for marking Turner ineligible for

rehire on his termination paperwork.  As described at length above, and documented in Turner's

2003 annual evaluation, Pineda had formed the opinion during Turner's first year of employment

that there were more than a dozen areas in which his performance needed improvement.  (Mar.

Ex. 16).  When she gave him that evaluation, Pineda hoped that Turner could overcome his

inexperience and improve his performance, especially in the designated areas.  Pineda testified

without contradiction that, in her opinion, Turner failed to do so in the nine months following his

evaluation.  (Pineda Tr. 162, 201-02).  As a result, when Pineda completed Turner's termination

paperwork in August 2004, seven weeks after Turner was laid off, she rated his performance as

poor in quantity, only fair in quality, and insufficient to warrant his rehire.  (Pineda Tr. 172-80,

Mar. Ex. 21).  No inference of unlawful motive can be drawn from the fact that Pineda held this

view or completed the termination paperwork in a manner consistent with her view.  See

Fitzpatrick v. N.Y. Cornell Hosp., 2002 U.S. Dist. LEXIS 25166 at *24 (S.D.N.Y. Jan. 9, 2003)

(laid-off plaintiff's poor record of performance demonstrated the "non-discriminatory reason

why plaintiff did not qualify for reemployment" after layoff)

#### 2.   Plaintiff Cannot Show Disparate Treatment In His Rehire Eligibility

Pineda and DeGazon have completed the termination paperwork for many employees

during their careers at NYUHC and have marked as "ineligible for rehire" employees who were

non-white, some of whom lost their jobs due to layoff and others who left voluntarily, not due to

poor performance. (Pineda Dec. ¶ 24, Ex. 24-27).  See Trotman, 2007 U.S. Dist. LEXIS 73641

at \*29.  These indisputable facts make it impossible for Turner to show disparate treatment in

Pineda's decision to make him ineligible for rehire.  Moreover, the fact that other employees

who were laid off were listed as ineligible for rehire flatly contradicts Turner assertion that he

had a guaranteed right to recall simply because he was laid off.  (Pineda Dec. ¶ 24, Ex. 23).

 The total absence of evidence of discriminatory animus or disparate treatment, and the

incontrovertible evidence showing the legitimate reasons for the actions about which Turner

complains, demonstrate conclusively that there are no triable issues of material fact in this case.

Thus, Turner's claims for unlawful discrimination and harassment should be dismissed.

## II. PLAINTIFF CANNOT PROVE HIS RETALIATION CLAIM

### A. Applicable Standards

 To establish a prima facie case of retaliation, a plaintiff must demonstrate: "(i)

participation in a protected activity; (ii) that the defendant knew of the protected activity; (iii)

adverse employment action; and (iv) a causal connection between the protected activity and the

adverse employment action."  Hanna v. N.Y. Hotel Trades Council, 851 N.Y.S.2d, 827-828

(2008).  While there are differences in the retaliation standards under the federal and City human

rights laws, the principal difference lies in the definition of an adverse employment action.

Fincher v. Depository Trust and Clearing Corp., 604 F.3d 712, 723 (2d Cir. 2010) (the City law

"rejects a materiality" requirement, while under federal standards, "retaliation claims must

involve an action by the employer that is materially adverse.")  In this case, that difference is

immaterial because the defense to Turner's retaliation claim is not predicated on the absence of

an adverse action.  Plaintiff's retaliation claim must be dismissed for two reasons:  first, Turner

cannot establish that he engaged in protected activity before he was laid off; and, second, even

assuming that Turner could meet that threshold requirement, he cannot identify any evidence

showing that the Hospital's reasons for its actions were both false and a pretext to retaliate against him for conduct he claims was statutorily protected.

**B.   <u>Plaintiff Did Not Engage In Protected Activity</u>**

"A 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination." <u>Wimes v. Kaleida Health</u>, 157 Fed. Appx. 327, 328 (2d Cir. 2005) (internal citations omitted). To meet the threshold proof requirement for a *prima facie* case of retaliation, a plaintiff must show "that the employer [is] aware of the protected activity" and that the employer "reasonably have understood that the plaintiff's opposition was directed at conduct prohibited by Title VII." <u>Krasner v. HSH Nordbank AG</u>, 680 F. Supp.2d 502, 520 (S.D.N.Y. 2010). "The onus is on the speaker to clarify to the employer that he is complaining of unfair treatment due to his membership in a protected class and not that he is complaining of unfair treatment generally. <u>Aspilaire v. Wyeth Pharm., Inc.</u>, 612 F. Supp.2d 289, 308-309 (S.D.N.Y. 2009).

    1.   <u>Complaints About Favoritism Are Not Statutorily Protected</u>

An employee's complaints about "favoritism" as opposed to "discrimination," do not constitute activity protected from retaliation under the civil rights statutes. <u>See</u> <u>Ruhling v. Tribune Co.</u>, 2007 WL 28283 at *21 (E.D.N.Y. Jan. 3, 2007) (favoritism complaint not protected activity where employee admitted that she did not frame complaint as one involving discriminatory conduct); <u>Krasner</u>, 680 F. Supp.2d at 521 (employee's complaint about "bullying" of him and "favoring" of another employee not protected activity because, even if he meant to complain of discrimination, employer did not have that understanding). Here, Turner admittedly did not complain about race or national origin discrimination but instead complained about "favoritism" (Pl. Tr. 50). Odom testified that Turner never mentioned discrimination, and he did not interpret Turner's statements about favoritism to be a complaint of discrimination. (Odom

Tr. 57-60; Odom Dec. ¶ 9). Because Turner's complaint was not sufficient to put NYUHC on notice that Turner was complaining of discrimination, it did not trigger the protection of the anti-retaliation provisions of the statutes under which Turner asserts this claim.

