EDWARDS ANGELL PALMER & DODGE LLP
David R. Marshall
Rachel B. Jacobson
Attorneys for Defendants
750 Lexington Avenue
New York, New York 10022
212.308.4411
dmarshall@eapdlaw.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - X

KEITH TURNER,                                            :

              Plaintiff,                           :

    -against-                                             :       06 Civ. 1910 (GBD)

NYU HOSPITALS CENTER, NYU MEDICAL              :       **RULE 56.1 STATEMENT**
CENTER, NYU SCHOOL OF MEDICINE, and
NYU HEALTH SYSTEM,                                       :

              Defendants.                          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - X

In accordance with Rule 56.1 of the Local Civil Rules of this Court, Defendants submit the following statement of material facts not in dispute.

1.      The Building Services Department (the "Department") provides cleaning, patient transport, and laundry services to patients and staff at NYU Hospital Center ("NYUHC"). (Pineda Dec. ¶ 4).[1]

2.      The Department is responsible for protecting patients from accident, injury and infection in accordance with guidelines established by the Joint Commission on Accreditation of Healthcare Organizations ("JCAHO").  (Pineda Dec. ¶ 4).

---

[1] References to "Pineda Dec.," "Odom Dec.," and "DeGazon Dec." are to the Declarations and exhibits ("Ex.") of Hilda Pineda, Reginald Odom, and Udel DeGazon submitted in support of Defendant's motion for summary judgment.  References to "Pl. Tr.," "Morelos Tr.," "Fromkin Tr.," "Stephen Tr.," "Pineda Tr.," "Parauda Tr.," and "Odom Tr." are to the deposition transcripts of Keith Turner, Joseph Morelos, Corie Fromkin, Robert Stephen, Udel DeGazon, Hilda Pineda, Mark Parauda, and Reginald Odom, excerpts of which are Exhibits 1-8 to the Declaration of David R. Marshall ("Mar. Dec.").  "Mar. Ex." refers to exhibits attached to the Marshall Declaration.

3.      The Department employs approximately 275 employees on three shifts, twenty-four hours a day, seven day a week.  (Pineda Dec. ¶ 3).

4.      In 2001, Joseph Morelos was hired as the Director of the Department.  (Morelos Tr. 5).

5.      Prior to joining NYUHC, Morelos spent approximately twenty-five years of his career in the hotel industry, and approximately five years working in a hospital setting.  (Odom Dec. ¶ 26, Ex. 7).

6.      Morelos was chosen for the Director position over Udel DeGazon, the Department's Associate Director who had worked at NYUHC for thirty-five years.  (DeGazon Tr. 7, 26-28).

7.      Morelos hired Corie Fromkin, who had previously worked in the film and music industries, to be the Department's Office Manager.  (Fromkin Tr. 7-8, Mar. Ex. 10).

8.      Morelos hired Bozena Sutowski, who had spent her entire career in the hotel industry, to be a Building Services Manager.  (Morelos Tr. 8; Odom Dec. ¶ 27, Ex. 8).

9.      Morelos hired Keith Turner to be the second Building Services Manager. (Morelos Tr. 37; Pl. Tr. 17-18).

10.      According to Morelos, DeGazon had recommended Department supervisor Robert Stephen for the position that Morelos eventually gave to Turner. (Morelos Tr. 9-12).

11.      Stephen had excellent performance evaluations since becoming a Department supervisor in 1997, and he had management experience at a prior employer.  (Stephen Tr. 25-33; Mar. Ex. 11, 12).

12.      Morelos rejected Stephen as unqualified.  (Morelos Tr. 12-13).

13.     Morelos solicited an application from Turner, whom he knew socially because Morelos had worked for Turner's wife at the Intercontinental Hotel, for the Building Services Manager position. (Morelos Tr. 14, Pl. Tr. 12-15).

14.     Turner had no prior hospital work experience, and had spent the previous 15 years working in the food and beverage industry.  (Pl. Tr. 6, 14-15, Mar. Ex. 13)

15.     The Building Services Manager position required "[k]nowledge of waste management, infection control and JCAHO."  (Morelos Tr. 29-30, 37, Mar. Ex. 14).

