USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: ** MAR 2011

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

KEITH TURNER,

                       Plaintiff,

    -v-

NYU HOSPITALS CENTER, NYU MEDICAL
CENTER, NYU SCHOOL OF MEDICINE, and
NYU HEALTH SYSTEM

                       Defendants.

MEMORANDUM DECISION AND ORDER

06 cv 01910 (GBD)

GEORGE B. DANIELS, District Judge:

      Plaintiff Keith Turner brought this action against his former employer NYU Hospital

Center ("NYUHC"), as well as NYU Medical Center, NYU School of Medicine, and NYU

Health System (collectively, "Defendants"), arising from the termination of his employment in

June 2004.  Plaintiff asserts claims against all Defendants for "unlawful discrimination based on

race, color and national origin, unlawful harassment, unlawful retaliation, and unlawful

employment practices, under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §

2000e et seq.; the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981 et seq.; the New York

State Human Rights Law ("NYSHRL"), N.Y. Exec. L. § 290 et seq.; and the New York City

Human Rights Law, ("NYCHRL"), N.Y.C. Admin. Code § 8-101 et seq."  Complaint ¶ 1.

Defendants moved pursuant to Fed. R. Civ. P. 15(a) for leave to amend their answer to the

Complaint.  Defendants subsequently moved pursuant to Fed. R. Civ. P. 56(c) for summary

judgment.  Defendants' motion for summary judgment is GRANTED.

1

# I.  BACKGROUND[1]

## A.   PLAINTIFF'S HIRING

Joseph Morelos, who is Filipino, was hired as the Director of the Building Services

Department (hereinafter, the "Department") at NYU Hospital in 2001.[2]  Declaration of Kenneth

Goldberg ("KG"), Ex. F, Deposition of Joseph Morelos, at 5; KG Decl., Ex. B, Deposition of

Plaintiff, at 156.  Morelos had twenty-five years of experience in the hotel industry and five

years of experience in a hospital setting.  Declaration of Reginald Odom, Ex. 7, Resume of

Joseph Morelos.  Morelos was chosen for the position over Department Associate Director, Udel

DeGazon, who had worked at NYUHC for over thirty-five years and who is a black St. Lucian.

KG Decl., Ex. C, Deposition of Udel DeGazon, at 16, 26-28.

In 2002, it was necessary for Morelos to fill a vacancy for Building Services Manager.

Id., Ex. F, at 12.[3]  Morelos initially considered Department Supervisor Robert Stephen, a Black

---

[1]  On September 22, 2010, this Court denied Plaintiff's letter request for sanctions under
Fed. R. Civ. P. 37 and the striking of Defendants' summary judgment motion in its entirety or, in
the alternative, the striking of the Pineda Declaration. See Docket # 45.  Plaintiff's renewed
request, which is articulated in his Opposition Memorandum, see Pl.'s Mem., at 4-5 is DENIED.
Plaintiff simply seeks to relitigate an issue already decided by the Court and thus fails to satisfy
the strict standard for reconsideration.  See Shrader v. CSX Transp., Inc., 70 F.3d 255, 257 (2d
Cir. 1995); Doe v. New York City Dep't of Social Services, 709 F.2d 782, 789 (2d Cir.1983);
Dorchester Fin. Secs v. Banco BRJ, 2010 U.S. Dist. LEXIS 59702, at *4 (S.D.N.Y. June 15,
2010) ("The moving party must establish: (1) that the court overlooked controlling decisions or
data; (2) that there has been a change in controlling law; (3) that new evidence has become
available; or (4) that reconsideration is necessary to correct a clear error or prevent manifest
injustice.").

[2]  The Department provides cleaning, patient transport, and laundry services to patients
and staff.  Declaration of Hilda Pineda, Associate Director, ¶ 4.  The Department is responsible
for protecting patients from accident, injury, and infection in accordance with guidelines
established by the Joint Commission on Accreditation of Healthcare Organizations.  Id.  As of
August 2010, the Department employed approximately 275 employees working shifts twenty-
four hours a day, seven days a week.  Id. ¶ 3.

[3]  The primary function of the position was to "[o]versee[] the cleaning operations in
assigned areas," though the Position Description contained a long and detailed list of principal

2

St. Lucian,[4] on DeGazon's recommendation. Id., Ex. F, at 12-13; id., Ex. G, at 5, 9. Morelos

determined that Stephen was unqualified due to "a lack of managerial experience." Id., Ex. F, at

13; see also id. Ex. D, Hildea Pineda, at 96-97.[5] Morelos then looked outside of NYU, and hired

Plaintiff.[6] Id., Ex. F, at 8-9, 13. Plaintiff had worked in the food, beverage, and hotel industry

for fifteen years, including managerial roles, but had no prior experience in a hospital setting.

Id., Ex. B, at 14-15; Marshall Declaration, Ex. 13, Plaintiff's Resume. Morelos deemed Plaintiff

qualified. KG Decl., Ex. F, at 37-38.

Plaintiff, a white American, began as a Department Building Services Manager in

September 2002. Id., Ex. B, at 17-18, 156. Plaintiff shared managerial responsibilities with

another Building Services Manager on the day shift, Bozena Sutowski, who is also white. Id.,

Ex. C., at 159-60; id., Ex. F, at 32; id. Ex. B., at 15-16, 18-19, 82-84, 154-156. Plaintiff and

Sutowksi reported indirectly to Department Assistant Director Udel DeGazon, a black St.

Lucian, and directly to Department Operations Manager Hilda Pineda, a hispanic Honduran

whose native language is Spanish. Id., Ex. B, at 10-11, 17-18, 27, 48; id., Ex. C, at 16; id. Ex.

D., at 6-7, 9-10, 70-78.

---

duties and responsibilities. Declaration of David Marshall ("DM"), Ex. 14. The minimum
qualifications were: "Associates degree plus six(6) years of supervisory experience or equivalent
combination of education and experience. Excellent communication skills necessary." Id.

[4] DeGazon knew Stephen prior to Stephen's employment at NYU and had referred him
to NYU for employment. KG Decl., Ex. G, Deposition of Robert Stephen, at 6; id., Ex. C, at 37,
76-77, 80.

[5] Defendants allege that Stephen had excellent performance evaluations and had
management experience. Id, Ex. B, at 25-33; DM Decl., Exs. 11, 12.

[6] Morelos notified Plaintiff of the position, having previously worked with Plaintiff's
wife and occasionally socialized with Plaintiff. KG Decl., Ex. B, at 12-13.

**B.   PLAINTIFF'S EMPLOYMENT**

**1.   Performance**

Around March/April 2003, Pineda raised several concerns with Plaintiff about his

performance, including: (a) his failure to complete the Department's holiday work schedule on

time; (b) his failure to respond to pages in a timely manner; (c) complaints from supervisors who

"were having a difficult time working under [his] leadership"; (d) his staff's failure to complete

their full shifts; (e) his staff's poor execution of cleaning duties; and (f) his infrequent use of the

disciplinary process to correct subordinates' performance problems.[7]  DM Decl., Ex. 15, Memos

and Emails, at 712, 714, 717, 722; KG Decl., Ex. D, at 201-202; id., Ex. B, at 30-31, 79.

In September 2003, Pineda conducted Plaintiff's annual performance review.  DM Decl.,

Ex. 16.  Plaintiff's overall performance was rated as "meets performance standards" or

"[p]erformance regularly meets normal expectations and job requirements."[8]  Id., Ex. 16, at 703.