Turner testified at his deposition that Odom "knew what he was complaining about," because Sutowski, who is also white, complained about DeGazon. This assertion, however, is insufficient to support Plaintiff's claim that he engaged in protected activity. "[T]he mere fact that a group making the complaints were [the same race] will not convert an ordinary complaint into a complaint of racial discrimination sufficient to put the employer on notice of such discrimination." Aspilaire, 612 F. Supp.2d at 310. Further, because Jesse Kilpatrick, who is black, met with Odom and complained about favoritism in the Department, Odom could not have inferred from the race or origin of the complaining employees he interviewed that DeGazon's purported favoritism was based on race or national origin.

### 2. References to Supervisor And Employee Being Of Same National Origin Insufficient To Put Employer On Notice Of Discrimination Claim

Turner testified that he did not complain to Odom that he was being discriminated against because he was "looking at a black man, trying to complain about a black man." (Pl. Tr. 50). Turner stated that he felt the racial and ethnic component of his complaint should have been clear to Odom because he mentioned that both DeGazon and Stephen were from Saint Lucia. (Pl. Tr. 50-51). "While a report of discrimination to a supervisor may be statutorily protected under Title VII, the report must include a complaint of national origin discrimination or sufficient facts to raise that inference." Andonissamy v. Hewlett-Packard Co., 547 F.3d 841, 850-851 (7th Cir. 2008) (rejecting plaintiff's claim that his reference to his own immigration status in course of complaint was sufficient to constitute a report of discrimination under Title VII). Regardless of Turner's subjective intent, and Turner's own patently racialist views, Turner's testimony establishes that he did not make a statutorily-protected complaint about racial or national origin

discrimination.  Thus, he cannot maintain a claim for retaliation under applicable law.

### C.  Defendant Has Articulated Legitimate-Non Retaliatory Reasons for Turner's Layoff and Ineligibility for Rehire And Plaintiff Cannot Point To Any Evidence Of Pretext

As shown in Point I above, the record in this case does not contain any genuine and material dispute of fact regarding the existence of legitimate business reasons for the actions upon which Turner predicates both his discrimination and his retaliation claims, including the decision to lay Turner off, place Stephen rather than Turner in the consolidated dayshift position, and make Turner ineligible for rehire.  In Point I, we also showed that Turner cannot identify any evidence from which a jury could conclude that NYUHC's legitimate reasons for each of those actions are false or a pretext masking an unlawful motive.  As shown below, the record is also devoid of any evidence that retaliation was the reason for NYUHC's actions.

### 1.  No Evidence of Disparate Treatment Based Upon Complaints To Odom

Turner cannot show a causal connection between complaints to Odom and the subsequent adverse actions taken regarding his employment, recall or rehire eligibility because Jesse Kilpatrick also complained and was not laid off or discharged.  (Odom Dec. ¶ 8).  Indeed, Mr. Majeed filed a formal agency complaint against DeGazon and still works at NYUHC.  (Odom Dec. ¶ 10).  Where the undisputed evidence demonstrates that similarly-situated employees in Plaintiff's protected class are treated favorably, Plaintiff cannot establish pretext.  Finally, it cannot be disputed that, in the past, DeGazon and Pineda rated a number of departing employees as ineligible for rehire, even though they were not discharged for poor performance, and there is no evidence that any of them complained about DeGazon or Pineda prior to their ineligibility rating.  (Pineda Dec. ¶ 24, Ex. 24-27).

### 2.  There Is No Evidence Of Hostility To Protected Complaints of Discrimination

Turner cannot identify any comments by anyone at NYUHC that express hostility toward discrimination complaints or other statutorily-protected activity.  DeGazon's alleged statement

that he knew "verbatim" what Turner complained about to Odom cannot be construed as hostility toward statutorily-protected complaints because Odom testified that Turner did not complain about discrimination. (Pl. Tr. 102-03; Odom Tr. 54-58). Thus, even assuming *arguendo* that Odom gave DeGazon a verbatim account of his interview with Turner, that account would not have put DeGazon on notice of a discrimination complaint. DeGazon's comment, assuming *arguendo* that he made it as Turner alleges, therefore could not have been motivated by hostility to discrimination complaints. Likewise, assuming that DeGazon told Turner and Sutowski, "decide whether or not [you] want to work [here] anymore," (Pl. Tr. 102-03), that comment is plainly directed at the partisan divide that had developed under Mr. Morelos, which the managers could close only by cooperating with Mr. DeGazon in the future or leaving the Department. Neither Turner's subjective feelings of discomfort, nor his personal interpretation of the comment, create a triable issue of fact regarding a motive to retaliate against those who complain about discrimination. See Phipps v. Comp. Cmtg. Dev. Corp., 2005 U.S. Dist. LEXIS 1672 at *57-58 (S.D.N.Y. Feb. 4, 2005).[6]

## CONCLUSION

For all the foregoing reasons, Defendant's motion for summary judgment should be granted and the Complaint should be dismissed in its entirety with prejudice.

Dated: August 11, 2010

EDWARDS ANGELL PALMER & DODGE LLP

By: _David R. Marshall_

David R. Marshall

---

[6] Notably, Turner does not claim that Pineda expressed any hostility because of his alleged complaint. Because it was Pineda who rated Turner ineligible for rehire, not DeGazon (who signed the CPP before Pineda completed it), Turner cannot attribute any retaliatory motive to her decision to rate him ineligible for rehire. (Pl. Tr. 103).