16.     Turner's resume does not indicate that he had an knowledge of waste management, infection control, or JCAHO.  (Mar. Ex. 13.)

17.     Morelos deemed Turner qualified for the position.  (Morelos Tr. 37-38).

18.     Turner began work in September 2002, reporting indirectly to DeGazon and directly to Hilda Pineda, the Operations Manager who had worked in the Department since 1982. (Pl. Tr. 17-18; Pineda Tr. 9-10).

19.     Pineda never conducted business in Spanish with Turner.  (Pineda Dec. ¶ 3; Stephen Tr. 28; Pl. Tr. 58).

20.     Turner and Sutowski shared the management duties.  (Pl. Tr. 18).

21.     Each morning Sutowski and Turner conducted check-in for the Department staff. (Pl. Tr. 19-20).

22.     DeGazon attended the check-in every morning, a practice he had followed for more than 20 years.  (Pl. Tr. 36-37; DeGazon Dec. ¶ 6).

23.     Turner was counseled about failing to complete the Department's holiday schedule on time and failing to respond to pages in a timely manner.  (Pl. Tr. 71-75, Mar. Ex. 15 at 713, 714, 717).

24.     Pineda received complaints from the supervisors in the Department about Turner. (Pl. Tr. 79; Pineda Tr. 201-02).

25.     Turner was counseled about the cleaning staff's "unacceptable" execution of cleaning duties, their failure to complete their full shifts, and Turner's failure to take any corrective action with them.  (Pl. Tr. 71-74, Mar. Ex. 15 at N711, 712, 722).

.26.     Turner was advised orally by DeGazon and Pineda that he needed to use the disciplinary process more often to correct his subordinates' performance problems.  (Pl. Tr. 30-31).

27.     Turner disagreed with DeGazon and Pineda's adherence to NYUHC's disciplinary procedures.  (Pl. Tr. 30-32).

28.     On April 10, 2003, Pineda gave Sutowski and Turner a memo indicating that they needed to work on communicating better with one another to improve their performance, noting eleven areas in which one or both of them were failing to meet expectations, and setting out a division of responsibility between Sutowski and Turner.  (Pl. Tr. 78-79, Ex. 15 at N723-724).

29.     Sutowski was responsible for the patient floors in Tisch Hospital.  (Mar. Ex. 15 at N724, Pineda Dec. ¶ 8).

30.     Turner was responsible for the sterile areas of Tisch Hospital, the patient areas of the Rusk Institute for Rehabilitation Medicine and the patient and sterile areas of the Health Care Center.  (Mar. Ex. 15 at N724, Pineda Dec. ¶ 8).

31.     Turner admits he did not adhere to this division of responsibilities.  (Pl. Tr. 81-84).

32.     Turner's September 2003 annual performance evaluation noted 13 different areas in which he was rated "needs improvement."  (Mar. Ex. 16).

33.     Because she hoped that Turner would correct his performance deficiencies with more time on the job, Pineda gave Turner an overall score of "meets expectations" in his September 2003 performance review.  (Pineda Tr. 33, 162, 202-203; Pineda Dec. ¶ 9, Ex. 8).

34.     After September 2003, Pineda had to review with Plaintiff the procedures for signing in employees, covering for absent employees, and bed tracking.  (Pineda Dec. ¶ 10, Ex. 9; Pl. Tr. 70-74, Mar. Ex. 15 at N725).

35.     In April 2004, Turner was counseled about not keeping up-to-date records of probationary employees' progress, and not answering pages in a timely manner.  (Pineda Dec. ¶ 11, 12 Ex. 11-13).

36.     In or about April 2004, Morelos told Reginald Odom, the Vice President of Human Resources, that people in the Department were not working well together, specifically mentioning Fromkin and DeGazon.  (Morelos Tr. 55-56; Odom Tr. 47-49).