Pineda alleges that she gave this rating "because of [Plaintiff's] inexperience, and [her] hope that

[Plaintiff's] performance would get better over the next year with more time in the job and a

greater focus on the deficiencies I had pointed out to him during the first year."  Pineda

Declaration, ¶ 9; KG Decl., Ex. D, at 33, 162, 202-203.  Pineda also commented in the written

evaluation that Plaintiff "needs improvement" in the areas of Management of Staff, Staff

---

[7]  On April 9, 2003, Pineda met with Plaintiff and Sutowksi to discuss performance
issues. DM Decl., Ex. 15, at 723. Pineda, as a result of this meeting, issued a written
Performance Update that identified communication between the two Building Services
Managers as a "serious problem" and that listed eleven areas in which one or both were failing to
meet expectations. Id., Ex. 15, at 723-724.

[8]  Plaintiff's performance in 61 categories was rated as "exceeds requirements" in 15
categories, "meets requirements" in 33 categories, and "fails to meets requirements" in 13
categories. Id., Ex. 16.

Development, Cost Containment, and Planning and Time Utilization.  DM Decl., Ex. 16.  Pineda

continued to address Plaintiff's performance problems in 2004.  Pineda Declaration ¶ 10-12; id.

Exs. 11-13; DM Decl., Ex. 15, at N725.

### 2.    Material Interactions/Treatment

#### a.    *DeGazon & Daily Check-ins*

Each morning Plaintiff and Sutowski conducted check-in for the Department's staff.  KG

Decl., Ex. B, at 19-20.  Plaintiff alleges that DeGazon attended these daily check-ins "to create a

hostile environment," id., Ex. B, at 36-37, and that he felt harassed.  Id., Ex. B, at 38-39.

Plaintiff alleges that, during his attendance, DeGazon "show[ed] his support or his preferential

treatment for Mr. Stephen in . . . full view of the staff," and engaged in conduct that undermined

Plaintiff's authority over the staff.  Id., Ex. B, at 37.  Specifically, Turner alleges that DeGazon

socialized with Stephen, criticized Plaintiff's performance when speaking to Stephen, and starred

at Plaintiff or had a stern look or look of disapproval.  Id. at 37-39.  DeGazon alleges that it was

his practice for more than 20 years to attend daily check-ins because "it gave [him] the chance to

observe and greet all staff, including the night shift, who [he] would otherwise not have an

opportunity to interact with and observe on a regular basis," and because it was a good

opportunity to make announcements.  DeGazon Declaration ¶¶ 6-7.

#### b.    *Pineda & Speaking Spanish*

Pineda's native language is Spanish.  Pineda Declaration ¶ 2.  She states that "[she] never

conduct[ed] any business in the Department in Spanish," except with members of the cleaning

staff who . . . had difficulty understanding something in English.  Id.  She also states that "[she]

do[es] not speak Spanish when talking to a group of employees that includes a non-Spanish

speaker."  Id.; KG Decl., Ex. G, at 28.  Plaintiff alleges that Pineda was "favorable" to a certain

5

female supervisor "because they spoke Spanish." KG Decl., Ex. B., at 57.   Plaintiff also alleges

that Pineda once told him that he should learn to speak Spanish. Id. at 57-58.

### c.   *Climate Survey*

In 2004, Department Office Manager Corrie Fromkin informed Morelos that she went to

Human Resources to complain about DeGazon.[9] KG Decl., Ex. F, at 55.  Morelos in response

followed up with Human Resources Manager Reginald Odom, expressing concerns that people

in the Department were not working well together.  Id., Ex. F, at 55-56; Id., Ex. H, at 47; Odom

Declaration ¶ 4.  Odom followed up by conducting what he termed a "climate survey."[10]  KG

Decl.; Ex. H, at 49; Odom Decl. ¶ 4.

Odom recalls Plaintiff telling him that the work environment was "okay" and that "others

had more difficulty with the environment than him primarily because . . . he was more custom

[sic] to the style." KG Decl., Ex. H,  at 57-58.  Odom does not recall Plaintiff saying that he felt

he was being discriminated against, or complaining that he was subject to unequal treatment

because of his race or national origin.  Odom Decl. ¶ 6.  Plaintiff alleges that he complained to

Odom about the "undermining of the department by Mr. DeGazon's actions" and his inability to

do his job properly because DeGazon and Pineda were protecting Plaintiff's subordinates.  KG

Decl., Ex. B., at 49.  Plaintiff further alleges that he described DeGazon's conduct as

"favoritism," not "racism," because he was "looking at a black man trying to complain about

another black man" and thus "trying to tread lightly." Id., Ex. B., at 49-50.  Plaintiff also said

---

[9] DeGazon allegedly referred to Fromkin as a "skinny white girl," commented that her pants were too tight, and called her stupid and dumb. KG Decl., Ex. E, at 28-9, 31-4, 40, 80-82.

[10] Odom interviewed several employees in the Department, including Fromkin, Sutowski, two black supervisors (Jesse Kilpatrick and Alhaji Majeed), and Plaintiff.  Marshall Declaration, Ex. E, at 42, 26; id., Ex. 18; id., Ex. H, at 57-62.

"being from St. Lucia, describing that Mr. Stephen was of the same race and of the same national origin." Id., Ex. B., at 50. Plaintiff asserts that "the point was quite clear that [he] was being treated unfavorably." Id., Ex. B., at 50-51.

Odom concluded that the divide in the Department was too deep and unbridgeable for a training solution. Odom Decl. ¶ 11. The Department was divided into two camps. KG Decl., Ex. H, at 67. Plaintiff, as well as Fromkin and Sutowski, belonged to the Morelos Camp. Id., Ex. H, at 68. Pineda belonged to the DeGazon Camp. Id., Ex. H, at 70. There was "a lot of tension between them." Id., Ex. H, at 71.

Odom reported his assessment to Vice President of Operations John Harney that Morelos and DeGazon could not effectively manage the Department together. Odom Decl. ¶ 12. Odom advised Harney that he needed to decide which manager he was going to support, but did not make a recommendation. Id. Harney asked Morelos to resign on April 30, 2004, and then named DeGazon as Interim Director. Id.; KG Decl., Ex. H, at 98-100.

### d.    *DeGazon and the Meeting Handout*

On June 8, 2004, DeGazon held a meeting for supervisors. KG Decl., Ex. B, at 140; id., Ex. C, at 113-15; DeGazon Decl. ¶ 12. Plaintiff alleges that the meeting was a response to Sutowski and him complaining to Human Resources. KG Decl., Ex. B, at 140-42. Plaintiff considered the meeting as "another form of harassment." Id., Ex. B, at 140-41. DeGazon contends that he did not single out any particular person at the meeting for criticism or name anyone as showing more or less commitment to the job. DeGazon Decl. ¶ 12; KG Decl., Ex. C, at 113-117. A handout was available for attendees, indicating "commitment" as the topic of the meeting. DeGazon Decl., Ex. 1; KG Decl., Ex. C, at 114. Plaintiff alleges that he received a handout with his name (i.e. "Mr. Turner") written at the top. KG Decl., Ex. J, at Ex. 84.

DeGazon contends that he did not write Plaintiff's name at the top of the copy Plaintiff received. KG Decl., Ex. C, at 113.

## C.    PLAINTIFF'S TERMINATION

On June 2, 2004, the President of NYUHC sent an urgent memo mandating that all departments decrease their personal budgets by 2% because the hospital was already over budget for the year. Odom Decl., Ex. 3. The memo directed all departments to submit staffing reduction plans by the following week. Id.