37.     In 2004, Odom commenced a "climate survey" of the Department, interviewing Fromkin as a first step.  (Odom Tr. 49; Odom Dec. ¶ 4).

38.     Fromkin did not say that DeGazon was discriminating against her, but that he showed "favoritism" towards certain employees.  (Fromkin Tr. 51-52).

39.     Fromkin directed Odom to other employees she felt shared her views, specifically, Sutowski, Turner, and Jesse Kilpatrick and Alhaji Majeed, two black supervisors. (Fromkin Tr. 42, 46, Mar. Ex. 18).

40.     In addition to interviewing Fromkin, Odom interviewed Turner and Kilpatrick. (Odom Tr. 57-62).

41.     No one reported to Odom that there was discrimination in the Department. (Odom Dec. ¶ 9; Pl. Tr. 49-51).

42.     Turner did not complain to Odom that he was being discriminated against because he was "looking at a black man, trying to complain about a black man." (Pl. Tr. 50).

43.     Turner never heard DeGazon or Pineda make any derogatory comments about Caucasians or Americans. (Pl. Tr. 113-15).

44.     Odom believed that there was a deep divide in the Department. (Odom Tr. 67-71).

45.     On April 30, 2004, John Harney, the Vice President of Operations who oversaw the Department, asked Morelos to resign. (Odom Tr. 98-100; Odom Dec. ¶ 12.)

46.     Harney named DeGazon the Interim Director. (Odom Tr. 98-100; Odom Dec. ¶ 12.)

47.     On April 30, 2004, Fromkin was terminated for falsifying her attendance records in violation of NYUHC policy. (Fromkin Tr. 62; Odom Tr. 87, 93; Odom Dec. ¶ 13-15, Ex. 2).

48.     On June 8, 2004, DeGazon held a supervisor meeting, which was for all supervisors to attend. (Pl. Tr. 140; DeGazon Tr. 113-15; DeGazon Dec. ¶ 12).

49.     At the June 8, 2004, a handout was available for all attendees, prepared by Mr. DeGazon, which indicated that the topic of the meeting was "Commitment," and which stated on it, "Are you a coward?" (Pl. Tr. 139-143; DeGazon Tr. 113-115; DeGazon Decl. ¶ 12, Ex. 1).

50.     No statements at the June 8, 2004 meeting were specifically directed at Turner. (Pl. Tr. 141-42; DeGazon Tr. 113-17; DeGazon Dec. ¶ 12).

51.     On June 2, 2004, an "urgent budget memo" was sent to all NYUHC Vice Presidents from Dr. Eric Rackow, the President of NYUHC, mandating that all departments immediately decrease their personnel budgets by 2% because the Hospital was already over budget for the year. (Odom Dec. ¶ 16, Ex. 3).

52.     The June 2, 2004 memo directed department heads to consider reducing managerial staff to expand the span of control for supervisors and managers so that they were supervising an appropriate number of employees.  (Odom Dec. ¶ 16, Ex. 3.)

53.     DeGazon determined that one of the two dayshift manager positions could be eliminated.  (DeGazon Dec. ¶ 15-16).

54.     Turner supervised 2 supervisors, who over saw approximately 40 unionized employees.  (Pineda Dec. ¶ 19; DeGazon Dec. ¶ 15).

55.     Sutowski supervised 4 supervisors, who oversaw approximately 60 employees.  (Pineda Dec. ¶ 19; DeGazon Dec. ¶ 15).

56.     Because Turner's position had a smaller span of control, DeGazon believed that his duties could be more easily distributed other managers in the Department.  (DeGazon Dec. ¶ 16).

57.     Turner received a higher salary than Sutowski.  (DeGazon Dec. ¶ 15).

58.     DeGazon decided to eliminate Turner's position.  (DeGazon Tr. 42; DeGazon Dec. ¶ 16).

59.     DeGazon did not think that Turner or Sutowski could serve as a solo Manager of Building Services because the position would have increased responsibilities and DeGazon and Pineda did not believe that Turner and Sutowski were performing well.  (Pineda Tr. 164, 201-02; Mar. Ex. 15; Pineda Dec. ¶ 7-13, Ex. 3-16; DeGazon Tr. 143-144; DeGazon Dec. ¶ 17-18).