The Department at the time was budgeted for two manager positions on the dayshift. Degazon Decl. ¶ 15. Sutowski's position managed 4 supervisors and approximately 60 unionized employees who worked on eleven patient floors, at a salary of $58,299.80. Id.; KG Decl., Ex. J, Plaintiff's Deposition Exhibits, Ex. 15. Plaintiff's position managed 2 supervisors and approximately 40 unionized employees who worked in the sterile areas of three facilities, at a salary of $60,465.08. Degazon Decl. ¶ 15; KG Decl., Ex. J, Exs. 105, 107. DeGazon contends that he eliminated Plaintiff's position and created a sole manager position that performed all of the duties of Sutowski's position and absorbed some of the duties of Plaintiff's position. KG Decl., Ex. C, at 42; DeGazon Decl. ¶¶ 16-17.[11]

DeGazon decided to eliminate eight positions and to layoff twenty-eight employees, two-thirds of which were people of color. Odom Declaration ¶ 18; id., Ex. 4. DeGazon alleges that he eliminated Plaintiff's position because "[he] could save more money, due to his higher salary,

---

[11] DeGazon determined that Sutowski "could not do the [new] job because of her record of inadequate performance." DeGazon Decl. ¶ 17. DeGazon "did not think that [she] could handle the Manager position if additional responsibilities were assigned to her." Id. Sutowski was discharged for cause by DeGazon after he consulted with Pineda. Id. ¶ 19; KG Decl., Ex. C, at 121; Pineda Decl. ¶ 20.

and because his smaller span of control and staff made it easier to distribute the duties of that

position to other managers."[12]  DeGazon Declaration ¶ 16.  DeGazon alleges that he considered

both Plaintiff and Sutowski for the sole manager position.  Id. ¶¶ 17-18.  He did not choose

Plaintiff due to Plaintiff's performance problems and inability to improve to the level expected

of an effective dayshift manager, even when he shared responsibilities with Sutowski.  Id. ¶ 18.

DeGazon made a judgment that Plaintiff "would not be able to handle the increased demands of

sole dayshift manager position."[13]  Id.  Because he was not offered the sole manager position and

because his old position was eliminated, Plaintiff was laid off on June 14, 2004.  Id.; KG Decl.,

Ex. D, at 163-164.

**D.    POST-TERMINATION DEVELOPMENTS**

**1.    Appointment of Sole Manager**

On June 17, 2004, DeGazon promoted Stephen from Supervisor to the sole Building

Services Manager.  KG Decl., Ex. C, at 30; DeGazon Decl. ¶ 20.  Stephen was responsible for all

of Sutowski's prior responsibilities, in addition to some of Plaintiff's responsibilities.  Pineda

Decl. ¶ 21; DeGazon Decl. ¶ 21.  DeGazon alleges that his selection was based upon several

considerations: (a) Stephen's seven years of experience and successful job performance at

NYUHC, as well as his prior management experience; (b) Stephen had a good working

relationship with Pineda, which was important to the smooth operation of the Department; and

(c) Stephen's salary was lower than either Plaintiff's or Sutowski's, allowing the Department to

---

[12]  Plaintiff admits that "[DeGazon] said [his] job was being eliminated for budgetary - - they had no money, couldn't afford to pay me anymore."  KG Decl., Ex. B., at 123.

[13]  DeGazon consulted with Pineda, and she agreed with his judgment.  DeGazon Declaration ¶ 19; KG. Decl., Ex. D, at 143-144.

save additional personnel costs.[14]   DeGazon Decl. ¶ 20; DM Decl., Exs. 11, 12.

On June 18, 2004, DeGazon sent an email to the Department announcing Stephen's promotion. DM Del., Ex. 23. Plaintiff was a recipient of that email. Id. DeGazon also admits that he had a vendetta against Plaintiff:

> Q:    Isn't it true that when you were unsuccessful getting Mr. Stephen into the
>        manager job and Mr. Turner came on board, you waited for an opportunity
>        to find a way to get Mr. Turner out and out of the way?
> A:    Yes.

KG Decl., Ex. C., at 157.

## 2.    Recall of Plaintiff

The Human Resources Policies and Procedure Manual is "an aid and guide in personnel matters" and "not a contract of any kind." Odom Declaration ¶ 19; id., Ex. 5. The policies "may be changed, rescinded or modified where desirable." Odom Declaration ¶ 19; id., Ex. 5. Section 10-1.B.4 describes a process for placing employees who have been selected for layoff in other vacant Hospital positions before the completion of the laid off employee's termination notice:

> Prior to initiating the termination notice (Confidential Personnel Profile form) which
> removes the employee from the payroll, the Human Resources/Employment and
> Recruitment Department should be contacted by the Supervisor and the terminating
> employee, in order that the employee may be considered for available positions in
> the Medical Center for which he or she is qualified. At that initial contact the Human
> Resources/Employment and Recruitment Department representative will request that
> the terminating employer obtain a recent (within the last year) Employee
> Performance Evaluation form and a Career Opportunity Posting Program form from
> his/her Supervisor. The completed forms are to be returned to the Human Resources.
> Employment and Recruitment Department, whereupon a representative will schedule
> an appointment to discuss available vacancies, as well as the employee's

---

[14]  Plaintiff alleges that he is more qualified than Stephen.  Plaintiff alleges that there were deficiencies in Stephen's job performance and that Pineda had criticisms of Stephen's performance. KG Decl., Ex. F, at 51-53; id., Ex. D, at 63, 198-199; id., Ex. G, at 22-24, 52-53, 25-27. Plaintiff also questions Stephen's management experience, alleging that he did not have any at NYUHS and little prior to NYUHS. Id., Ex. J, Exs. 33, 34; id., Ex. G, at 31-33.

10

reemployment benefits. Preference will be given to such qualified employees for positions open at the time of the layoff as well as for future openings.

The Confidential Personnel Profile form should be processed at least two weeks prior to the employee's last day of work.

Odom Declaration ¶ 19; id., Ex. 6. Odom explains that a recall list was not kept for non-union employees at that time and that a non-union employee, like Plaintiff, had to contact the Recruiting Department to be considered for other vacant positions. Odom Declaration ¶¶ 20, 22. Odom reports that Plaintiff neither contacted the Recruiting Department for placement nor applied for another position. Id. ¶ 22.

### 3.   Plaintiff's Rehire Designation

Pineda and DeGazon completed Plaintiff's Confidential Personnel Profile two months after Plaintiff's discharge. KG Decl., Ex. C., at 50-52; Marshall Declaration, Ex. 21. Pineda rated Plaintiff's performance as follows: (a) Fair Quality; (b) Poor Quantity; (c) Good Attendance; and (d) Fair Cooperation.[15] Marshall Declaration, Ex. 5, at 173-74; id., Ex. 21. Pineda indicated that Plaintiff was not eligible to be rehired because of Plaintiff's "unacceptable level of performance." Id., Ex. 21. DeGazon approved the Profile. KG Decl., Ex. C, at 50-53.

## II.  STANDARD OF REVIEW

Summary judgment is appropriate where the evidence, viewed in the light most favorable to the non-moving party, shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Vacold. L.L.C. v. Cerami, 545 F.3d 114, 121 (2d Cir. 2008). The burden of proof rests upon the moving party to show that no

---

[15] Fair and Good are passing ratings. KG Decl., Ex. D., at 174. Pineda alleges that her ratings were based upon Plaintiff's performance after September 2003 – namely, Plaintiff's failure to improve despite repeated intervention. Id., Ex. D, at 179-80; id., Ex. C, at 50.

genuine issue of material fact exists. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).
A "material" fact is one that will affect the outcome of the suit under governing law. Anderson
v. Liberty Lobby. Inc, 477 U.S. 242, 248 (1986).  For there to be a "genuine" issue of material
fact, the evidence must be such "that a reasonable jury could return a verdict for the non-moving
party." Id.  In determining whether there is a genuine issue of material fact, the court is required
to resolve all ambiguities and draw all inferences in favor of the non-moving party. See Sec. Ins.
Co. of Hartford v. Old Dominion Freight Line. Inc., 391 F.3d 77, 83 (2d Cir. 2004).