60.     DeGazon laid off Turner because his position had been eliminated.  (Pl. Tr. 123; DeGazon Tr. 84-85; DeGazon Dec. ¶ 18).

61.     DeGazon terminated Sutowski because her performance was unsatisfactory.  (DeGazon Tr. 75-76; DeGazon Dec. ¶ 17).

62.     DeGazon and Pineda have discharged for cause or selected for layoff employees who were black or Hispanic, as well as whites.  (Pineda Dec. ¶ 23-24, Ex. 19-22; DeGazon Dec. ¶ 23).

63.     Because Turner was a non-union employee, he needed to contact the Recruiting Department if he wanted to be considered for other positions at the Hospital. (Odom Dec. ¶ 20, 22).

64.     After he was laid off from NYUHC, Turner never contacted Recruiting or applied for another Hospital position.  (Odom Dec. ¶ 22).

65.     Stephen was promoted from Supervisor to dayshift Manager.  (DeGazon Tr. 30; DeGazon Dec. ¶ 20).

66.     DeGazon selected Stephen for the position based on Stephen's 7 years of Hospital experience and successful job performance.  (Mar. Ex. 11; DeGazon Dec. ¶ 20).

67.     Stephen also had management experience prior to joining NYUHC, and worked well with Pineda.  (Mar. Ex. 12; DeGazon Dec. ¶ 20).

68.     Stephen was assigned to all of Sutowski's prior responsibilities, along with Turner's prior responsibilities in the sterile areas of Tisch Hospital building.  (Pineda Dec. ¶ 21).

69.     For the purposes of this motion only, NYUHC admits that on June 18, 2004, DeGazon sent an email to the Department announcing  Stephen's promotion, which Turner received.  (Marshall Dec. Ex. 9, ¶ 54; Mar. Ex. 23).

70.     NYUHC's June 2004 reduction in force resulted in the layoff of approximately 28 employees, the majority of whom were people of color.  (Odom Dec. ¶ 17).

71.     No one laid off as a result of the June 1, 2004 reduction in force directive was rehired by the Hospital (Odom Dec. ¶ 18).

72.     Two months after Turner was discharged, Pineda and DeGazon completed termination paperwork indicating that Turner was ineligible for rehire.  (DeGazon Tr. 50-52, Mar. Ex. 21).

73.     Turner was deemed ineligible for rehire because of DeGazon's and Pineda's beliefs that Turner's performance was deficient, and because he failed to improve despite repeated intervention.  (Pineda Tr. 172-180;. DeGazon Tr. 50, Mar. Ex. 21).

74.     Non-union employees are not automatically eligible for rehire upon layoff, and managers in each department are permitted to make their own judgment as to a departing employee's eligibility for rehire.  (Odom Dec. ¶ 23).

75.     Philip Curry, a black male, was previously laid off from the Department and listed as "ineligible for rehire."  (Pineda Dec. ¶ 24, Ex. 23).

76.     Black and Hispanic employees who were not terminated for cause have also been listed as "ineligible for rehire" by DeGazon and Pineda.  (DeGazon Dec. ¶ 24; Pineda Dec. ¶ 24, Ex. 24-27).

77.     In 2003, the Department did not win Full Accreditation, the highest rating JCAHO gives in the accreditation process.  (Pineda Dec. ¶ 4, Ex. 1).

78.     In 2006, JCAHO awarded NYUHC the highest rating, "Full Accreditation." (Pineda Dec. ¶ 4, Ex. 1).

Dated: August 10, 2010          EDWARDS, ANGELL, PALMER & DODGE LLP
       New York, New York

                                By: _David R. Marshall_____
                                    David R. Marshall
                                    Attorneys for Defendants
                                    750 Lexington Avenue
                                    New York, NY 10022
                                    212.308.4411
                                    dmarshall@eapdlaw.com