In employment discrimination cases, courts are particularly cautious about granting
summary judgment where intent is at issue. See Gallo v. Prudential Residential Servs., Ltd.
Pshp., 22 F.3d 1219, 1224 (2d Cir. 1994); Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985).
"[B]ecause writings directly supporting a claim of intentional discrimination are rarely, if ever,
found among an employer's corporate papers, affidavits and depositions must be carefully
scrutinized for circumstantial proof which, if believed, would show discrimination." Id.
However, even in such cases, a "plaintiff must provide more than conclusory allegations of
discrimination to defeat a motion for summary judgment," Schwapp v. Town of Avon, 118 F.3d
106 (2d Cir. 1997) (citing Meiri, 759 F.2d at 998), and "show more than some metaphysical
doubt as to the material facts." Gorzynski v. Jetblue Airways Corp., 596 F.3d 93, 101 (2d Cir.
2010) (internal citations and quotations omitted).  A defendant will be entitled to summary
judgment unless the plaintiff "can point to evidence that reasonably supports a finding of
prohibited discrimination." Joseph v. Leavitt, 465 F.3d 87, 90 (2d Cir. 2006) (citations and
quotations omitted).

## III.  TITLE VII & SECTION 1981 CLAIMS

As a preliminary matter, "[t]he substantive standards applicable to claims of employment

discrimination under Title VII . . . are also generally applicable to claims of employment

discrimination brought under § 1981."[16]  Vivenzio v. City of Syracuse, 611 F.3d 98, 106 (2d

Cir. 2010) (citing as examples, Patterson v. County of Oneida, 375 F.3d 206, 225 (2d Cir. 2004);

Brennan v. Metropolitan Opera Association, Inc., 192 F.3d 310, 316 n.2 (2d Cir. 1999); Stratton

v. Dep't for the Aging for the City of New York, 132 F.3d 869, 879 (2d Cir. 1997)).

Accordingly, this Court will jointly consider the Title VII and Section 1981 claims for unlawful

termination and retaliation.

### A.    UNLAWFUL TERMINATION

Under the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green,

411 U.S. 792 (1973), a plaintiff must first make out a prima facie case of discrimination by

showing: "1) that he belonged to a protected class; 2) that he was qualified for the position he

held; 3) that he suffered an adverse employment action; and 4) that the adverse employment

action occurred under circumstances giving rise to an inference of discriminatory intent."

Feingold v. New York, 366 F.3d 138, 152 (2d Cir. 2004); see also McDonnell Douglas, 411 U.S.

at 802.  "If a plaintiff establishes a prima facie case, a presumption of discrimination is created

and the burden of production shifts to the [employer] to articulate some legitimate,

nondiscriminatory reason for the adverse employment action or termination."  Farias v.

---

[16]  A court analyzing a § 1981 claim applies the same standards as those in Title VII cases.  See Taitt v. Chemical Bank, 849 F.2d 775, 777 (2d Cir. 1988) (citing Choudhury v. Polytechnic Institute of New York, 735 F.2d 38, 44 (2d Cir. 1984)) ("The elements required to make out a claim of retaliatory discharge under 42 U.S.C. § 1981 are the same as those required to make out such a claim under Title VII.").

Instructional Sys., 259 F.3d 91, 98 (2d Cir. 2001) (citations omitted); see also McDonnell

Douglas, 411 U.S. at 802-03.  If the employer does so, then a plaintiff "is given an opportunity to

adduce admissible evidence that would be sufficient to permit a rational finder of fact to infer

that the employer's proffered reason is pretext for an impermissible motivation."  Howley v.

Town of Stratford, 217 F.3d 141, 150 (2d Cir. 2000) (citations omitted); see also McDonnell

Douglas, 411 U.S. at 804-05.

   Defendants do not argue that Plaintiff has not established a prima facie case.  See Defs.'

Mem., at 12.  Rather, Defendants argue that they are entitled to summary judgment on the

unlawful termination claims because Plaintiff has not produced sufficient evidence to prove that

their stated reasons for Plaintiff's termination were false and that the real reason was

discrimination against whites (race) and/or individuals not from St. Lucia (national origin).[17]

   Defendants have articulated legitimate, nondiscriminatory reasons for Plaintiff's

termination:[18] (1) Plaintiff's position was eliminated because of a workforce reduction;[19] and (2)

Plaintiff was laid off because a person perceived to be more qualified was offered the sole

---

   [17] Title VII regulates "discriminat[ion] against any individual . . . because of *such
individual's* race, color, religion,  sex, or national origin" within the employment context.  28
U.S.C. § 2000e-2(A).  Plaintiff alleges that he was subject to national origin discrimination not
because *he is* American, but because *he is not* St. Lucian.  Alleging discrimination based upon
another's membership in a protected class is an awkward construction of a Title VII claim.
Nevertheless, it is permitted.  See, e.g., Hewitt v. N.Y. City Dep't of Health & Mental Hygiene,
2010 U.S. Dist. LEXIS 129049 (E.D.N.Y. Dec. 6, 2010) (plaintiff was "not of West Indian
descent"); Sanders v. Mount Sinai Med. Ctr., 1999 U.S. Dist. LEXIS 17608 (S.D.N.Y. Nov. 10,
1999) (plaintiff was "an African American not of Caribbean descent"); Avagliano v. Sumitomo
Shoji America, Inc., 614 F. Supp. 1397 (S.D.N.Y. 1985) (plaintiffs were "not of Japanese
national origin or Japanese racial background. ).

   [18] This is not disputed by Plaintiff.  See Pl.'s Mem. at 11.

   [19] A reduction in workforce and/or restructuring is a legitimate, non-discriminatory
reason.  See Gallo v. Prudential Residential Servs., Ltd. Pshp., 22 F.3d 1219, 1226 (2d Cir.
1994); Parcinski v. Outlet Co., 673 F.2d 34, 36 (2d Cir. 1982); Tarshis v. Riese Org., 195
F.Supp.2d 518, 525 (S.D.N.Y. 2002), aff'd, 66 Fed. Appx. 238 (2d Cir. 2003) (citing Tarshis v.
Riese Org., 211 F.3d 30, 37 (2d Cir. 2000)).

Building Services Manager position.[20]  See Defs.' Mem., at 12-13.  Therefore, Plaintiff cannot

survive summary judgment unless he raises a material issue of fact as to pretext for

discrimination.[21]

### 1.    No Material Issue Regarding the Falsity or Credence

Plaintiff has failed to raise a material issue of fact as to whether Defendants' stated

reasons for his termination are false or unworthy of credence.  Plaintiff has not produced any

evidence demonstrating that Defendants have offered inconsistent reasons for Plaintiff's

termination.  Plaintiff argues that Defendants' references to a "consolidated position" in their

motion paper contradicts DeGazon's testimony and  NYUHC's EEOC statement.[22]  See Pl.'s

Mem., at 14-15.  Plaintiff, however, has not identified an inconsistency.  Both DeGazon and

NYUHC alleged, by Plaintiff's admission, that "Mr. Stephen filled Ms. Sutowski's Manager

position and Ms. Pineda absorbed Mr. Turner's job duties."  Pl.'s Mem., at 15.  Both also alleged

---

[20]  "A defendant meets his burden if he presents reasons that, 'taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action.'"  Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 469 (2d Cir. 2001) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993)) (emphasis omitted).

[21]  A plaintiff must "produce not simply 'some' evidence, but 'sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the [defendant] were false, and that more likely than not [discrimination] was the real reason for the [employment action]."  Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000) (alteration in original; citations omitted); see also Howley v. Town of Stratford, 217 F.3d 141, 150 (2d Cir. 2000) ("merely showing that the employer's proffered explanation is not a genuine explanation does not in itself entitle the plaintiff to prevail"); Fisher v. Vassar, 70 F.3d 1420, 1433 (2d Cir. 1995) ("[T]he plaintiff must also prove by a preponderance of the evidence that defendant's stated reason is 'a pretext for discrimination' . . . [by] establish[ing] 'both that the reason was false, and that discrimination was the real reason.'"), abrogated on other grounds, Reeves, 530 U.S. at 147-48.

[22]  Defendants state that: "In response, DeGazon decided that he could eliminate Turner's position, which was the higher paid of the two dayshift positions with the smaller span of control, and consolidate most of the duties of the two positions. (DeGazon Dec. ¶ 16). He could fill the consolidated position with a veteran Department supervisor, Robert Stephen . . . . (DeGazon Dec. ¶ 20)."  Defs.' Mem., at 12.

that, after the restructuring, the Department went from two manger positions to only one and some of Plaintiff's duties were assumed by the restructured position. See DeGazon Decl. ¶¶ 16-17; KG Decl., Ex. J, Ex. 95, at 2-3. Defendants not only make the same factual allegations on the instant motion, see Defs.' Mem., at 8-9, but also cite to the very testimony that Plaintiff argues is being contradicted. See id. at 12. In fact, the DeGazon Declaration actually refers to the position as "consolidated." See DeGazon Decl. ¶ 18. Defendants' characterization merely reflects a semantic word choice. It was not used to suggest that the restructured position combined all of the duties of both Plaintiff's and Sutowski's positions. Thus no reasonable jury could find that Defendants have offered different or inconsistent reasons for Plaintiff's termination.

Plaintiff has not produced any evidence demonstrating that Defendants' stated reasons conveyed false information or were otherwise false. Plaintiff's argument that his position was not eliminated is not supported by the record. See Pl.'s Mem., at 14. It is undisputed that, during Plaintiff's term of employment, the Department had two Building Services Manager positions, each being responsible for different duties. It is also undisputed that, after the Department's restructuring and Plaintiff's termination, the Department had one Building Services Manager. Plaintiff has not produced any evidence contradicting Defendants' evidence that the restructured position was responsible for all of the duties from Sutowski's position and some of the duties from Turner's position. Contrary to Plaintiff's assertion, whether a position entitled Building Services Manager existed immediately after Plaintiff's termination is a separate issue from whether a position comprised of substantially the same duties performed by Plaintiff

16

existed immediately after Plaintiff's termination. Only the latter issue,[23] on which Plaintiff has

produced no evidence, is relevant to the falsity or credence of Defendants' stated reason.

Additionally, Plaintiff has provided no evidence that Defendants did not consider the need for a

workforce reduction in eliminating Plaintiff's position, or that the budgetary elimination of the

position was not a reason in selecting Plaintiff for termination. Thus no reasonable jury could

find that Defendants' representation that Plaintiff's position was eliminated for budgetary

reasons was false.

Plaintiff's argument that his termination did not "save money" is also not supported by

the record. See Pl.'s Mem., at 11-12, 15-16. Although Plaintiff's argument is technically a

misstatement of the reason articulated by Defendants,[24] the record is devoid of any evidence that

hiring Stephen as the sole Building Services Manager did not result in decreased personnel costs.

It is undisputed that Plaintiff and Sutowski earned salaries of $60,465.08 and $58,299.80,

respectively. It is also undisputed that Stephen earned a salary of $47,599.76 as the sole

Building Service Manager, which was raised by a merit increase on December 21, 2004, to

$49,265.84. See KG Decl., Ex. J, Exs. 40, 41. Thus, both at the time of Plaintiff's termination

in June 2004 and even as late as December 2004, the restructuring as arranged by DeGazon

saved the Department approximately $71,165.12. Having never alleged that DeGazon specified

---

[23]  Contrary to Plaintiff's assertion, Dollman v. Mast Indus., 2010 U.S. Dist. LEXIS
84137 (S.D.N.Y. Aug. 17, 2010), is distinguishable from the present case. In Dollman, the
employer alleged that the plaintiff's position had been eliminated but continued to advertise for
that same position after the plaintiff's termination. Here, Plaintiff has produced no evidence
showing that the manager position filled by Stephen was the same position formerly filled by
Plaintiff. Plaintiff simply proffers that Stephen filled his position.

[24]  See, supra, section I-C.

the amount or characterized the extent of the savings, Plaintiff's argument that the savings were "minimal" raises an immaterial issue. Thus no reasonable jury could find that Defendants' representation that eliminating Plaintiff's position decreased personnel costs was false.

Finally, Plaintiff's argument that he was more qualified for the sole manager position than Stephen and that DeGazon and Pineda were aware of his superior qualification does not raise a material issue as to the falsity or credence of Defendants' stated reason to the contrary. "Courts have recognized that an employer's disregard or misjudgment of a plaintiff's job qualifications may undermine the credibility of an employer's stated justification for an employment decision." Byrnie v. Town of Cromwell Bd. of Educ., 243 F.3d 93, 103 (2d Cir. 2001) (collecting cases). However, for a material issue of fact regarding plaintiff's qualifications to exist, "the plaintiff's credentials would have to be so superior to the credentials of the person selected for the job that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question." Id. (internal quotation marks and citation omitted). This is because "the court must respect the employer's unfettered discretion to choose among qualified candidates." Id. (same).

Plaintiff has failed to produce any evidence demonstrating that his qualifications were so superior that an unreasonable disparity existed between Plaintiff and Stephen.[25] Plaintiff has not demonstrated that Stephen failed to satisfy the minimum qualifications for the position, but that

---

[25] See, e.g., Lomotey v. Conn.-DOT, 355 Fed. Appx. 478, 481 (2d Cir. 2009); Moreno v. Town of Huntington, 334 Fed. Appx. 426, 428 (2d Cir. 2009); Skalafuris v. City of New York, 2010 U.S. Dist. LEXIS 115287, at *21-22 (S.D.N.Y. Oct. 27, 2010); Adams v. Canon USA, Inc., 2009 U.S. Dist. LEXIS 86722, at *43-44 (E.D.N.Y. Sept. 22, 2009); Paluh v. HSBC Bank USA, 409 F. Supp. 2d 178, 201-202 (W.D.N.Y. 2005); Sandman v. Mediamark Research, Inc., 2002 U.S. Dist. LEXIS 4495 , at *16-17(S.D.N.Y. Mar. 15, 2002).

he did.  Plaintiff has not offered evidence or even made actual, specific comparisons of his

relevant credentials with those of Stephen to demonstrate that "no reasonable person" could have

selected Stephen.  Plaintiff's personal disagreement with Defendants' assessment of his job skills

and performance is simply insufficient.[26]  Additionally, Plaintiff has also failed to offer any

evidence that DeGazon or Pineda considered him to be more qualified than Stephen at the time

of restructuring.  Thus, no reasonable jury could find that Defendants' representation that

Stephen  was more qualified for the restructured position than Plaintiff was false.

### 2.    No Material Issue That Plaintiff's Race or National Origin Was A Reason

Plaintiff has failed to raise a material issue of fact as to whether Plaintiff's Race or

National Origin was a real reason for his termination.

#### a.    *The Evidence Identified by Plaintiff Doesn't Demonstrate Pretext*

Plaintiff alleges that pretext is shown by the following: (a) DeGazon violating Plaintiff's

recall rights; (b) DeGazon directing Pineda to complete an evaluation "falsely stating that

[Plaintiff] was unqualified for the position and ineligible for the rehire"; and (c) a pattern of

discrimination and retaliation in the Department by DeGazon.  However, none of these

circumstances raise the inference that Plaintiff was laid off for an unstated reason related to his

race or national origin.

Plaintiff contends that "pretext is shown by the fact that Mr. DeGazon's actions violated

Mr. Turner's recall rights under NYU's written policies."  Pl.'s Mem, at 12.  Although it is

undisputed that Plaintiff was eligible for recall, Plaintiff has not produced any evidence that the

---

[26]  See Davis v. State Univ. of N.Y., 802 F.2d 638, 641 (2d Cir. 1986)("The employer
need not prove that the person promoted had superior objective qualifications, or that it made the
wisest choice, but only that the reasons for the decision were nondiscriminatory.").

written policy was violated.  Section 10-1.B.4 provides that "the Human Resources/Employment and Recruitment Department should be contacted by the Supervisor and the terminating employee, in order that the employee may be considered for available positions."  There is no evidence that Plaintiff ever contacted anyone at NYUHC for a placement, nor does Plaintiff allege that he did so.  There is also no evidence that Plaintiff was a union employee, the implication being that he was not eligible to be automatically placed on a recall list.

Plaintiff offers merely conclusory assertions that "[he] was entitled to be recalled for the Manger position" and that "DeGazon refused to place [him] in the position."  Pl.'s Mem., at 12. Plaintiff has not identified any language in the Manual that guaranteed him the restructured manager position or required that he be considered, notwithstanding his failure to contact the Recruiting Department for a placement.  Plaintiff has also not produced any evidence that DeGazon could have, or even did, engage in conduct that prevented him from being recalled.

Plaintiff also contends that "pretext is shown by the fact that in August 2004, Mr. DeGazon, to cover up his tracks, had Ms. Pineda (his agent who had discriminated against [Plaintiff] as well) complete an 'evaluation' section on a personnel record falsely stating the [Plaintiff] was unqualified for the position and ineligible for rehire."  Pl.'s Mem., at 12-13. However, Plaintiff's contention is contradicted by the actual content of the Confidential Personnel Profile.  See MD, Ex. 21.  The Profile requires the evaluator to rate a terminated employee's performance in four categories: quality, quantity, attendance, and cooperation.  The Profile also required the evaluator to make a recommendation regarding rehire eligibility. Pineda marked "no" for rehire eligibility on Plaintiff's Profile and wrote "unacceptable level of performance" as an explanation.  The Profile contained no statements, implied or expressed,

20

regarding whether Plaintiff was qualified for either his former position or the new Building

Service Manager position.  Thus, there is no evidence from which a reasonable jury could

conclude that Pineda stated that Plaintiff was unqualified to be a Building Services Manager.

With respect to rehire eligibility, Pineda designated Plaintiff as ineligible and stated that

Plaintiff had an unacceptable level of performance.  Plaintiff has not produced any evidence

contradicting Odom's testimony that managerial employees were not guaranteed eligibility for

rehire simply because they were laid off, and that, in such circumstances, the supervising

manager had the discretion to make the eligibility designation based on [her] assessment of the

employees's performance.  Furthermore, Plaintiff has not produced any evidence that Pineda or

DeGazon considered impermissible factors such as Plaintiff's race or national origin in making

the designation, or that there was disparate treatment in the designations across similarly situated

employees.  There is, as a result, no basis for Plaintiff to demonstrate that the designation was

either false or unlawfully improper.

Finally, Plaintiff contends that a pattern of discrimination in the Department establishes

pretext.  Plaintiff alleges that DeGazon made "discriminatory and harassing comments . . . based

on sex and religion" to Fromkin.[27]  Pl.'s Mem., at 13.  Regardless of whether DeGazon's

comments constituted unlawful discrimination, Plaintiff has only accused DeGazon of

derogatory gender and religious remarks.  Plaintiff is not a member of either protected class.

Nor is the instant action premised upon discrimination against members of either protected class.

The mere existence of a discriminatory animus against a particular protected class does not raise

---

[27] Plaintiff's allegations with respect to Sutowski seem to focus on retaliation not
discrimination.  See Pl.'s Mem., at 14.

the inference that an individual has a discriminatory animus against other protected classes.[28]

Plaintiff also alleges that Fromkin was the victim of a similar hiring-and-firing scenario: (a) DeGazon wanted Morelos to promote Ms. Richards within the Department for the Office Manager position "because of her race and color" but Morelos hired Fromkin; and (b) once DeGazon became the Interim Director, he terminated Fromkin's employment based upon a "false accusation of theft of time" and promoted Ms. Richards. Pl.'s Mem., at 13. Plaintiff's evidence demonstrates that Fromkin and Morelos may have had an arrangement for compensating her for overtime. Plaintiff, however, has not produced any evidence demonstrating that Fromkin's time sheets accurately stated when she was in the office or that Odom's recommendation for termination to DeGazon was unreasonable based on the information available. Plaintiff's evidence also does not demonstrate or even raise the inference that DeGazon recommended Ms. Richards because of her race and/or fired Fromkin because of her race or color.

### b.     *No Other Evidence in the Record Demonstrates Pretext*

The evidence indicates that Plaintiff likely had a contentious relationship with DeGazon

---

[28] Furthermore, "[t]his is the kind of isolated and stray remark that is insufficient to establish racial animus and defeat a motion for summary judgment." Campbell v. Alliance Nat'l Inc., 107 F. Supp. 2d 234, 247 (S.D.N.Y. 2000) (quoting Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 545 (3d Cir. 1992) ("Stray remarks by non-decision-makers or by decision-makers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote form the date of decision."); other citation omitted).; see, e.g., Danzer v. Norden Sys., 151 F.3d 50, 56 (2d Cir. 1998) (stray remark by employer without more does not constitute sufficient evidence to make out case of employment discrimination); Woroski v. Nashua Corp., 31 F.3d 105, 108-110 & n.2 (2d Cir. 1994) (granting summary judgment to employer despite age-related comments made by employer). Plaintiff has shown no nexus between DeGazon's comments and his decision to terminate Fromkin.

and Pineda, both of whom were his superiors.  Pineda had ongoing concerns with Plaintiff's job

performance and lack of improvement, and Plaintiff seems to think that his performance was

fine.  Both DeGazon and Pineda had close or friendly relationships with employees under

Plaintiff's supervision, and Plaintiff felt that their relationships threatened his authority.  There

was a deep division within the Department and Plaintiff belonged to the Morelos Camp rather

than the DeGazon Camp.  Most of all, DeGazon admits that he had a vendetta against Plaintiff

because Morelos chose Plaintiff over Stephen for the manager position.

However, the record lacks any evidence indicating that the unstated reason was related to

Plaintiff's race or national origin.[29]  "Title VII does not establish a 'general civility code' for the

American workplace."  Petrosino v. Bell Atlantic, 385 F.3d 210, 223 (2d Cir. 2004) (citation

omitted).  "[A]n employer can fire an employee for any reason as long as the reason is

non-discriminatory even if based on reasons that are 'unbecoming or small-minded, such as

back-scratching, log-rolling, horse-trading, institutional politics, envy, nepotism, spite, or

personal hostility.'"  Tappe v. Alliance Capital Mgmt. L.P., 177 F. Supp. 2d 176, 185 n.9

(S.D.N.Y. 2001) (quoting Fisher, 114 F.3d at 1337).  The reality is that "[e]vidence that an

employer merely used poor business judgment . . . is insufficient to establish a genuine issue of

---

[29] Cf. Fisher, 114 F.3d at 1337 ("A showing that the defendant's proffered reason for the
adverse employment action is not the real reason may serve as evidence that the defendant
intentionally discriminated. We attach the label 'pretext' to a proffered reason that is not credited
by the finder of fact. But the label 'pretext' does not answer the question: pretext for what? In
some cases, an employer's proffered reason is a mask for unlawful discrimination. But
discrimination does not lurk behind every inaccurate statement. . . . And if, on examination of
the circumstances, there are many possible reasons for the false explanation, stated or unstated,
and illegal discrimination is no more likely a reason than others, then the pretext gives minimal
support to plaintiff's claim of discrimination.).

fact as to the credibility of the employer's reasons." Dister v. Continental Group, Inc., 859 F.2d

1108, 1116 (2d Cir. 1988) (citation omitted). "Only when an employer's business decision is so

implausible as to call into question its genuineness should this Court conclude that a reasonable

trier of fact could find that it is pretextual." Fleming v. MaxMara USA, Inc., 371 Fed. App'x

115, 118 (2d Cir. Mar. 25, 2010) (citing Dister, 859 F.2d at 1116). Therefore, absent direct

evidence of bias, a plaintiff must offer concrete evidence of disparate treatment. A plaintiff

cannot rely upon "purely conclusory allegations of discrimination." Meiri v. Dacon, 759 F.2d

989, 998 (2d Cir. 1985).

Plaintiff has failed to produce any evidence that similarly situated employees outside his

protected class were treated more favorably than him *on account of race or national origin.* See

International Bhd. of Teamsters v. United States, 431 U.S. 324, 335 n.15 (1977); Norville v.

Staten Island Univ. Hosp., 196 F.3d 89, 95 (2d Cir. 1999).[30] Plaintiff heavily relies upon the

mere fact that Plaintiff is of a different race and national origin from DeGazon and Stephen, who

are both of the same race and national origin. Plaintiff has not produced any evidence

demonstrating that Stephen or any other employee was both similarly situated to him and treated

differently than him. The only similarity with Stephen that Plaintiff identifies is that Stephen

held the title of Building Service Manager after his termination. Plaintiff has not provided any

---

[30] See, e.g., Galimore v. City Univ. of N.Y. Bronx Cmty., 641 F. Supp. 2d 269, 285-86
(S.D.N.Y. 2009) (noting that without evidence that similarly situated employees outside her
protected class were not terminated, plaintiff failed to meet her burden of showing that
defendant's reasons for terminating her were pretextual); Ford v. Consol. Edison Co. of N.Y.,
2006 U.S. Dist. LEXIS 8599, at *52 (S.D.N.Y. Mar. 3, 2006) ("Absent concrete, admissible
evidence that similarly situated non-African-American employees were treated differently under
identical circumstances, [the p]laintiff's discrimination claims must fail.").

proof that he and Stephen were similar "in all material respects" or appropriate comparators during the time Plaintiff allegedly experienced disparate treatment.[31]  Given that Stephen was Plaintiff's subordinate during the relevant time period and that Stephen had more experience working both in the Department and in hospital settings, it is unclear how both were "subject to the same standards governing performance evaluation and discipline." Mazzella v. RCA Global Communications, Inc., 642 F. Supp. 1531, 1547 (S.D.N.Y. 1986), aff'd, 814 F.2d 653 (2d Cir. 1987).  Thus no reasonable jury could find in Plaintiff's favor on the similarly situated prong.[32]

Even if Plaintiff could demonstrate that Stephen was similarly situated, no reasonable jury could find that Plaintiff experienced differential treatment based upon his race or national origin.  The record lacks any evidence of differential treatment.  Plaintiff does not identify instances of comparable conduct by Stephen, whether social or professional, to which DeGazon had different reactions.  Rather Plaintiff's allegations and evidence focus solely on the interactions between DeGazon and Stephen in Plaintiff's presence.  To the extent that any favoritism DeGazon showed to Stephen constituted differential treatment towards Plaintiff, the

---

[31]  See Shumway v. United Parcel Serv., Inc., 118 F.3d 60, 63 (2d Cir. 1997) ("To be 'similarly situated,' the individuals with whom . . . [the plaintiff] compares herself must be similarly situated in all material respects."); Thomas v. Istar Fin, Inc., 438 F. Supp. 2d 348, 368 n. 7 (S.D.N.Y. 2006) (to be similarly situated employees "must share a sufficient amount of significant employment characteristics, including similar educational background, performance, and work duties.").

[32]  Plaintiff correctly asserts that "similarly situated" is a question of a fact.  However, this status does not relieve a plaintiff of the obligation to produce evidence to survive summary judgment.  See Cine SK8, Inc. v. Town of Henrietta, 507 F.3d 778, 790-1 (2d Cir. 2007) (internal quotations and citations omitted) ("[A] court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met."); see, e.g., Analytical Diagnostic Labs. Inc. v. Kusel, 626 F.3d 135, 143 (2d Cir. 2010).

record also lacks any evidence that DeGazon's conduct was motivated by discriminatory animus against whites or non-St. Lucians.  Absent such evidence, the differences in national origin and race are simply insufficient to themselves demonstrate intentional unlawful discrimination. "Title VII does not insulate an individual from criticism that is not based on an impermissible reason." Bickerstaff v. Vassar Coll., 196 F.3d 435, 451 (2d Cir. 1999).  "Title VII does not outlaw cronyism." Foster v. Dalton, 71 F.3d 52, 56 (1st Cir. 1995).[33]; see also Fisher, 114 F.3d at 1337; Lee v. Poughkeepsie City Sch. Dist., 2008 U.S. Dist. LEXIS 25920, at *25-26 (S.D.N.Y. Mar. 28, 2008) ("Mere proof of cronyism, however, does not demonstrate race-based . . . animus, and cannot on its own satisfy Plaintiff's burden.").

Plaintiff has also failed to produce any other circumstantial evidence from which a jury could infer that DeGazon or anyone else intentionally discriminated against him on the basis of his race or national origin.  The evidence regarding the June 2004 reduction in force and other employees' interactions with DeGazon do not support an inference of a discriminatory motive. Two-thirds of the twenty-eight employees that DeGazon chose to layoff were non-white. Odom. Decl. ¶ 17.  None were re-employed by the Department. Id. ¶ 18.  Additionally, non-white employees also complained about DeGazon's conduct.  Jesse Kilpatrick, a black American supervisor, KG Decl., Ex. B., at 155, complained to Odom that Pineda and DeGazon "had favorites in the Department, though he did not specifically identify who those 'favorites' were"

---

[33] See, e.g., cases finding that poof of friendship is insufficient - Tappe v. Alliance Capital Mgmt. L.P., 177 F. Supp. 2d 176, 185 n.9 (S.D.N.Y. 2001); Harris v. N. Y. City Dep't of Homeless Servs. Eligibility Investigation Unit, 1998 U.S. Dist. LEXIS 5865, at *24-26 (S.D.N.Y. Apr. 28, 1998); Rivera v. National Westminster Bank, 801 F. Supp. 1123, 1133 n.13 (S.D.N.Y. 1992); Scaria v. Rubin, 1996 U.S. Dist. LEXIS 9659, at *32 (S.D.N.Y. July 11, 1996), aff'd, 117 F.3d 652 (2d Cir. 1997).

and "did not say that he saw or suffered any race or national origin discrimination in the

Department." Odom. Decl. ¶ 7.

Having failed to produce any evidence that could demonstrate pretext for race or national

origin discrimination, Plaintiff cannot, as a matter of law, prevail on his unlawful termination

claim. Defendants are thus entitled to summary judgment on the unlawful termination claim.

## B.    UNLAWFUL RETALIATION

The burden-shifting framework set forth by McDonnell Douglas also applies to unlawful

retaliation claims. See Stratton v. Dep't for the Aging for the City of New York, 132 F.3d 869,

879 (2d Cir. 1997). "[T]he plaintiff must first present sufficient evidence to make out a prima

facie case, that is, evidence sufficient to permit a rational trier of fact to find": "[1] that she

'engaged in protected participation or opposition under Title VII, [2] that the employer was

aware of this activity, [3] that the employer took adverse action against the plaintiff, and [4] that

a causal connection exists between the protected activity and the adverse action, i.e., that a

retaliatory motive played a part in the adverse employment action.'" Cifra v. GE, 252 F.3d 205,

216 (2d Cir. 2001) (quoting Sumner v. United States Postal Service, 899 F.2d 203, 208-09 (2d

Cir. 1990)). "[T]he burden of production shifts to the defendant to proffer a legitimate

non-retaliatory reason for the adverse employment action." Kaytor v. Elec. Boat Corp., 609 F.3d

537, 552-53 (2d Cir. 2010) (citation omitted). "If the employer produces such evidence, the

employee must, in order to avoid summary judgment, point to evidence sufficient to permit an

inference that the employer's proffered non-retaliatory reason is pretextual and that retaliation

was a substantial reason for the adverse employment action." Id. at 553 (internal quotation

marks omitted).

Plaintiff has failed to produce sufficient evidence to demonstrate that he engaged in a

protected activity and that NYUHC had knowledge of the protected activity.   A "protected

activity" includes "the filing of formal charges of discrimination" as well as "informal protests

of discriminatory employment practices, including making complaints to management, writing

critical letters to customers, protesting against discrimination by industry or by society in

general, and expressing support of co-workers who have filed formal charges." Sumner v.

United States Postal Service, 899 F.2d 203, 209 (2d Cir. 1990).   "Complaints about conduct

clearly prohibited by the statute need not mention discrimination or use particular language."

Int'l Healthcare Exch., Inc. v. Global Healthcare Exch., LLC, 470 F. Supp. 2d 345, 357

(S.D.N.Y. 2007) (citing Ramos v. City of New York, 1997 U.S. Dist. LEXIS 10538, at *7)

(S.D.N.Y. July 22, 1997) (no "magic words" must be used)).   "However, ambiguous complaints

that do not make the employer aware of alleged discriminatory misconduct do not constitute

protected activity." Id. (citing Ramos, 1997 U.S. Dist. LEXIS 10538, at *7 ("[T]he complaint

must put the employer on notice that . . . discrimination is occurring."); citation omitted).

   Plaintiff claims that "in April 2004, [he] complained to NYU's Human Resources

Department that Mr. DeGazon was discriminating based on race, color and national origin, and

in fact, was according favorable treatment to Robert Stephen, a Supervisor in the Department,

with respect to terms, conditions and privileges of employment and employment opportunities."

Complaint ¶ 23.   However, neither Plaintiff's deposition testimony,[34] nor any other evidence in

---

[34] Plaintiff testified that he voiced concerns about DeGazon undermining the Department
and his authority over the supervisors. KG Decl., Ex. B., at 49. He admitted he did not say
his race was the reason, but rather said the unfair treatment was due to "favoritism." KG Decl.,
Ex. B., at 49-50. Plaintiff also testified that he specifically mentioned Stephen, saying that "he
was receiving preferential treatment from Mr. DeGazon because he was from St. Lucia, because
they were both from St. Luica." KG Decl., Ex. B., at 53-54. Plaintiff testified that he provided
Odom with examples, such as (1) "being overly friendly" with Stephen and not being
"concerned with how we were doing or trying to assist us in any kind of way" during daily

the record, supports such a characterization of his complaint. There is no admissible evidence

suggesting that Plaintiff complained to Odom that he was being treated differently by DeGazon

because of his race or national origin. Merely referencing the fact that DeGazon and Stephen

were of the same national origin was not "sufficiently specific terms" to provide notice that

Plaintiff believed he was being discriminated against. Brummell v. Webster Cent. Sch. Dist.,

2009 U.S. Dist. LEXIS 7644, at *17-18 (W.D.N.Y. Jan. 29, 2009). No reasonable jury could

conclude that Plaintiff complained about any treatment beyond unfair treatment generally. See

Aspilaire v. Wyeth Pharm., Inc., 612 F. Supp. 2d 289, 308 (S.D.N.Y. 2009) ("[M]ere complaints

of unfair treatment by an individual are not protected speech because unfair treatment by an

employer does not implicate a public interest concern.") (citing Ezekwo v. New York City

Health & Hosps. Corp., 940 F.2d 775, 781 (2d Cir. 1991)). He never disclosed his belief that he

was the victim of unlawful discrimination. Id. at 308-09 (S.D.N.Y. 2009) ("The onus is on the

speaker to clarify to the employer that he is complaining of unfair treatment due to his

membership in a protected class and that he is not complaining merely of unfair treatment

generally."). He also never clarified that he believed the unfair treatment was due to his

membership in a protected class.[35] [36]  Id.  Therefore, Plaintiff has not established a prima facie

---

check-ins; and (2) his perception that there was a "double standard" because he knew of Stephen
having problems and complaints but "Stephen never received a reprimand" or "had to make any
improvements" "to [his] knowledge." KG Decl., Ex. B., at 54.

[35] Although not dispositive of the issue of employer knowledge, it is important to note
that Defendants have proffered undisputed evidence that Odom did not understand Plaintiff to be
complaining about unlawful discrimination. See Odom Decl. ¶¶ 6, 9; KG Decl., Ex. H, at 58-61.
"[I]mplicit in the requirement that the employer have been aware of the protected activity is the
requirement that it understood, or could reasonably have understood, that the plaintiff's
opposition was directed at conduct prohibited by Title VII." Galdieri-Ambrosini v. National
Realty & Dev. Corp., 136 F.3d 276, 292 (2d Cir. 1998).

[36] See, e.g., Rommage v. MTA Long Island Rail Rd., 2010 U.S. Dist. LEXIS 104882, at
*42-43 (E.D.N.Y. Sept. 30, 2010) (rejecting the argument that "it was clear that the complaint

case for retaliation.  Defendants are entitled to summary judgment on the retaliation claims.

## STATE & CITY CLAIMS[37]

Courts in the Second Circuit "review discrimination claims brought under the NYSHRL [] according to the same standards that . . . apply to Title VII discrimination claims." Pucino v. Verizon Communs., Inc., 618 F.3d 112, 117 (2d Cir. N.Y. 2010) (citing Cruz v. Coach Stores, Inc., 202 F.3d 560, 565 n.1 (2d Cir. 2000)).  Thus, for the reasons stated for granting summary judgment of the Title VII and § 1981 claims for discrimination based on race and national origin, Plaintiff's claims under the NYSHRL are dismissed.

NYCHRL claims must be given an independent liberal construction from Title VII and section 1981 claims.  See Kolenovic v. ABM Industries Inc., 361 Fed. App'x 246 (2d Cir. Jan. 21, 2010) (citing Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 278 (2d Cir. 2009); other citations omitted); Williams v. New York City Housing Authority, 872 N.Y.S.2d 27 (N.Y. App. Div. 2009) (trial court's "decision dismissing the action failed, however, to properly construe plaintiff's claims under the local Restoration Act, which mandates that courts be sensitive to the distinctive language, purposes, and method of analysis required by the City HRL, requiring an analysis more stringent than that called for under either Title VII or the State HRL").  Yet, even

---

was about race and gender because 'plaintiff was an African-American woman complaint about behavior of a Caucasian man'"); Aspilaire, 612 F. Supp. 2d at 310 ("[E]ven assuming that only African Americans met with Wilkinson to complain about scheduling and work assignments, the mere fact that the group making the complaints was African American will not convert an ordinary complaint into a complaint of racial discrimination sufficient to put the employer on notice of such discrimination, as is the purpose of the speech protections under Title VII.").

[37] "Once a district court's discretion is triggered under § 1367(c)(3), it balances the traditional 'values of judicial economy, convenience, fairness, and comity' in deciding whether to exercise jurisdiction." Kolari v. New York-Presbyterian Hosp., 455 F.3d 118, 122 (2d Cir. 2006) (quoting Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 (1988)); see also 28 U.S.C. § 1367(c)(3).  Here, exercising supplemental jurisdiction is appropriate because unsupported conclusory allegations such as those alleged by Plaintiff are necessarily insufficient to withstand dismissal under the NYHRL and NYCHRL.

under the NYCHRL's more liberal standard, Plaintiff has still failed to frame any genuine issue of fact as to race or national origin discrimination.  Defendants have "prove[n] that the alleged discriminatory conduct in question does not represent a 'borderline' situation but one that could only be reasonably interpreted by a trier of fact as representing no more than petty slights or trivial inconveniences."  Williams, 872 N.Y.S.2d at 41.  Therefore, Plaintiff's claims under the NYCHRL are dismissed.

## CONCLUSION

Defendants' motion for summary judgment is GRANTED.   Defendants' motion for leave to amend the answer is denied as moot.


Dated: New York, New York
         March 4, 2011


SO ORDERED:

GEORGE B. DANIELS
United States District Judge

31